## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x

*In re:*      :      **Chapter 11**

     :

**AMERICAN GILSONITE**      :      **Case No. 16–** _____ (    )

**COMPANY,** *et al.,*      :

     :

         **Debtors.**[1]      :      **(Joint Administration Requested)**

---------------------------------------------------------- x

### DECLARATION OF STEVEN A. GRANDA IN SUPPORT OF
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY RELIEF

I, Steven A. Granda, make this declaration under 28 U.S.C. § 1746:

1.     I am the Vice President and Chief Financial Officer ("**CFO**") of American Gilsonite Company ("**AGC**"), a wholly-owned subsidiary of American Gilsonite Holding Company ("**AGHC**"). The remaining Debtors are all wholly-owned direct or indirect subsidiaries of AGC (collectively, with AGC and AGHC, the "**Debtors**," "**American Gilsonite**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.     I am a Certified Public Accountant and earned a Bachelor's of Business Administration Degree in Accounting from Texas A&M University. I have served as Vice President and CFO of AGC since November 2015. I previously served as chief financial officer of other companies since 2009. I have over 25 years of experience in the energy sector, utilities, mining, oilfield services, public accounting, and other service industries. As CFO of AGC, I report to AGC's Board of Directors and Chief Executive Officer.

3.     On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: American Gilsonite Holding Company (2164), American Gilsonite Company (1788), DPC Products, Inc. (7329), Lexco Acquisition Corp. (9699), and Lexco Holding, LLC (9699). The Debtors' mailing address is 16200 Park Row Drive, Suite 250, Houston, Texas 77084.

Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with American Gilsonite's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of the Chapter 11 Cases.  I submit this declaration (the "**Declaration**") in support of the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      To minimize the adverse effects on their businesses, the Debtors have filed motions and pleadings on the Commencement Date seeking various types of "first-day" relief (collectively, the "**First-Day Motions**").  The First-Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.

5.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, discussions with other members of the Debtors' senior management and the Debtors' advisors, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning American Gilsonite's operations and business.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      This Declaration is organized into five sections.  Section I provides an overview of the Chapter 11 Cases.  Section II describes American Gilsonite's business.  Section III describes the circumstances that led to the commencement of the Chapter 11 Cases.  Section IV describes American Gilsonite's corporate and capital structure.  Section V provides a summary of the First-Day Motions and factual bases for the relief requested therein.

# I.
## Overview[2]

7.    <u>Prepackaged Plan</u>.  The Debtors are pleased to appear before the Court after commencing the solicitation of votes on their prepackaged chapter 11 plan[3] from their Second Lien Noteholders and holders of AGHC Interests, the only classes of claims and interests entitled to vote on the Prepackaged Plan.  I have been advised that the Prepackaged Plan has already received acceptances by the Second Lien Noteholders holding more than sixty-seven percent (67%) in dollar amount of all Second Lien Notes and by holders of AGHC Interests holding 100% in amount of all issued AGHC Interests.

8.    The Prepackaged Plan provides for a substantial reduction of approximately $160 million of the Company's existing indebtedness and an annual cash debt service reduction of approximately $27 million in 2017 upon the completion of the restructuring embodied in the Prepackaged Plan (the "**Restructuring**").  The Prepackaged Plan and the commencement of these Chapter 11 Cases are milestone achievements that will benefit the Company and all of its stakeholders.  The Restructuring will substantially de-lever the Company's balance sheet and set American Gilsonite on a path to emerge from bankruptcy as a leaner, healthier enterprise that is better positioned to withstand currently depressed oil and natural gas prices and achieve long-term sustainability and growth.

9.    The Restructuring only impairs the Second Lien Noteholders and holders of AGHC Interests.  More specifically, pursuant to the Prepackaged Plan, as contemplated by the

---

[2] Capitalized terms used in this overview section but not otherwise defined herein shall have the respective meanings ascribed to them below.

[3] *See Joint Prepackaged Chapter 11 Plan of Reorganization of American Gilsonite Company and Its Affiliated Debtors* (the "**Prepackaged Plan**") and *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of American Gilsonite Company and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**"), each filed contemporaneously herewith.  Capitalized terms used but not defined in this Declaration shall have the meaning ascribed to them in the Prepackaged Plan.

RLF1 15532199V.1

Restructuring Support Agreement, the Debtors and the Consenting RSA Parties have agreed to a

reorganization transaction that provides for the following:

- certain Second Lien Noteholders will provide a $30 million debtor in possession financing facility that will be used, subject to Court approval, to pay the existing Prepetition Credit Agreement and provide the Debtors with an additional $7.5 million of liquidity, with the entire principal portion of the DIP Loans converting to an exit term loan upon emergence from bankruptcy;

- the Second Lien Notes will be canceled and, in exchange, Second Lien Noteholders will receive (i) 98% of the new equity of Reorganized AGC and (ii) $100 million in Subordinated Notes on a pro rata basis;

- all General Unsecured Claims will be unimpaired and treated in the ordinary course of business; and

- holders of AGHC Interests will receive 2% of the new equity interests in Reorganized AGC.

10.    The effect of the Restructuring on the Company's capital structure is

summarized as follows:

| Prepetition | During Chapter 11 Cases | Effective Date |
|---|---|---|
| | DIP Facility - $30M Term Loan | $30M Exit Facility (Secured)[4] |
| $20M Drawn Under Prepetition Credit Agreement with KeyBank | Paid in cash in full upon interim approval of DIP Facility | |
| $270M Second Lien Notes | $270M Second Lien Notes | 98% of New Common Stock $100M of Subordinated Notes |
| **Total Debt = $290M (All Secured)** | **Total Debt = $300M (All Secured)** | **Total Debt = $130M $30M Secured $100M Unsecured** |
| General Unsecured Claims | Paid in the ordinary course | Unimpaired |
| AGHC Interests | | 2% of new equity of Reorganized AGC |

11.    <u>Restructuring Support Agreement</u>.    The Restructuring is the result of

several months of good faith arm's length negotiations among the Debtors and the holders of

---

[4] The Exit Facility includes a senior secured debt basket of $20 million.

more than 67% of the outstanding principal amount of AGC's 11.5% Second Lien Notes due 2017 (collectively, the "**Consenting Second Lien Noteholders**," who organized into an ad hoc group, the "**Ad Hoc Group**") and the Company's prepetition equity sponsor, which owns or controls one hundred percent (100%) of the equity interests in AGHC (the "**Consenting AGHC Interest Holders**").   On October 19, 2016, the Debtors executed a restructuring support agreement (the "**Restructuring Support Agreement**" or "**RSA**"), attached as **<u>Exhibit A</u>** to the Disclosure Statement, with the Ad Hoc Group and Consenting AGHC Interest Holders (together, the "**Consenting RSA Parties**"), pursuant to which such Ad Hoc Group members and Consenting AGHC Interest Holders agreed to vote in favor of and support confirmation of the Prepackaged Plan.

12.    <u>DIP Financing</u>.  In addition, the Ad Hoc Group is providing postpetition debtor-in-possession financing ("**DIP Financing**") to the Debtors in the amount of $30 million (the "**DIP Facility**"), which will be used, subject to Court approval, to pay in full the Company's outstanding obligations of approximately $20 million under its prepetition secured revolver and to support the Company's working capital needs during and after the Chapter 11 Cases.  Upon emergence from bankruptcy, all principal borrowings under the DIP Facility will be converted into a senior secured exit facility and leave an estimated $9.8[5] million (assuming a December 31, 2016 emergence date) of cash and cash equivalents on the Company's balance sheet to maintain operations, and satisfy obligations in the ordinary course of business.   All Second Lien Noteholders will be offered the opportunity to participate in the DIP Facility on a pro rata basis, but the Ad Hoc Group members have agreed to backstop the entire amount of the DIP Facility.

---

[5] Estimated cash figure is updated relative to Disclosure Statement estimates for actual cash flow performance prior to filing.

In exchange for agreeing to backstop the DIP Facility, the members of the Ad Hoc Group will receive a fee of 3.5% of the total principal amount borrowed under the DIP Facility.

13.    Proposed Timeline.    The Debtors believe that, to be successful, the Chapter 11 Cases must proceed in the most expeditious manner permitted by the Bankruptcy Code.  The terms of the RSA reflect that belief.  Among other milestones contained in the RSA is a deadline for entry of an order by the Bankruptcy Court approving the Disclosure Statement and solicitation procedures and confirming the Prepackaged Plan within fifty-five (55) calendar days after the Commencement Date.  To meet this deadline, the Debtors have proposed the following timeline for the Chapter 11 Cases (subject to the Court's calendar):

| Proposed Timeline | |
| --- | --- |
| Commencement Date | October 24, 2016 |
| Plan Supplement Deadline | November 9, 2016 |
| Complete Solicitation | November 16, 2016 |
| Plan Objection Deadline | November 29, 2016 |
| Combined Disclosure Statement and Plan Hearing | December 7, 2016 |

14.    The Debtors believe that an expedited Chapter 11 Case is essential to the preservation of the value of their assets and estates.  The Company's stakeholders have supported American Gilsonite's business leading up to the filing in anticipation of a balance sheet restructuring that does not adversely impact the Company's operations or its trade vendors, employees, or mining lease counterparties.  To ensure that result, the Debtors negotiated a favorable transaction with the Consenting RSA Parties.  In exchange for that consideration, the Consenting RSA Parties have insisted that chapter 11 costs be minimized and that the transaction be effectuated promptly to avoid delay, disruption to operations, and degradation of value.

RLF1 15532199V.1

15.     Due, in large part, to these negotiations and the contributions of the Consenting RSA Parties, the Debtors are before the Court with the Prepackaged Plan.  This marks the end of the most critical and complex task required for a successful reorganization: the negotiation and formulation of a chapter 11 plan of reorganization.  The Debtors respectfully request to progress expeditiously toward confirmation of the Prepackaged Plan and emergence from chapter 11 as a stronger, more competitive business.

## II.
## Debtors' Businesses

16.     American Gilsonite is the world's principal commercial miner and processor of uintaite, a unique mineral which is marketed under its trademarked name "Gilsonite."  Gilsonite is a nonhazardous, naturally occurring hydrocarbon resin that has only been found in economically viable quantities in northeastern Utah, where the Company controls the largest known reserves.  The Company holds mineral rights to approximately 11,191 acres containing approximately 7 million tons of Gilsonite reserves located exclusively in northeastern Utah.  The Company holds its Gilsonite reserves through directly-owned mineral rights and lease interests.

17.     Gilsonite is primarily used in oil and gas well drilling muds, oil and gas well cements, asphalts, printing inks, foundry sands, building materials, paints, and protective coatings.  Gilsonite's unique physical and chemical properties, including low specific gravity, its tendency to soften and smear at high-temperatures, and its superior binding properties, make it an important component in many highly manufactured products.

18.     The Company serves a diversified, global customer base with an average tenure of 15 years among its top ten customers.  The Company's four core markets include: (i) oil and gas, (ii) inks and paints, (iii) foundry, and (iv) asphalt.  In the oil and gas industry,

RLF1 15532199V.1

customers use Gilsonite to plug micro-pores in wellbores, to lower torque, and to minimize stuck pipe.  With respect to inks and paints, Gilsonite is the only natural additive that can be used to make high quality, no-rub inks.  In addition, Gilsonite has advanced lithographic and gravure printing properties that customers use in publication and in paint and coatings production. Customers in the foundry industry use Gilsonite because it imparts a smoother casting surface and finish in sand casting, and improves mold release and the overall finish of iron casting. Finally, for asphalt products, Gilsonite is easier to use and provides enhanced binding characteristics and long-term durability.

**III.**
**Circumstances Leading to Chapter 11 Cases**

19.     As stated, the Debtors are filing the Chapter 11 Cases to implement a Prepackaged Plan that provides for a comprehensive balance sheet restructuring of the Second Lien Notes with the consent of certain Second Lien Noteholders, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of the Debtors' employees.

A.     **Collapse in Oil Prices**

20.     The Company's business benefits from strong operating margins and low capital requirements.  The Company also enjoys a significant market share for its product. Recently, however, the prices of crude oil and natural gas have declined dramatically, having reached multiyear lows, as a result of robust non-Organization of the Petroleum Exporting Countries' ("**OPEC**") supply growth led by unconventional production in the United States, weakening demand in emerging markets, and OPEC's decision to continue to produce at high levels.  The Company derives the majority of its revenue from sales to companies in the oil and gas services industry (oil and gas drilling products have historically represented 75% of the

company's revenues, prior to the downturn in oil and gas prices). Demand for oil and gas drilling products has diminished commensurate with the drop in oil and gas prices. Therefore, the Company's earnings have diminished substantially due to reduced demand for its oil and gas drilling products.

21.     For the six months ended June 30, 2016, the Company's net sales were approximately $15.6 million. This represents a 39% decrease from its net sales for the same period a year prior. The Company's declining revenues have impacted its ability to service its long-term debt obligations.

22.     Based on current market conditions, the Debtors believe that a reduction in their long-term debt and cash interest obligations is needed to improve their financial position and flexibility. In 2016, the Debtors attempted to manage their reduced financial position through several cost-cutting measures, including the implementation of employee rationalization programs, an aggressive inventory reduction program, as well as taking measures to decrease the Company's overhead expense burden. In total, the Debtors were able to lower their annualized cash expenditures by approximately $2.5 million.

23.     Ultimately, however, those efforts proved insufficient to address the pressures on the Company's liquidity resulting from its amount of debt.

B.     **Prepetition Negotiations and Restructuring Support Agreement**

24.     In February 2016, the Company appointed two independent directors, Alan Miller and Alan Carr, to its board of directors. Commencing in June 2016, the Company began working closely with its advisors, Weil, Gotshal & Manges LLP ("**Weil**"), as counsel, Evercore Group LLC ("**Evercore**"), as financial advisor, and FTI Consulting, Inc. ("**FTI**"), as restructuring advisor, to develop and implement a comprehensive restructuring strategy. In that connection, a subset of the board worked closely with management and the Company's advisors

to explore and evaluate the various strategic alternatives that were available to the Company. After evaluation and some market outreach, it became clear that a sale or refinancing transaction that would generate proceeds exceeding the existing secured indebtedness of the Company was unlikely and a more comprehensive restructuring was needed.

25.     The Company thereafter began discussions with its largest Second Lien Noteholders, who organized into the Ad Hoc Group.  Soon after formation, the Ad Hoc Group retained its own advisors, Stroock & Stroock & Lavan LLP ("**Stroock**"), as legal advisor, and Houlihan Lokey Capital, Inc. ("**Houlihan**"), as financial advisor.  The Company also initiated discussions with KeyBank National Association ("**KeyBank**"), administrative agent under the Prepetition Credit Agreement, to determine their interest in continuing under a new capital structure.

26.     During the next several weeks, the Ad Hoc Group and KeyBank engaged in confidential due diligence with the assistance of the Company and its advisors.  The parties had constructive discussions and dialogue regarding potential capital structures and tax strategies that were being considered by the Company.

27.     Ultimately, the Company determined, in the exercise of its business judgment and as fiduciaries for all of the Debtors' stakeholders, that the best and only viable path to maximize the value of American Gilsonite's business and preserve many jobs was a strategic chapter 11 filing to implement the Prepackaged Plan, which equitizes the Company's Second Lien Notes and significantly de-levers its balance sheet.  Accordingly, the parties focused on negotiating a fair and value-maximizing deleveraging transaction.

28.     To allow discussions to continue and preserve liquidity, on September 1, 2016, the Company elected to exercise a 30-day grace period and not make its semi-annual

interest payment on the Second Lien Notes of approximately $15.5 million.  The grace period expired on October 1, 2016 and the failure to make the interest payment constituted an event of default under the Second Lien Notes Indenture and a cross-default under the Prepetition Credit Agreement.  On September 30, 2016, the Company entered into forbearance agreements with KeyBank and the Ad Hoc Group, pursuant to which each of KeyBank and the Ad Hoc Group agreed to forbear from exercising remedies under the Prepetition Credit Agreement and Second Lien Notes Indenture, respectively, arising from the defaults specified therein.  Such forbearance agreements are subject to termination on October 25, 2016.

29.    After good faith and arm's length negotiations, on October 19, 2016, the Debtors, the Ad Hoc Group, and the Consenting AGHC Interest Holders agreed on the terms of a financial restructuring that is embodied in the Prepackaged Plan and described herein, and executed the Restructuring Support Agreement.

30.    Under the Restructuring Support Agreement, each of the Consenting RSA Parties has agreed to, among other things: (i) vote any Claim or Interests it holds against, or in, the Debtors to accept the Prepackaged Plan and not (a) change or withdraw (or cause to be changed or withdrawn) its vote to accept the Prepackaged Plan, (b) object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Prepackaged Plan, or (c) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of, or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for any of the Debtors other than the Prepackaged Plan; (ii) subject to certain exceptions, condition any transfer of its Claims against, or Interests in, the Debtors to the transferee thereof being an existing Consenting RSA Party or becoming party to the Restructuring Support Agreement; and (iii) to the extent any Consenting RSA Party acquires any additional Claims against, or Interests

in, the Debtors, vote any such additional Claims or other Claims or Interests entitled to vote on the Prepackaged Plan in a manner consistent with the Restructuring Support Agreement, in each case, subject to the terms and conditions of the Restructuring Support Agreement.

31.     In exchange, the Debtors agreed to, among other things, (i) commence the Chapter 11 Cases, (ii) prosecute the Prepackaged Plan and Disclosure Statement, and (iii) continue their operations in the ordinary course until the Restructuring is consummated and not take various actions related to the business, in each case subject to the terms and conditions of the Restructuring Support Agreement.

32.     The Restructuring Support Agreement also provides for various termination events.  Depending on the termination event, the Requisite Noteholders under the Restructuring Support Agreement or the Debtors may terminate the Restructuring Support Agreement, such as if certain milestones in the Chapter 11 Cases are not met, including, among other things, with respect to the confirmation and effective date of the Prepackaged Plan.

33.     The Debtors believe that the deleveraging transaction contemplated by the Restructuring Support Agreement and the Prepackaged Plan is the best approach for relieving American Gilsonite from the constraints that currently restrict its profitability.  The proposed transaction will allow American Gilsonite to focus on stabilizing the business and reaching profitability rather than on managing burdensome debt and debt service payments.  Most importantly, American Gilsonite will have the capital needed to invest in its business and preserve jobs.

C.     Solicitation

34.     On October 20, 2016, the Debtors' voting agent, Epiq Bankruptcy Solutions, LLC (the "**Voting Agent**" or "**Epiq**"), commenced solicitation on the Prepackaged Plan on behalf of the Debtors.  The Debtors have already received votes to accept the

Prepackaged Plan from Second Lien Noteholders collectively holding more than sixty-seven percent (67%) in amount of all outstanding Second Lien Notes and one-hundred percent (100%) of the holders of AGHC Interests.  The voting deadline is 5:00 pm (Prevailing Eastern Time) on November 16, 2016.

**IV.**
**<u>Corporate and Capital Structure</u>**

      A.      **Corporate Structure**

      35.      The Debtors consist of five (5) entities organized in Delaware, Oklahoma, and Utah.  AGC was organized as a corporation under the laws of the State of Oklahoma on October 18, 1988.  AGC is a wholly-owned subsidiary of AGHC, a corporation organized under the laws of Delaware.  DPC Products, Inc. is a wholly-owned subsidiary of AGC that was organized as a corporation under the laws of the State of Delaware on June 6, 2002.  Lexco Acquisition Corp. is a wholly-owned subsidiary of AGC that was organized under the laws of the State of Delaware on July 20, 2009.  Lexco Holdings, LLC is a wholly-owned subsidiary of Lexco Acquisition Corp. and is a limited liability company that was organized under the laws of the state of Utah.  The following chart illustrates AGC's corporate structure, as of the date hereof:

RLF1 15532199V.1



**B.      Capital Structure**

(1)      *Prepetition Indebtedness*

36.      As of the date hereof, the Debtors have outstanding secured debt obligations in the aggregate principal amount of approximately $290 million, which amount consists of (i) approximately $20 million in secured borrowings under the Debtors' Prepetition Credit Agreement (as described below), and (ii) approximately $270 million in principal amount of Second Lien Notes (as described below), plus accrued and unpaid interest, fees, and other expenses.

(i)      <u>Prepetition Credit Agreement</u>

37.      AGC, as borrower, and each of the other Debtors, as guarantors, are parties to that certain Credit and Guaranty Agreement, dated as of August 28, 2012 (as amended, restated, modified, or supplemented from time to time, the "**Prepetition Credit Agreement**"),

with KeyBank.  The First Lien Credit Agreement matures on May 28, 2017.  As of the date hereof, the aggregate principal amount outstanding under the Prepetition Credit Agreement is approximately $20 million, plus any applicable interest, fees, and other amounts.

38.     Pursuant to the Prepetition Credit Agreement, each of the Debtors granted a first-priority lien on substantially all of their assets in order to secure Prepetition Credit Agreement (the "**Prepetition First Lien Collateral**"), in favor of KeyBank.

(ii)     Second Lien Notes

39.     The Debtors are party to that certain indenture (as amended, modified, or otherwise supplemented from time to time, the "**Second Lien Notes Indenture**"), dated as of August 28, 2012, by and among AGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as trustee and collateral agent (the "**Second Lien Trustee**"), pursuant to which AGC issued 11.5% Senior Secured Notes due 2017 in the aggregate principal amount of $260 million (the "**Initial Second Lien Notes**").  The Initial Second Lien Notes mature on September 1, 2017.  On September 24, 2012, AGC issued additional Second Lien Notes (the "**Additional Second Lien Notes**" and, collectively with the Initial Second Lien Notes, the "**Second Lien Notes**") pursuant to the Second Lien Notes Indenture, in the aggregate principal amount of $10 million.  The Additional Second Lien Notes are identical to and are treated together with the Initial Second Lien Notes as a single class of debt securities under the Second Lien Indenture.  Pursuant to that certain Second Lien Security and Pledge Agreement, dated as of August 28, 2012 (as amended, modified, or supplemented from time to time, including, without limitation, the "**Second Lien Security Agreement**"), the Second Lien Notes are secured by second-priority liens on the Prepetition Collateral (subject only to the liens of KeyBank).  The Second Lien Notes are jointly and severally and fully and unconditionally guaranteed by all of the Debtors.  As of the date hereof, the aggregate amount

outstanding under the Second Lien Notes is approximately $270 million in principal amount, plus unpaid principal, interest, fees, and other amounts due thereunder.

(iii)    <u>Intercreditor Agreement</u>

40.    The Debtors, KeyBank, as the administrative agent under the Prepetition Credit Agreement, and the Second Lien Trustee, on behalf of the Second Lien Noteholders, are parties to an Intercreditor Agreement, dated as of August 28, 2012, between the Debtors, KeyBank, and the Second Lien Trustee (as amended, modified, or supplemented from time to time, the "**Intercreditor Agreement**").   Pursuant to the Intercreditor Agreement, the Second Lien Trustee, on behalf of the Second Lien Noteholders, agreed, among other things and subject to the terms thereof, that the security interests and liens granted by the Debtors in favor of the Second Lien Trustee to secure the Debtors' obligations under the Second Lien Notes shall be junior to the security interest and liens granted in favor of KeyBank to secure the Debtors' obligations under the Prepetition Credit Agreement.

(iv)    <u>Trade Claims</u>

41.    In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (the "**Trade Claims**") to various third-party providers of goods and services (the "**Trade Creditors**") that facilitate the Debtors' business operations.   As of the date hereof, the Debtors estimate that the aggregate amount of Trade Claims outstanding is approximately $500,000.   A majority of the Debtors' General Unsecured Claims are Trade Claims.   Certain of the Trade Claims may be entitled to statutory priority, such as under section 503(b)(9) of the Bankruptcy Code, or may give rise to shippers, warehouseman, or mechanics liens against the Debtors' property if unpaid (collectively, the "**Priority Trade Claims**").   Excluding the likely Priority Trade Claims, the Debtors estimate that the total Trade Claims equal approximately $240,000 (the "**Non-Priority Trade Claims**").

(2)     *Equity Ownership*

42.     AGHC is a privately held company.   As of the Commencement Date, AGC (Delaware), LP, a subsidiary of Palladium Equity Partners III, LP and Palladium Equity Partners III, LLC ("**PEP III, LLC**"), holds approximately 98% of the existing equity in AGHC (the "**AGHC Interests**").  The remaining approximately 2% of the AGHC Interests is owned by AGC/PEP LLC, which is jointly owned by PEP III, LLC (0.0001%) and Prospect Capital Corporation (99.9999%).   The remaining Debtors are all wholly-owned direct or indirect subsidiaries of AGHC.

## V.
## First-Day Motions

43.     The Debtors intend to continue to operate their business in the ordinary course during the pendency of the Chapter 11 Cases as they had prior to the Commencement Date.  It is imperative that the Debtors make a seamless transition into chapter 11 to preserve the reputation of their business and minimize any disruptions to the Debtors' operations.  Sales and operations must continue in the ordinary course of business to preserve the value of the business and implement the reorganization transaction.

44.     Accordingly, the Debtors have filed the First-Day Motions to facilitate their transition into the Chapter 11 Cases.  The First-Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First-Day Motion and believe that the relief sought in each First-Day Motion is necessary and critical to the Debtors' ability to execute the Prepackaged Plan and will enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of

the Debtors, and best serves the Debtors' estates and creditors' interests.  I adopt and affirm the factual representations set forth in each of the First-Day Motions.

45.    The Debtors anticipate that the Court will conduct a hearing soon after the Commencement Date at which the Court will hear and consider many of the First-Day Motions.[6] A description of the relief requested and the facts supporting each of the pleadings is set forth below.

**A.    Administrative Motions**

(i)    Motion of Debtors to (A) Schedule Combined Hearing on (I) Adequacy of Disclosure Statement and Solicitation Procedures and (II) Confirmation of Prepackaged Plan; (B) Establish Procedures for Objecting to Disclosure Statement, Solicitation Procedures, and Prepackaged Plan; (C) Approve Form, Manner, and Sufficiency of Notice of Combined Hearing and Commencement of Chapter 11 Cases; (D) Extending Time, and Upon Plan Confirmation, Waiving of Requirements to (I) Convene Section 341 Meeting and (II) File Statement of Financial Affairs and Schedules of Assets and Liabilities; and (E) Grant Related Relief

46.    The Debtors request that the Court enter an order (i) setting a combined hearing to (a) approve the Disclosure Statement, Solicitation Procedures, and confirm the Prepackaged Plan; and (b) approve objection procedures and deadlines in connection with the Prepackaged Plan and Disclosure Statement.  The Debtors also seek (i) deferral of the Section 341 Meeting of creditors unless the Prepackaged Plan is not confirmed by the Deadline (approximately sixty (60) days after the Commencement Date) and (ii) approval of the combined notice of (a) commencement of the Chapter 11 Cases, (b) deferral of the Section 341 Meeting, and (c) scheduling of the combined hearing of the Prepackaged Plan and Disclosure Statement and related deadlines.

---

[6] Capitalized terms used below in the descriptions of the First-Day Motions and not otherwise defined have the meanings given to them in the applicable First-Day Motion.

47.    The holders of Second Lien Notes Claims (Class 3) and AGHC Interests (Class 6) are the only classes of claims and interests entitled to vote on the Prepackaged Plan. Accordingly, on October 20, 2016, following execution of the RSA, Epiq transmitted a Solicitation Package (defined below) to holders of Class 3 Claims and Class 6 Interests. The Solicitation Package included: ballots containing instructions on how to vote on the Prepackaged Plan, copies of the Disclosure Statement, and the exhibits to the Disclosure Statement, which included the Prepackaged Plan, Restructuring Support Agreement, DIP Commitment Letter and DIP Term Sheet, MIP Term Sheet, Subordinated Debt Term Sheet, and the Exit Term Sheet (the "**Solicitation Package**"). Epiq transmitted the Solicitation Package to the holders of Class 3 Claims and Class 6 Interests by first-class mail. In addition, the Ad Hoc Group and Consenting AGHC Interest Holders received the Solicitation Package by email. The Debtors have set a voting deadline of November 16, 2016.

48.    I understand from counsel that the Debtors' solicitation of the Prepackaged Plan is in compliance with the Bankruptcy Code and the Bankruptcy Rules. I also believe, based on discussion with counsel, that the proposed service of the Combined Notice will provide sufficient notice to all parties in interest in the Debtors' Chapter 11 Cases of the commencement of such cases, the date, time, and place of the Combined Hearing, and the procedures for objecting to the adequacy of the Disclosure Statement and Solicitation Package, and the confirmation of the Prepackaged Plan (including the release contained therein). Finally, I believe that setting a combined hearing on the Prepackaged Plan and Disclosure Statement, in combination with the aforementioned noticing and solicitation procedures, is necessary to allow the Debtors to prosecute the Chapter 11 Cases in an expeditious manner, thereby minimizing

administrative costs and delays and avoiding operational disruption to the Debtors' business for the benefit of all parties in interest.

        (ii)        Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases

49.        The Debtors request entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, American Gilsonite Company.

50.        Joint administration of the Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases almost certainly will affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will save the Debtors and their estates substantial time and expense because it will remove the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the Region 3 and other parties in interest will similarly benefit from joint administration of the Chapter 11 Cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

        (iii)      Debtors' Application  for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving Retention and Appointment of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent to Debtors, Effective *Nunc Pro Tunc* to Commencement Date

51.        The Debtors request authority to appoint Epiq as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the terms and conditions of that certain Engagement Agreement dated September 12, 2016, by and between the Debtors and Epiq (the "**Services Agreement**"), effective *nunc pro tunc* to the Commencement Date.  Epiq's duties will

include assuming full responsibility for the distribution of notices and other administrative tasks. I believe the Debtors' selection of Epiq to serve as their Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c). Specifically, the Debtors have solicited and reviewed engagement proposals from at least three other Court-approved claims and noticing agents to ensure selection through a competitive process.

52.    I believe that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. The terms of Epiq's retention are set forth in the Services Agreement attached to, and filed contemporaneously therewith, the Claims and Noticing Agent Retention Application. Appointing Epiq as their Claims and Noticing Agent will maximize the efficiency of the distribution of notices and relieve the Office of the Clerk of the Bankruptcy Court of the administrative burdens.

**B.    Operational Motions Requesting Immediate Relief**

53.    The Debtors intend to ask for immediate interim relief with respect to the following First-Day Motions and, therefore, will present these motions at the First-Day Hearing.

(i)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 4001(b)–(c) for Authorization to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule a Final Hearing

54.    To address their working capital needs and fund their reorganization efforts, on the Commencement Date, the Debtors intend to seek Bankruptcy Court approval of an agreement with the Ad Hoc Group for approval of a senior secured super-priority priming DIP Facility in an aggregate principal amount of $30 million, with $22.5 million (inclusive of original issue discount) to be borrowed by the Debtors on an interim basis. The interim amounts provided under the DIP Facility will be used to satisfy all outstanding obligations under the

21

Debtors' Prepetition Credit Agreement with KeyBank, and $7.5 million will be advanced to the Debtors following entry of a final order approving the DIP Facility.  The agreement will also establish the terms under which the Debtors may use Cash Collateral (as defined in the Bankruptcy Code).  The DIP Facility will have an interest rate of LIBOR plus 9% per annum (subject to a LIBOR floor of 1% per annum), with an original issue discount of 4%.  All eligible Second Lien Noteholders will be offered the opportunity to participate as DIP Lenders, in accordance with syndication procedures to be announced.  It is currently anticipated that the record date for purposes of the syndication will be Tuesday, November 1, 2016 (as may be extended or modified by the Ad Hoc Group in their discretion).  In exchange for agreeing to backstop the DIP Facility, the Ad Hoc Group will receive a fee of 3.5% of the principal amount borrowed under the DIP Facility, equaling approximately $1.05 million.  The DIP Facility contains representations, warranties, covenants, conditions, and events of default that are customary for debtor in possession credit facilities.

55.    The Debtors' obligations under the DIP Facility will be secured by a first priority perfected senior priming lien on all pre- and postpetition assets of the Debtors and the Debtors' estates.  The DIP Facility will be entitled to super-priority administrative expense status.

56.    Upon emergence from bankruptcy, all principal borrowings under the DIP Facility will be converted into the Exit Facility, leaving an estimated $9.8 million (assuming a December 31, 2016 emergence date) of cash and cash equivalents on the Company's balance sheet that will allow it to maintain its operations and satisfy its obligations in the ordinary course of business.

57.    I am familiar with the terms of the DIP Facility and the Adequate Protection proposed to be provided by the Debtors in exchange for access to Cash Collateral. The proposed DIP Financing is the linchpin of the Prepackaged Plan.  I believe that interim approval of the DIP Facility is necessary and appropriate to allow the Debtors to pay off their obligations under the Prepetition Credit Agreement and implement a critical initial feature of the Restructuring.  In addition, the interconnected commitments of the Initial DIP Lenders to backstop the DIP Facility and accept the treatment provided in the Prepackaged Plan will allow the Debtors to sufficiently de-lever their business and emerge from bankruptcy better equipped to provide the first-rate goods, services, and business relationships that their customers, employees, vendors, and suppliers have come to expect from the world's preeminent supplier of Gilsonite.

58.    In addition, the Company's business requires access to Cash Collateral and the liquidity under the DIP Facility to function.  The Company's cash-inflows from product sales have diminished due to substantially lower oil and gas prices that have reduced demand for the Company's oil and gas drilling products, which historically represent a majority of its revenues.  Access to the cash collateral and the DIP Facility is essential for the Debtors to assure their employees, customers, vendors, and suppliers that the Company has sufficient working capital to continue its operations in the ordinary course of business during the pendency of these chapter 11 cases.

59.    As explained in the Hannan Declaration, Evercore, on behalf of the Debtors, commenced a process to survey various sources of financing.  In exploring financing options, Evercore was cognizant of the challenges presented by the fact that the Prepetition Liens encumber substantially all of the Debtors' assets.  It was clear that, in order to obtain the

necessary liquidity to administer their chapter 11 cases and execute their reorganization, the Debtors either would have to (i) find a postpetition lender willing to extend credit that would be either unsecured or junior to the Prepetition Liens, or (ii) obtain postpetition financing secured by liens that would prime the Prepetition Liens either with the consent of the Prepetition Lenders or over their objection.

60.     Evercore contacted sixteen (16) financial institutions, in addition to KeyBank and the Ad Hoc Group, to solicit offers to provide the Debtors with financing on a postpetition debtor in possession loan or exit financing basis or both.   In discussions with potential lenders, parties inquired about, among other things, the Debtors' asset base, the scope of the Prepetition Liens, and the loan-to-value resulting from these or other available assets relative to the Debtors' financing needs.   None of the potential lenders whom Evercore contacted were willing to extend financing on any basis – neither on a junior priority nor priming basis. The potential lenders cited the Debtors' exposure to the oil and gas industry, minimal hard assets other than the Debtors' land and reserves, and the relatively small capital-need as reasons for not submitting financing proposals.   As a result, the Debtors' solicitation did not yield any offers from any of the financing institutions that Evercore contacted.   Accordingly, the Debtors focused their financing efforts on securing financing from either KeyBank or the Second Lien Noteholders.

61.     The Debtors received proposals from both KeyBank and the Ad Hoc Group and ultimately concluded that the Ad Hoc Group offered a more favorable option to the Debtors.   KeyBank conditioned its proposal on a full roll-up and on the Debtors agreeing to pay back KeyBank in cash for the full amount borrowed upon the effective date of a plan of reorganization.   Due to their liquidity constraints, the Debtors would need to refinance whatever

RLF1 15532199V.1

postpetition financing ultimately was provided by KeyBank, and would need to receive funding in an amount that would allow the Debtors to fund their operations after exit. In contrast, the Ad Hoc Group offered to provide a postpetition financing that (i) is of sufficient size to provide the Debtors with the required liquidity to meet its operational demands upon emergence, and that (ii) the Debtors can convert into an exit facility pursuant to a plan of reorganization acceptable to the DIP Lenders. KeyBank's proposal also contemplated significant upfront fees, yet provided for a limited term of not more than sixty (60) days. Accordingly, the Debtors determined that the Ad Hoc Group's proposal was more favorable in comparison to the loan proposed by KeyBank, most importantly, because KeyBank's proposal did not provide the Debtors the necessary financial flexibility to successfully and promptly emerge from chapter 11.

62. Moreover, the deleveraging transaction that the Debtors seek to effectuate will equitize the Second Lien Notes Claims, and the Debtors were working with the Ad Hoc Group to maximize the value of the enterprise and negotiate a reorganization transaction that was interconnected with the DIP Facility. Evercore, on behalf of the Debtors, also independently evaluated the Ad Hoc Group's proposal relative to market rates and concluded that the economic terms of the Ad Hoc Group's proposal were fair and reasonably priced. For all of these reasons, the Debtors ultimately determined that the Ad Hoc Group offered a superior proposal.

63. For several weeks, the Debtors and their advisors engaged in rigorous negotiations with the Ad Hoc Group and their advisors to obtain the best financing terms available. The negotiations were conducted in good faith and at arm's length and may properly be characterized as "hard bargaining" by all interested parties. Notably, the Debtors were successfully able to (a) ensure that all Second Lien Noteholders can participate in the DIP Facility, and (b) achieve meaningful reductions in the costs and fees initially proposed by the Ad

Hoc Group.   On October 19, 2016, the Debtors and the Initial DIP Lenders entered into a commitment letter for the DIP Facility (the "**Commitment Letter**"), a copy of which is attached to the Disclosure Statement as **Exhibit D**.

64.    The DIP Term Sheet attached to the Commitment Letter reflects the most favorable terms on which the members of the Ad Hoc Group were willing to extend the DIP Financing, and those terms are fair and reasonable.   Importantly, the DIP Facility provides for payment in full of prepetition amounts owed to KeyBank upon entry of the Interim DIP Order. This allows the Debtors to avoid an expensive priming dispute while still achieving the benefits of the deleveraging transaction.   Thus, the DIP Facility is the only realistic financing available to the Debtors under the circumstances and is critical to the Debtors' going concern value.

(ii)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 345, 363, and 364 for Authorization to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, and (III) Extend Time to Comply with Requirements of 11 U.S.C. §§ 345(b)

65.    The Debtors request authorization to (i) continue their existing cash management system, including, without limitation, the continued maintenance of their existing bank accounts and business forms, (ii) implement changes to their cash management system in the ordinary course of business, including, without limitation, opening new or closing existing bank accounts, (iii) extend the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Debtors' Bank Accounts, and (iv) related relief.

66.    In the ordinary course of business, the Company utilizes an integrated, centralized cash management system to collect, transfer, and disburse funds generated by its operations (the "**Cash Management System**").   The Cash Management System is comprised of seven (7) bank accounts at various financial institutions (the "**Banks**") to collect, organize and

track various forms of customer receipts (collectively, the "**Bank Accounts**").  The Cash Management System is tailored to meet the Company's operating needs.  The Cash Management System enables the Company to efficiently collect and disburse cash generated by its business, pay its financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of its financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data.  It is critical that the Cash Management System remain intact to ensure seamless continuation of transactions and uninterrupted collection of revenues.

67.    To minimize the expense to the Debtors' estates associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion that may be caused to suppliers and other vendors, the Debtors seek authority to continue using their business forms substantially in the forms used immediately prior to the Commencement Date, without reference to the Debtors' status as "debtors in possession."  In the event that the Debtors generate new business forms during the pendency of the Chapter 11 Cases, such business forms shall include a legend referencing the Debtors as "Debtors-In-Possession," and, to the extent practicable, the Debtors shall laser print such legend on any business forms and checks electronically generated during these cases.

68.    Finally, the Debtors seek entry of an order authorizing and directing Zions First National Bank to continue to treat, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the usual and ordinary course, and to receive, process, and honor, and pay all checks, drafts, wires, or Automated Clearing House Payments drawn on the Bank Accounts after the Commencement Date.

(iii)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 362, 363, and 503 for Authorization to Pay Prepetition Trade Claims in Ordinary Course of Business

69.    In the ordinary course of business, the Company relies upon a variety of Trade Creditors to conduct operations. The Debtors intend to seek authority from the Bankruptcy Court to pay all Trade Claims in full in the ordinary course, on the condition that the Trade Creditors continue to provide the Debtors with ordinary course trade terms prior to any unilateral contraction.

70.    It is a sound exercise of the Debtors' business judgment to pay the Trade Claims as they become due in the ordinary course of business because doing so will avoid value-destructive business interruption and will not prejudice the Debtors' other stakeholders. The Prepackaged Plan provides for the full and uninterrupted payment of such claims. The goods and services provided by Trade Creditors are essential for the continued, uninterrupted operation of the Debtors' business. The Debtors anticipate that failure to pay the Trade Claims as they become due is likely to result in some Trade Creditors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms. Only a handful of the Debtors' Trade Creditors have contracts with the Debtors that could be enforced if such Trade Creditors refuse to perform. Such nonperformance could materially disrupt the Debtors' operations and negatively impact the value of the Debtors' business, ultimately to the detriment of all of the Debtors' stakeholders. In addition, because the Trade Creditors are already familiar with the Debtors' assets and business needs based on years of the Debtors' building relationships with such vendors, they are in the best position to provide goods and services on commercially reasonable terms. Further, due to the highly-specialized nature of the Debtors' operations, certain Trade Creditors may be the only or preferred source from which the Debtors can procure essential goods and services. If the

Trade Creditors refuse to perform on their obligations, AGC may find it very difficult to locate replacement products. Therefore, even if it were possible to obtain replacement goods and services, doing so would likely cause substantial delay and significant costs.

> (iv)     Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 507(a) for Authorization to (A) Pay Certain Prepetition Wages, Salaries, Reimbursable Expenses, and Other Compensation, (B) Pay and Honor Employee Medical and Other Benefits, (C) Continue Employee Benefits Programs, and (D) for Related Relief

71.     The Debtors request the entry of interim and final orders authorizing the Debtors, in their discretion, to (a) pay prepetition wages, salaries and other compensation, taxes, withholdings, and related costs and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance, and other benefits programs, and (c) continue their employee medical, insurance, and other benefits programs on a postpetition basis.

72.     The relief requested includes compensation for the Debtors' seventy-four (74) full-time employees, all of which are currently in active status, temporary employees retained through an outside agency, and independent contractors and consultants that provide services related to various aspects of the Debtors' operations and are vital to the Debtors' businesses. As of the date hereof, certain prepetition obligations to such employees and supplemental workers may be due and owing.

73.     The majority of the Debtors' workforce relies on the Debtors' compensation, benefits, and reimbursement of expenses to satisfy daily living expenses. The workforce would be exposed to significant operational and financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses in the ordinary course. Moreover, if the Debtors are unable to satisfy such obligations,

morale and loyalty will be jeopardized at a time when support is critical to the Debtors' businesses.  In the absence of such payments, the workforce may seek alternative employment opportunities, hindering the Debtors' ability to meet their customer obligations and likely diminishing stakeholder confidence in the Debtor's ability to successfully carry out their chapter 11 strategy.  Loss of valuable employees would distract from the Debtors' focus on their operations and administering the Chapter 11 Cases.

> (v)     Motion of Debtors' Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363, and 364 for Entry of an Order (I) Authorizing the Debtors to Continue to Maintain Their Insurance Policies and Collateral Program and Honor all Obligations with Respect Thereto and (II) Modifying Automatic Stay to Extent Necessary to Allow Debtors' Employees to Proceed with Claims Under Workers' Compensation Programs

74.     The Debtors seek entry authorization to (a) continue to maintain their Insurance Policies and the Collateral Program and honor their Insurance Obligations and the Collateral Obligations in the ordinary course of business, (b) pay any prepetition Insurance Obligations or Collateral Obligations, and (ii) modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Programs.

75.     The Debtors maintain various insurance policies related to, among other things, directors' and officers' liability, workers' compensation, property, crime, automobile, personal injury, theft, business interruption, excess policies, and various other general liability- and property-related programs, in order to help manage and limit the various risks associated with operating their businesses.  The Debtors employ Lockton Companies LLC ("**Lockton**") to help them procure, negotiate, and evaluate their insurance policies and identify and review claims that arise under such policies.  The Debtors are also obliged (pursuant to applicable law or

contractually) to provide surety bonds and other collateral as security for certain of the Debtors obligations owed to various third parties.

76. Postpetition, the Debtors' Insurance Policies, Collateral Program, and Workers' Compensation Programs will be essential to the preservation of the value of the Debtors' business, operations, and assets, and, in certain instances, are required by laws, various regulations, financing agreements, and contracts. If any of the Debtors' Insurance Policies are terminated or lapse, the Debtors could be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law. State law may also prohibit the Debtors from operating without certain insurance.

77. In addition, the Debtors are required, both legally and contractually, to provide security in the form of surety bonds and Other Collateral to governmental authorities and other contract counterparties, relating to, among other things, reclamation costs and royalty obligations. As of the Commencement Date, the Debtors had approximately $445,000 in outstanding commercial surety bonds and $1.6 million in Other Collateral held with various financial institutions. The Debtors are obligated to provide surety bonds or Other Collateral in the aggregate amount of approximately $550,000 to the BLM over the next four years. A failure to continue the Collateral Program and to honor Collateral Obligations in the ordinary course of business may result in violations of applicable law and breaches under the Debtors' significant contracts and leases, which could be disruptive to the Debtors' operations and impair value for the Debtors' stakeholders. Accordingly, the continuation of the Collateral Program and the ability to honor the Collateral Obligations is essential to preserve the Debtors' business and the value of the Debtors' estate for all parties in interest.

RLF1 15532199V.1

78.     Finally, the Debtors' request modification of the automatic stay as it relates to any workers' compensation claims to allow the Debtors' employees to proceed with any valid claims under the Debtors' Workers' Compensation Programs.  The Debtors believe that, absent this relief, employees would face significant harm and may voluntarily terminate their employment which would severely disrupt the Debtors' business and prevent a successful reorganization.

79.     I believe that maintaining the Debtors' Insurance Obligations and Collateral Program, as well as satisfying the Insurance Obligations and the Collateral Obligations (including prepetition obligations, if any) is necessary and critical to the continued operation of the Debtors' businesses.

(vi)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a) and 541(d) for Authorization to Pay Certain Prepetition Taxes and Assessments

80.     The Debtors request authority to satisfy all Taxes and Assessments due and owing to various federal, state, and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "**Taxing Authorities**") that arose prior to the Commencement Date, including all Taxes and Assessments subsequently determined by audit or otherwise to be owed for periods prior to the Commencement Date, in the ordinary course of business.  This includes certain royalties that the Debtors must pay to the federal government in connection with its extraction of Gilsonite from the ground.

81.     In the ordinary course of operating their business, the Debtors collect, withhold, and incur an assortment of Taxes and Assessments that they remit periodically to various Taxing Authorities.  Some of the Taxes and Assessments collected are held in trust for and must be turned over to the Authorities.  The Debtors also seek to pay certain prepetition Taxes and Assessments in order to, among other things, forestall the Taxing Authorities from

taking actions that may interfere with the administration of the Chapter 11 Cases, such as asserting liens on the Debtors' property, assessing penalties and/or significant interest on past-due taxes, or seeking to lift the automatic stay, which would disrupt the Debtors' day-to-day operations and could impose material costs on the Debtors' estates.  In addition, I understand that the non-payment of such Taxes and Fees may subject the Debtors' officers and directors to lawsuits or criminal prosecution during the pendency of the Chapter 11 Cases, and may also give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.  Accordingly, I believe that the relief requested in the Taxes and Assessments Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses.

> (vii)   Motion of Debtors Pursuant to 11 U.S.C. §§ 366 and 105(a) For Entry of an Order (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Resolving Objections by Utility Providers, and (III) Prohibiting Utility Providers from Altering, Refusing, or <u>Discontinuing Service</u>

82.     The Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing service on account of outstanding prepetition invoices.

83.     Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.  Indeed, any interruption in utility services—even for a brief period of time—would seriously disrupt the Debtors' ability to continue operations and service their customers.  This disruption would adversely impact customer relationships and would result in a decline in the Debtors' revenues.  The Utility Services provided at the Debtors' mines make up the largest portion of the Debtors' monthly spend for Utility Services.  In addition to the mining

operations, the Debtors maintain offices, processing and warehousing operations, and other business locations in connection with managing the day-to-day operations of the Debtors' business, including a corporate headquarters in Houston, Texas. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted. Such a result could seriously jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries. Therefore, it is critical that utility services continue uninterrupted during the Chapter 11 Cases.

84.     On average, the Debtors spend approximately $93,000 each month on utility costs. The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. The Debtors expect that cash flows from operations and their DIP Financing will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business.

85.     Furthermore, the Debtors propose to segregate a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Provider based on the average that the Debtors were billed for the fiscal year ending 2015 (collectively, the "**Adequate Assurance Deposit**").

86.     I believe that the Adequate Assurance Deposit, in conjunction with the DIP Financing, cash flow from operations, and cash on hand demonstrate the Debtors' ability to pay for future utility services in the ordinary course of business and constitute sufficient adequate assurance to the Utility Providers.

34

## <u>Conclusion</u>

87.    This declaration illustrates the factors that have precipitated the commencement of the Chapter 11 Cases and the critical need for the Debtors to implement the reorganization strategy embodied in the Prepackaged Plan.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 24th day of October, 2016

/s/ *Steven A. Granda*
Steven A. Granda
Vice President and Chief Financial Officer
American Gilsonite Company and its
Affiliated Debtors

RLF1 15532199V.1