**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
----------------------------------------------------------- x
In re:                                 :     Chapter 11
                                       :
AMERICAN GILSONITE                     :     Case No. 16– _____ (     )
COMPANY, et al.,                       :
                                       :
              Debtors.¹                :     (Joint Administration Requested)
----------------------------------------------------------- x
```

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 361,
362, 363, 364 AND 507 AND FED. R. BANKR. P. 4001(b)-(c) FOR
AUTHORIZATION TO (A) OBTAIN POSTPETITION FINANCING,
(B) USE CASH COLLATERAL, (C) GRANT CERTAIN PROTECTIONS
TO PREPETITION SECURED PARTIES, AND (D) SCHEDULE A FINAL HEARING**

American Gilsonite Company ("**AGC**") and its debtor affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the

"**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Preliminary Statement²**

1.      The Debtors commenced these prepackaged chapter 11 cases to execute a

comprehensive reorganization designed to de-lever the Company's balance sheet and better

position it for long-term sustainability and growth.  The Debtors' reorganized capital structure

will ensure that the Company can maintain its position as the principal commercial miner of

uintaite (referred to by its trademarked name "Gilsonite").  Prior to the Commencement Date, on

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable, are: American Gilsonite Holding Company (2164), American Gilsonite Company (1788),
DPC Products, Inc. (7329), Lexco Acquisition Corp. (9699), and Lexco Holding, LLC (9699).  The Debtors'
mailing address is 16200 Park Row Drive, Suite 250, Houston, Texas 77084.

² Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms
in the Interim Order (as defined herein), the DIP Loan Documents (as defined herein), and/or the Granda
Declaration (as defined herein).

October 20, 2016, the Debtors commenced the solicitation of votes by the Second Lien Noteholders and holders of AGHC Interests (each as defined herein)—the only classes of claims and interests entitled to vote on the Prepackaged Plan (as defined herein).  The Debtors have already received votes to accept the Prepackaged Plan from Second Lien Noteholders collectively holding more than sixty-seven percent (67%) in amount of all outstanding Second Lien Notes and one-hundred percent (100%) of holders of AGHC Interests.  The solicitation period for the Prepackaged Plan will remain open until November 16, 2016.

2.    Significantly, the reorganization transaction embodied in the Prepackaged Plan will provide the Company with an infusion of new capital through postpetition debtor in possession financing (the "**DIP Financing**") that will be converted, pursuant to the Prepackaged Plan and subject to the terms and conditions thereof, to exit financing upon consummation of the Prepackaged Plan.  The DIP Financing is the linchpin of the Prepackaged Plan and the numerous transactions to be entered into by the Debtors in connection therewith.  Upon their exit from chapter 11, the Debtors estimate that the Company will have approximately $9.8[3] million (assuming a December 31, 2016 emergence date) of cash on their balance sheet to operate their reorganized business.

3.    The DIP Financing is initially being provided by the Consenting Second Lien Noteholders (or affiliates thereof) (as defined herein) (the "**Initial DIP Lenders**") that are members of an Ad Hoc Group (the "**Ad Hoc Group**") and are signatories to the Restructuring Support Agreement with the Debtors (the "**RSA**").  Following entry of the Interim Order (as defined herein), eligible Second Lien Noteholders will be offered the opportunity to become lenders under the DIP Financing, pursuant to a syndication process (those Second Lien

---

[3] Estimated cash figure is updated relative to Disclosure Statement estimates for actual cash flow performance prior to filing.

Noteholders who choose to participate in the DIP Financing upon entry of the Interim Order, the "**Subsequent DIP Lenders**," and together with the Initial DIP Lenders, the "**DIP Lenders**"). The Debtors anticipate the record date for purposes of the syndication will be Tuesday, November 1, 2016 (as may be extended or modified by the Initial DIP Lenders in their discretion). All DIP Lenders will receive their pro rata share (based on their holdings of the Second Lien Notes) of interest and original issue discount under the DIP Facility. To ensure that the Debtors receive the entire amount of the DIP Financing regardless of whether any other Second Lien Noteholders become Subsequent DIP Lenders, the Initial DIP Lenders have agreed to backstop the DIP Financing in exchange for a backstop payment. The Initial DIP Lenders have executed a Commitment Letter (the "**Commitment Letter**"), a copy of which is attached hereto as **<u>Exhibit A</u>**.[4]

4.      To obtain the liquidity necessary to administer these chapter 11 cases and continue their mining operations in the ordinary course of business, the Debtors have procured and seek approval of a $30 million senior secured postpetition term loan facility (the "**DIP Facility**," and the loans under the DIP Facility, the "**DIP Loans**") pursuant to that certain Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement (the "**DIP Credit Agreement**" and the other agreements and documents executed or delivered in connection therewith, the "**DIP Loan Documents**"),[5] by and among AGC, as borrower (the "**Borrower**"), each of the other Debtors as guarantors, and the DIP Lenders. Upon the Debtors' emergence from bankruptcy, pursuant to the Prepackaged Plan, and subject to the terms and conditions

---

[4] Due to the sensitive commercial nature of the commitment amounts reflected on Annex A to the Commitment Letter and the confidentiality provisions contained therein, the Debtors have not attached a copy of Annex A to the Commitment Letter to this Motion. The Debtors will make copies of such Annex A available to the Court and the U.S. Trustee on a confidential basis.

[5] A copy of the form of DIP Credit Agreement will be filed prior to the hearing on the Motion. The key terms of the DIP Credit Agreement are included in the DIP Term Sheet attached as Exhibit 1 to the Commitment Letter.

thereof, the outstanding principal amount under the DIP Loans will convert on a dollar-for-dollar basis into an exit term loan (the "**Exit Facility**").

5.      The Debtors are parties to that certain Credit and Guaranty Agreement, dated as of August 28, 2012 (the "**First Lien Credit Agreement**") with KeyBank National Association ("**KeyBank**,"), as sole lender and administrative agent under which the Debtors maintain with KeyBank a revolving credit facility with a maximum borrowing base of $25 million.  As of the date hereof, the aggregate principal amount outstanding under the First Lien Credit Agreement is approximately $20 million, plus any applicable interest, fees, and other amounts.  Pursuant to the First Lien Credit Agreement, each of the Debtors granted to KeyBank a first-priority lien on substantially all of the Company's assets (the "**Prepetition Credit Facility Liens**" and with the Prepetition Second Lien Note Liens (as defined herein), the "**Prepetition Liens**").  Subject to entry of the Interim Order, the Debtors will use the DIP Financing to pay KeyBank in full for all amounts outstanding under the First Lien Credit Agreement.  The payment of the obligations under the First Lien Credit Agreement will not prejudice any party in interest.  Payment in full of the obligations under the First Lien Credit Agreement is contemplated by the Prepackaged Plan, was described in the Disclosure Statement (as defined herein), and has been accepted by the Ad Hoc Group who collectively hold more than sixty-seven percent (67%) in amount of Second Lien Notes.  The Debtors are simply accelerating the timing of the payoff of the First Lien Credit Agreement in order to obtain the benefits of the DIP Facility.  In addition, as provided in the Interim Order, all creditors, including an official committee, if appointed, will retain the right to investigate the Prepetition Credit Facility Liens.

6.      As set forth in further detail below, the Debtors have satisfied the requirements under section 364 of the Bankruptcy Code to obtain approval of the DIP Facility.

Substantially all of the Debtors' assets are encumbered by the Prepetition Liens.  As a result, the Debtors could only obtain postpetition financing from a third party on an unsecured or junior priority basis or on a priming basis subject to the consent of KeyBank and the Second Lien Noteholders (the "**Prepetition Lenders**"), or approval of the Court over the objection of the Prepetition Lenders.  Working within these parameters, the Debtors contacted sixteen (16) financial institutions, in addition to KeyBank and the Ad Hoc Group, to ascertain their interest in extending financing to the Debtors, but, given the circumstances, none of the parties offered financing to the Debtors.  As a result, the Debtors have determined to move forward with the proposed DIP Facility, which pays off KeyBank in full and primes the Second Lien Notes with the consent of a super-majority of the Second Lien Noteholders, and to their financial benefit.

7.    Additional information regarding the DIP Facility, including in particular the process through which the Debtors solicited lender interest in and negotiated the terms of the DIP Facility is set forth in the *Declaration of Stephen A. Granda in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "**Granda Declaration**") and the *Declaration of Stephen Hannan in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed.  R. Bankr.  P.  4001(b)-(c) for Authorization to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule a Final Hearing* (the "**Hannan Declaration**"), both sworn on the date hereof.

8.    For the reasons set forth herein, the Granda Declaration, and the Hannan Declaration, the DIP Facility should be approved and the Motion granted.

RLF1 15532572v.1

## Summary of Terms of DIP Facility[6]

9.       In accordance with Rules 4001(b)-(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2(a) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the below chart summarizes the significant terms of the Interim Order and the DIP Loan Documents as contained in the DIP Term Sheet.

| MATERIAL TERMS OF DIP FACILITY | | Location |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | AGC (the "**Borrower**"). | **DIP Term Sheet:** 1; **Interim Order:** Request for Relief ¶ 1. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | American Gilsonite Holding Company ("**AGHC**") and each of the direct and indirect Subsidiaries of AGHC and the Borrower. | **DIP Term Sheet:** 1; **Interim Order:** Request for Relief ¶ 1. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Lenders party to the Commitment Letter.  Eligible Second Lien Noteholders will be offered the opportunity to participate as lenders in the DIP Financing pursuant to a syndication process.[7] | **DIP Term Sheet:** 1; **Interim Order:** Request for Relief ¶ 1. |

---

[6] This summary is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents and/or the Interim Order.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Loan Documents, the provisions of the DIP Loan Documents shall control.   Any capitalized terms used but not otherwise defined in the summary shall have the respective meanings ascribed to such terms in the DIP Loan Documents and/or the Interim Order, as applicable.

[7] The Debtors intend to provide notice of the syndication process to all Second Lien Noteholders and anticipate a record date for participation in the syndication of Tuesday November 1, 2016 (as may be extended or modified by the Initial DIP Lenders in their discretion).

| | | |
|---|---|---|
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Trust, National Association. | **DIP Term Sheet:** 1; **Interim Order:** Request for Relief ¶ 1. |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B); | $30 million term loan facility, with an original issue discount of $1.2 million. | **DIP Term Sheet:** 1–2; **Interim Order:** Request for Relief ¶ 1. |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | Initial Borrowing on the Closing Date, in the aggregate principal amount of $22.5 million, including Original Issue Discount of $1.2 million, which will be deducted from the initial funding amount. During the Availability Period, one additional Borrowing in the aggregate principal amount of $7.5 million, subject to entry of the Final Order (as defined herein). | **DIP Term Sheet:** 2; **Interim Order:** Request for Relief ¶ 1. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | Use of Cash Collateral and proceeds of the DIP Facility are subject to the agreed budget ("**Approved Budget**") consisting of bi-weekly statements of all forecasted receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing on November 17, 2016. The Approved Budget is subject to "**Permitted Variances**," which means, for the first two (2) weeks after the Commencement Date, the first four (4) weeks after the Commencement Date, and on a rolling four (4)-week basis to be tested every four (4) weeks thereafter (each such period, a "**Testing Period**"), Projected Net Cash Flow shall not vary by more than 20% in an unfavorable manner from actual Net Cash Flow. | **DIP Term Sheet:** 11; **Interim Order:** Ordered ¶ 16. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | 9.00 % + LIBOR, subject to a 1.00% LIBOR floor.<br>Default Interest Rate: + 2.00% per annum. | **DIP Term Sheet:** 5. |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | Administrative Agent Fee: amounts specified in the Agent Fee Letter.[8]<br><br>Original Issue Discount: 4.00% of the Commitment Amount, which discount shall be allocated pro rata among all DIP Lenders based on their respective Commitments.<br><br>Backstop Payment: 3.50% of the Commitment Amount allocated among the Initial DIP Lenders on a pro rata basis based on the Commitments under the Commitment Letter.<br><br>Professional Fees and Expenses: The Debtors are obligated to pay all reasonable and documented fees, costs, and disbursements (including professional fees and expenses) of the DIP Agent and the Initial DIP Lenders associated with the Agent Fee Letter and DIP Loan Documents. | **DIP Term Sheet:** 2, 5, 14; **Interim Order:** ¶ (F)(v). |

---

[8] Due to the sensitive commercial nature of the Agent Fee Letter and the confidentiality provisions contained therein, the Debtors have not attached a copy of the Agent Fee Letter to this Motion. The Debtors will make copies of the Fee Letter available to the Court and the U.S. Trustee on a confidential basis.

| | | |
|---|---|---|
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | Twelve months after the Closing Date unless a prior DIP Termination Date occurs. | **DIP Term Sheet:** 5. |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject to the Carve-Out, the DIP Obligations are secured by the following (the "**DIP Collateral**"):<br>(i)    fully perfected first-priority liens on all DIP Collateral that is not otherwise subject to a valid, perfected, and non-avoidable security interest or lien as of the Commencement Date.<br>(ii)    fully perfected junior liens on all DIP Collateral (other than as set forth in clauses (i) and (iii)), subject to Permitted Prior Liens.<br>(iii)    fully perfected first-priority senior priming liens on all DIP Collateral that also constitutes Prepetition Collateral which liens shall prime the Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens (as defined herein), subject to liens permitted under the DIP Credit Agreement.<br><br>Subject to the Carve-Out, the DIP Agent and DIP Lenders are granted a superpriority administrative expense claim (the "**Superpriority DIP Claim**") in each of the chapter 11 cases and any Successor Cases for all of the DIP Obligations. | **DIP Term Sheet:** 6–8;<br>**Interim Order:** Ordered ¶¶ 5, 6, 7. |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type, including, among other things:<br><br>Affirmative Covenants:  delivery of and compliance with the Approved Budget, notices of material events, payment of obligations, maintenance of cash management system, payment of taxes and claims, preservation of existence, maintenance of properties and insurance, inspections, compliance with laws, and compliance with Milestones, form of final order, and post-closing matters.<br><br>Negative Covenants: limitations on indebtedness, liens, guarantees, negative pledges, restricted payments, subsidiary distributions, investments, engaging in novel lines of unrelated business, fundamental changes, disposition of assets, acquisitions, disposal of subsidiary interests, sale and lease-backs, transactions with affiliates, conduct of business, deposit accounts, modifying the Interim or Final Orders without consent of the DIP Lenders, making claims under § 506(c) or 552(b) of the Bankruptcy Code against the DIP Agent, DIP Lenders, Prepetition Agent, or Prepetition Lenders, and permitting any change in its fiscal year. | **DIP Term Sheet:** 9–11. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | The DIP Facility shall be subject to usual and customary events of default including, but not limited to, and subject to usual and customary cure periods:<br>(i)    nonpayment of principal;<br>(ii)    nonpayment of interest or other amounts subject to a 3 business day cure period;<br>(iii)    violation of covenants;<br>(iv)    incorrectness of representations and warranties in any material respect;<br>(v)    material judgments in excess of certain amounts;<br>(vi)    material ERISA events;<br>(vii)    actual or asserted invalidity of the DIP Loan Document or liens or claims created thereunder or under the Interim Order or the Final | **DIP Term Sheet:** 23–25. |

8

| | | |
|---|---|---|
| | | Order; |
| | (viii) | a revocation of any material license, permit, lease or agreement necessary to its business to the extent that such revocation could reasonably be expected to have a Material Adverse Effect; |
| | (ix) | filing of a motion by any Loan Party, without the consent of the Required DIP Lenders, (i) revoking or amending any DIP Loan Document, the Interim Order or the Final Order, (ii) obtaining any financing not permitted under the DIP Credit Agreement, (iii) granting any lien not permitted under the DIP Credit Agreement, (iv) modifying or terminating the use of cash collateral (except as set forth in the Interim Order or the Final Order) or (v) seeking or authorizing any other actions directly and materially adverse to the DIP Lenders and the DIP Agent; |
| | (x) | the filing by or support of a Loan Party of a motion to reject or entry of an order approving the rejection of the RSA; |
| | (xi) | dismissal of the Chapter 11 Case of the Borrower, conversion of the Chapter 11 Case of the Borrower to a chapter 7 case or termination or modification of the Loan Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization; |
| | (xii) | the Final Order is not entered on or before 35 calendar days after the Commencement Date; |
| | (xiii) | commencement of any adversary proceeding, contested matter or other action by any Loan Party asserting any claims or defenses against any of the Second Lien Trustee (as defined herein) or Second Lien Noteholders with respect to the Second Lien Obligations or the liens securing the Second Lien Obligations; |
| | (xiv) | the sale of all or substantially all of a Loan Party's assets, through a 363 sale, a plan of reorganization, or otherwise that does not provide consideration sufficiency to satisfy the Obligations in full in cash; |
| | (xv) | the payment or application by any Loan Party for authority to pay any prepetition claim other than as provided in an Acceptable Plan, any "first day order" reasonably acceptable to Required Lenders and as set forth in the Approved Budget or as permitted under the DIP Credit Agreement, in each case without the Required Lenders' prior written consent; |
| | (xvi) | entry of an order appointing or application by any Loan Party for an order seeking the appointment of a trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties or with the power to conduct an investigation of the DIP Agent or the DIP Lenders; |
| | (xvii) | the entry of an order granting relief from or modifying the automatic stay (i) to allow any creditor to execute upon or enforce a lien on any material portion of the DIP Collateral, or (ii) with respect to any lien of or the granting of any Lien on any material portion of the DIP Collateral to any state or local environmental or regulatory agency or authority in excess of $2,000,000; |
| | xviii) | the Loan Parties file a motion to amend, supplement extend or otherwise modify the Interim Order or the Final Order without the prior written consent of the Required DIP Lenders in the sole discretion; |
| | (xix) | payment of or granting adequate protection for any prepetition indebtedness, except as set forth in the Interim Order or the Final Order; |

9

| | | |
|---|---|---|
| | (xx)    the Loan Parties' failure to comply with and perform any of the terms, subject to customary notice and/or cure periods in certain cases, provisions, conditions, covenants or other obligations under the Interim Order or the Final Order;<br>(xxi)    the failure by the Loan Parties to comply with any Milestone; and<br>(xxii)    filing of a motion requesting, or the entry of an order authorizing, approving, or granting a claim against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code, or relief under the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Liens or the DIP Obligations. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | The Loan Parties shall be required to comply with the following milestones (the "**Milestones**"):<br>(i)    On the Commencement Date, the Loan Parties shall have filed with the Bankruptcy Court (i) a plan of reorganization in form and substance acceptable to the Required DIP Lenders (an "**Acceptable Plan**"); (ii) a disclosure statement in respect of such Acceptable Plan in form and substance acceptable to the Required DIP Lenders (an "**Acceptable Disclosure Statement**") in each case, it being understood that the chapter 11 plan and disclosure statement attached to the restructuring support agreement entered into amount the Loan Parties, the "**Consenting Noteholders**" referred to therein and the "**Consenting Sponsors**" referred to therein (as amended, supplemented or otherwise modified from time to time, the "**RSA**") as Exhibits A and B respectively, pursuant to which the DIP Lenders would surrender all claims for payment of principal of the DIP Facility as of the Effective Date in exchange for claims for payment of principal of the Exit Facility in an aggregate principal amount equal to the aggregate principal amount of the DIP Facility as of the Effective Date, in full and final satisfaction of the principal portion of the DIP Loan Claims, subject to the terms and conditions thereof, shall be deemed an "Acceptable Plan" and "Acceptable Disclosure Statement" respectively; and (iii) a motion, in form and substance reasonably acceptable to the Required DIP Lenders, to approve solicitation of such Acceptable Plan and such Acceptable Disclosure Statement and schedule a joint hearing for approval of such Acceptable Plan and such Acceptable Disclosure Statement (a "**Solicitation Motion**").<br>(ii)    On or before the date that is five (5) calendar days after the Commencement Date, the Bankruptcy Court shall have entered the Interim Order.<br>(iii)    On or before the date that is thirty-five (35) calendar days after the Commencement Date, the Bankruptcy Court shall have entered the Final Order.<br>(iv)    On or before the date that is seven (7) calendar days after the Commencement Date, the Bankruptcy Court shall have entered an order approving the Solicitation Motion.<br>(v)    On or before the date that is thirty (30) calendar days after the commencement of solicitation of the Acceptable Plan, the Borrower shall have completed such solicitation.<br>(vi)    On or before the date that is fifty-five (55) days after the Commencement Date, the Bankruptcy Court shall have entered an order, confirming an Acceptable Plan and approving an Acceptable Disclosure Statement. | **DIP Term Sheet:** 8–9. |

| | | |
|---|---|---|
| | (vii)   On or before the date that is seventy (70) calendar days after the Commencement Date, an Acceptable Plan shall have become effective pursuant to its terms. | |
| **Carve-Out** Bankruptcy Rule 4001(b)(1)(B)(iii) | A Carve-Out (the "**Carve-Out**") for the payment of :<br>(i)   all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717;<br>(ii)   all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000;<br>(iii)   to the extent allowed by the Court, all accrued and unpaid fees and expenses incurred on or prior to the delivery of a Carve-Out Trigger Notice (as defined below) by professionals or professional firms retained by the Debtors or Official Committee, if any, (the "**Estate Professionals**"), including any success or transaction fees payable to Evercore Group L.L.C. or FTI Consulting Inc., solely to the extent such success or transaction fee is earned and payable pursuant to a court-approved engagement letter between AGC and such professional; and<br>(iv)   all unpaid fees and expenses incurred by Estate Professionals after the date of delivery of the Carve-Out Trigger Notice to the extent allowed by the Court at any time, in an aggregate amount not to exceed $1 million plus any success or transaction fees that may become due or payable to Evercore Group, L.L.C. or FTI Consulting Inc., solely to the extent such success or transaction fee is earned and payable pursuant to a court-approved engagement letter between AGC and such professional ("**Post-Carve-Out Trigger Notice Cap**"); *provided, however,* that nothing shall be construed as a consent to the allowance of any Estate Professionals' fees or expenses or impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any such Estate Professionals.<br><br>"**Carve-Out Trigger Notice**" means a written notice delivered by the Required DIP Lenders to counsel to the Debtors, the U.S. Trustee, and lead counsel to any Official Committee appointed in these chapter 11 cases, which notice may be delivered following the occurrence of a Termination Event and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  Any payment or reimbursement made on or after the date and time of the Carve-Out Trigger Date to an Estate Professional shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  To the extent that any payment to an Estate Professional is subsequently disallowed and/or disgorged, the proceeds of any claim against the Estate Professional for amounts so disallowed or disgorged shall constitute DIP Collateral and as such, shall be subject to DIP Liens and DIP Superpriority Claims. | **DIP Term Sheet:** 21–22; **Interim Order:** Ordered ¶ 30. |
| **Disparate Treatment of Professionals Under Carve-Out** Local Rule 4001-2(a)(i)(F) | The Interim Order contains no provision for disparate treatment for professionals retained by an Official Committee, if any, with respect to the Carve-Out.  Up to $50,000 will be made available to any committee for investigation costs related to the Prepetition Lenders and Prepetition Liens. | **Interim Order:** Ordered ¶ 31. |

| | | |
|---|---|---|
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | (i)   First Lien Agent on behalf of the First Lien Lenders. <br>(ii)   Second Lien Trustee on behalf of the Second Lien Noteholders. <br>(iii)   DIP Agent on behalf of the DIP Lenders. | **Interim Order:** ¶ (E). |
| **Purposes for Use of DIP Proceeds and Cash Collateral** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | Provide working capital and other general corporate needs during these chapter 11 cases, pay in full the outstanding balance of the First Lien Obligations, pay prepetition amounts pursuant to the orders approving the first day motions, pay costs and expenses relating to the administration of these chapter 11 cases, and make adequate protection payments. | **DIP Term Sheet:** 3–5; **Interim Order:** ¶ (F)(v), Ordered ¶ 10(a). |
| **Terms of Use of DIP Proceeds and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(ii), Local Rule 4001-2(a)(ii) | The Debtors are authorized to use Cash Collateral and proceeds of the DIP Loans subject to the terms and conditions of the Interim Order, the DIP Credit Agreement, and the DIP Documents and in accordance with the Approved Budget. Nothing in the Interim Order authorizes the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral, DIP Loans, or Carve-Out, or other proceeds resulting therefrom, except as permitted in the Interim Order, the DIP Credit Agreement, the DIP Documents, and in accordance with the Approved Budget. | **DIP Term Sheet:** 5; **Interim Order:** Request for Relief ¶ 1, Ordered ¶ 31. |
| **Duration of Use of DIP Collateral** Bankruptcy Rule 4001(b)(1)(B)(iii) | The Debtors' right to use the DIP Collateral shall terminate upon the earlier of: <br>(i)   the Maturity Date; <br>(ii)   the date on which the Commitments terminate or the DIP Loans become due and payable in accordance with the DIP Credit Agreement; <br>(iii)   the sale of all or substantially all of a Loan Party's assets through a 363 sale, a plan of reorganization, or otherwise; <br>(iv)   unless waived by the Required DIP Lenders, any date on which any of the Loan Parties files a motion with the Bankruptcy Court to proceed with the sale or liquidation of any of the Loan Parties, or files a plan of reorganization without the prior consent of the Required DIP Lenders; or <br>(v)   the Plan Effective Date. | **DIP Term Sheet:** 5; **Interim Order:** Ordered ¶ 23. |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(c)(1)(B)(ii), 4001(b)(1)(B)(iv) and (c)(1)(B)(ii), Local Rule 4001-2(a)(ii) | The First Lien Obligations will be paid in full upon entry of the Interim Order. <br><br>The First Lien Agent or the First Lien Lenders shall be granted the following additional adequate protection: <br>(i)   adequate protection liens to the extent of any postpetition diminution in value of the contingent obligations owed to the First Lien Agent or First Lien Lenders, which will be a first-priority lien on the Credit Facility Reimbursement Account funded with $50,000 (the "**Credit Facility Reimbursement Account Liens**"). <br><br>The Second Lien Trustee and the Second Lien Noteholders shall be granted the following adequate protection for the use of the Prepetition Second Lien Collateral, to the extent of any postpetition Diminution in Value of the Prepetition Lenders' interest in the Prepetition Second Lien Collateral: <br>(i)   current payment of all reasonable and documented out-of-pocket fees, costs, and expenses, including, without limitation, legal and | **DIP Term Sheet:** 17–21; **Interim Order:** ¶ (G), Ordered ¶¶ 10(b)–(c), 12, 13. |

|  | other professionals' fees and expenses, of the Second Lien Trustee and the Ad Hoc Group; |  |
|  | (ii)    adequate protection liens on all DIP collateral, which liens will be junior to the DIP liens and the Carve-Out, and senior to all other liens, including Prepetition Liens (the "**Second Lien Noteholder Adequate Protection Liens**"); |  |
|  | (iii)   superpriority administrative expense claims, which claims will be junior to the DIP Superpriority Claim and the Carve-Out, but senior to other administrative expense claims and all other claims and be payable from and have recourse to all assets and property of the Debtors (the "**Second Lien Noteholder Superpriority Claims**"); |  |
|  | (iv)   compliance with the Approved Budget, subject to Permitted Variances; and |  |
|  | (v)    reasonable access to the Debtors' books and records and such financial reports as are provided to the DIP Agent. |  |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) | Any party in interest who seeks to assert a claim against the Prepetition Lenders and/or Prepetition Agents on behalf of the Debtors, or otherwise seeks to challenge the Debtors' stipulations in relation to the validity, extent, priority, or perfection of the mortgages, security interests, and Prepetition Liens of the Prepetition Agents and/or Prepetition Lenders, the validity, allowability, priority or amount of the Prepetition Obligations, the liability of the of the Prepetition Agents and/or Prepetition Lenders with respect to anything arising from the Prepetition Loan Documents, must commence such proceeding during the "**Challenge Period.**"<br><br>For any Official Committee, the Challenge Period is the earlier of five (5) days before the Plan Confirmation hearing and thirty (30) calendar days from the date of the Official Committee's appointment.<br><br>For any other party in interest, the Challenge Period is the earlier of five (5) days before the Plan Confirmation hearing and no later than forty-five (45) calendar days from entry of the Interim Order to bring such a claim. | **DIP Term Sheet:** 22–23; **Interim Order:** Orders ¶ 32(b). |
| **Determination Regarding Prepetition Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), Local Rule 4001-2(a)(i)(B) | The Proposed Interim Order contains stipulated findings of fact, including those related to the validity and enforceability of the Prepetition Debt Obligations and the Prepetition Liens.<br><br>The Prepetition Loan Parties stipulate that they are in default of certain terms and provisions of the Prepetition Loan Documents as of the Commencement Date. | **DIP Term Sheet:** 15–17; **Interim Order:** ¶ (E), Orders ¶ 32(b). |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi), Local Rule 4001-2(a)(i)(D) | The Interim Order excludes liens on the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code unless authorized by the Final Order. | **DIP Term Sheet:** 7–8; **Interim Order:** Orders ¶ 5(xviii). |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii), Local Rule | The stipulations and admissions contained in the Interim Order shall be binding upon each applicable Debtor, their estates and any successor thereto, including any trustee appointed in any of these chapter 11 cases or Successor Cases, provided that any other parties in interest or creditor committee may challenge that conclusion during the Challenge Period (a "**Challenge**"). | **Interim Order:** Orders ¶ 32(a). |

13

| | | |
|---|---|---|
| 4001-2(a)(i)(B) | | |
| **Waiver or Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Upon five (5) days' prior notice to the Debtors, and subject to termination of the automatic stay, the automatic stay is vacated to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default under their respective DIP Loan Documents, any and all of their respective rights and remedies provided for in the DIP Loan Documents. | **DIP Term Sheet:** 13; **Interim Order:** Orders ¶¶ 17, 24. |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit**<br>Bankruptcy Rule 4001(c)(1)(B)(v) | The Interim Order does not provide for a waiver of any entity's authority or right to file a plan, request the use of cash collateral, or request authority to obtain credit, provided that there are limitations imposed on the Debtors' rights to do any of the forgoing.  If any such actions are taken, it may cause an Event of Default under the DIP Facility. | N/A. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests and liens in collateral under the DIP Credit Agreement, shall be valid and perfected upon entry of the Interim Order. | **DIP Term Sheet:** 6–7; **DIP Credit Agreement:** ¶¶ 4.21, 4.24(b). |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Loan Parties and Indemnities are not liable for special, indirect, consequential or punitive damages, unless resulting from gross negligence, fraud, or willful misconduct.<br><br>Subject to the expiration of the Challenge Period, with respect to the Prepetition Liens and Obligations, and subject to the Carve-Out, the Debtors waive, discharge and release any valid and enforceable claims, counterclaims, causes of action, defenses, or setoff rights of any kind, and waive, discharge and release any right they may have to challenge the Prepetition Obligations, Prepetition Loan Documents and Prepetition Liens, and any right to assert any and all claims or causes of action against the Prepetition Agents or Prepetition Lenders, or their related parties. | **DIP Term Sheet:** 16–17; **Interim Order:** ¶ (E)(vii). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower indemnifies the Agent, each Lender, each other Secured Party and their participants, parent corporations, subsidiary corporations, affiliated corporations, successor corporation, and all present and future officers, directors, employees, attorneys and agents  (the **Indemnitees**") from and against:<br>(i)    Environmental Liability and liability in connection with Hazardous Substances, incurred following foreclosure and that are attributable to acts of an applicable Indemnitee;<br>(ii)    Transfer, documentary, and recording taxes, assessments or charges made by any Governmental Authority by reason of the execution and delivery of the DIP Credit Agreement, recording or filing of any Loan Document, the Agent's Lien in any Collateral, | **DIP Term Sheet:** 14–15; **Interim Order:** Orders ¶ 28. |

| | | |
|---|---|---|
| | or the making of any Loans; and<br>(iii)  Any and all Liabilities of any kind or nature whatsoever in connection with any investigative, administrative or judicial proceedings, in any manner relating to or arising out of in connection with the acts, event or transaction related, detailed in (w) to (z) of § 10.5 of the DIP Credit Agreement. | |
| **Cross-Collateralization**<br>Local Rule 4001-2(a)(i)(A) | The DIP Loan Documents do not provide for cross-collateralization. | N/A. |
| **Provisions Deeming Prepetition Debt to be Postposition Debt**<br>Local Rule 4001-2(a)(i)(E) | The DIP Loan Documents do not deem prepetition secured debt to be postpetition debt, and do not use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt. | N/A. |
| **Non-Consensual Priming Liens**<br>Local Rule 4001-2(a)(i)(G) | The DIP Loan Documents do not provide for non-consensual priming of any existing secured lien.  The Second Lien Trustee, on behalf of the Second Lien Noteholders, consents to the priming of the Second Lien Notes.  The Second Lien Trustee does not oppose the Adequate Protection. | N/A. |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(C) | Subject to the entry of the Final Order, in partial consideration for, among other things, the Carve-Out and the payments made under the Approved Budget to administer the chapter 11 cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the chapter 11 cases at any time shall be charged against the DIP Agent, the Prepetition Agents, the DIP Lenders or the Prepetition Lenders, any of the DIP Obligations or Prepetition Obligations, or any of the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lenders upon the DIP Collateral or Prepetition Lenders upon the Prepetition Collateral, as applicable, without the prior express written consent of the affected DIP Agent, Prepetition Agent and/or affected DIP Lender or Prepetition Lender, in their sole discretion. For the avoidance of doubt, consent to the Carve-Out or the approval of any budget hereunder shall not be deemed a consent in this context. | **DIP Term Sheet:** 27; **Interim Order:** ¶ J, Orders ¶ 34. |
| **Section 552(b)(1) Waiver**<br>Local Rule 4001-2(a)(i)(H) | Subject to entry of the Final Order, the Prepetition Agents and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Agents, the Prepetition Lenders or the Prepetition Obligations. | **DIP Term Sheet:** 27–28; **Interim Order:** ¶ J, Orders ¶ 35. |

## **Background**

10.    On the date hereof (the "**Commencement Date**"), the Debtors each

commenced with this Court a voluntary case under the Bankruptcy Code.  The Debtors are

authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

11.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules.

12.     On October 19, 2016, the Debtors executed the RSA with holders of more than sixty-seven percent (67%) of the outstanding principal amount of the Debtors' Second Lien Notes (collectively, the "**Consenting Second Lien Noteholders**," represented by the Ad Hoc Group), pursuant to which such Consenting Second Lien Noteholders agreed to vote in favor of and support confirmation of the Prepackaged Plan. The prepetition equity sponsor, which owns or controls one hundred percent (100%) of the prepetition equity in American Gilsonite Holding Company, has also executed the RSA and agreed to support the Prepackaged Plan.

13.     Prior to the Commencement Date, on October 20, 2016, the Debtors commenced the solicitation of votes by the (a) Second Lien Noteholders (as defined in the Joint Prepackaged Chapter 11 Plan of Reorganization of American Gilsonite Company and Its Affiliated Debtors (the "**Prepackaged Plan**"))—the only class of voting creditors— and (b) holders of AGHC Interests through their Disclosure Statement for Joint Prepackaged Plan of Reorganization of American Gilsonite Company and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code (the "**Disclosure Statement**"), each filed contemporaneously herewith. As discussed, the Debtors have already received votes to accept the Prepackaged Plan from Second Lien Noteholders collectively holding more than sixty-seven percent (67%) in amount of all outstanding Second Lien Notes and one hundred percent (100%) of the holders of AGHC Interests.

16

14.    The Prepackaged Plan provides for a reorganization transaction pursuant to which:

- certain Second Lien Noteholders will provide a $30 million debtor in possession financing facility that will be used, subject to Court approval, to pay the existing First Lien Credit Agreement and provide the Debtors with an additional $7.5 million of liquidity, with the entire principal portion of the DIP Loans converting to an exit term loan upon emergence from bankruptcy;

- the Second Lien Notes will be canceled and, in exchange, Second Lien Noteholders will receive (i) 98% of the new equity of Reorganized AGC and (ii) $100 million in Subordinated Notes on a pro rata basis;

- all General Unsecured Claims will be unimpaired and treated in the ordinary course of business; and

- holders of AGHC Interests will receive 2% of the new equity interests in Reorganized AGC.

The Debtors have requested a joint hearing for approval of the Prepackaged Plan and Disclosure Statement to be held within fifty-five (55) days of the Commencement Date—the outside milestone date for approval of the Prepackaged Plan and Disclosure Statement in the RSA.

15.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Granda Declaration, which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

### Jurisdiction

16.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

RLF1 15532572v.1

17.     Pursuant to Local Rule 9013–1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

18.     By this Motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **Exhibit B** (the "**Interim Order**"), and final order (the "**Final Order**," and, together with the Interim Order, the "**DIP Orders**"), granting, among other things, the following relief:

(a)     authority for AGC to be the Borrower under the DIP Facility;

(b)     authority for each other Debtor to guarantee AGC's obligations under the DIP Facility;

(c)     authority for the Borrower to execute and enter into the DIP Credit Agreement and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Loan Documents;

(d)     upon entry of the Interim Order, authority for Borrower to make an initial draw under the DIP Facility in the aggregate amount of $22.5 million (which includes original issue discount that will not be funded), and to pay all obligations arising under the First Lien Credit Agreement to KeyBank;

(e)     authority for the Debtors to use the proceeds under the DIP Facility in accordance with the Approved Budget (as defined herein), DIP Loan Documents, and the Debtors' existing cash management system;

(f)     authority for the Debtors to grant security interest, liens, and superpriority claims to the DIP Agent and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in the DIP Orders and the DIP Loan Documents;

(g)     authority for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) and all other Prepetition

18

Collateral (as defined in the Interim Order) in accordance with the Approved Budget;

(h)     upon entry of the Final Order, waiver of any right to seek to surcharge against either of the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any other law or principle of equity;

(i)     upon entry of the Final Order, waiver of any right to apply the "equities of the case" exception pursuant to section 552(b) to the Prepetition Agents, Prepetition Lenders, or Prepetition Obligations;

(j)     authority for the Debtors to provide Adequate Protection (as defined herein) to KeyBank and the Second Lien Noteholders on the terms set forth in the Interim Order and the DIP Loan Documents;

(k)     modification of the automatic stay under section 362 of the Bankruptcy Code on the terms and conditions set forth herein to the extent necessary to implement and effectuate the terms of the DIP Loan Documents and the Interim Order;

(l)     waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including under Bankruptcy Rule 6004); and

(m)     scheduling a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to consider entry of an order granting the relief requested in this Motion on a final basis.

## **Prepetition Indebtedness**

19.     As stated above, AGC, as borrower, and each of the other Debtors, as guarantors, are parties to the First Lien Credit Agreement with KeyBank. The First Lien Credit Agreement matures on May 28, 2017. As of the date hereof, the aggregate principal amount outstanding under the First Lien Credit Agreement is approximately $20 million, plus any applicable interest, fees, and other amounts. Pursuant to the First Lien Credit Agreement, each of the Debtors granted a first-priority lien on substantially all of their assets in order to secure the First Lien Credit Agreement (the "**Prepetition First Lien Collateral**") in favor of KeyBank.

19

20.     On August 28, 2012, AGC issued, in a private placement, the Second Lien Notes in an aggregate principal amount of $260 million, and subsequently, on September 24, 2012, issued an additional $10 million in principal amount of the same Second Lien Notes, pursuant to that certain indenture (as amended, modified, or supplemented from time to time, the "**Second Lien Note Indenture**") with each of the other Debtors as named guarantors therein, and Wilmington Trust, National Association as trustee and collateral agent (the "**Second Lien Trustee**").

21.     Pursuant to that certain Second Lien Security and Pledge Agreement, dated as of August 28, 2012 (as amended, modified, or supplemented from time to time, including, without limitation, the "**Second Lien Security Agreement**"), the Second Lien Notes are secured by second-priority liens on the Prepetition Collateral (the "**Prepetition Second Lien Notes Liens**").  Pursuant to the terms of that certain Intercreditor Agreement, dated as of August 28, 2012, between the Debtors, KeyBank, and the Second Lien Trustee (as amended, modified, or supplemented from time to time, the "**Intercreditor Agreement**"), the security interests and the guarantees that secure the Second Lien Notes are contractually subordinated to liens that secure the First Lien Credit Agreement.  The Second Lien Notes are jointly and severally and fully and unconditionally guaranteed by all of the Debtors.

22.     As of the date hereof, the aggregate principal amount outstanding under the Second Lien Notes is approximately $270 million, plus any applicable interest, fees, and other amounts due thereunder.

### Need for DIP Financing

23.     The proposed DIP Financing is the linchpin of the Prepackaged Plan.  As set forth in the Granda Declaration, the interim approval of the DIP Facility is necessary and

20

appropriate to allow the Debtors to pay off their obligations under the First Lien Credit Agreement and implement a critical initial feature of the Restructuring.  In addition, the interconnected commitments of the Initial DIP Lenders to backstop the DIP Facility and accept the treatment provided in the Prepackaged Plan will allow the Debtors to sufficiently de-lever their business and emerge from bankruptcy better equipped to provide the first-rate goods, services, and business relationships that their customers, employees, vendors, and suppliers have come to expect from the world's preeminent supplier of Gilsonite.  *See* Granda Decl. ¶ 57.

24.    In addition, the Company's business requires access to Cash Collateral and the liquidity under the DIP Facility to function.  The Company's cash-inflows from product sales have diminished due to substantially lower oil and gas prices that have reduced demand for the Company's oil and gas drilling products, which historically represent a majority of its revenues.  Access to the cash collateral and the DIP Facility is essential for the Debtors to assure their employees, customers, vendors, and suppliers that the Company has sufficient working capital to continue its operations in the ordinary course of business during the pendency of these chapter 11 cases.  *See* Granda Decl. ¶ 58.

### Efforts to Obtain Postpetition Financing

25.    As explained in the Hannan Declaration, beginning in August 2016, the Debtors commenced a process to survey various sources of financing.  In exploring financing options, Evercore was cognizant of the challenges presented by the fact that the Prepetition Liens encumber substantially all of the Debtors' assets.  It was clear that, in order to obtain the necessary liquidity to administer their chapter 11 cases and execute their reorganization, the Debtors either would have to (i) find a postpetition lender willing to extend credit that would be either unsecured or junior to the Prepetition Liens, or (ii) obtain postpetition financing secured

by liens that would prime the Prepetition Liens either with the consent of the Prepetition Lenders or over their objection.  *See* Hannan Decl. ¶ 9.

26.    Evercore, on behalf of the Debtors, contacted sixteen (16) financial institutions, in addition to KeyBank and the Ad Hoc Group, to solicit offers to provide the Debtors with financing on a postpetition debtor in possession loan or exit financing basis or both. In discussions with potential lenders, parties inquired about, among other things, the Debtors' asset base, the scope of the Prepetition Liens, and the loan-to-value resulting from these or other available assets relative to the Debtors' financing needs.  None of the potential lenders whom Evercore contacted were willing to extend financing on any basis – neither on a junior priority nor priming basis.  The potential lenders cited the Debtors' exposure to the oil and gas industry, minimal hard assets other than the Debtors' land and reserves, and the relatively small capital-need as reasons for not submitting financing proposals.  As a result, the Debtors' solicitation did not yield any offers from any of the financing institutions that Evercore contacted.  *See* Hannan Decl. ¶ 10.  Accordingly, the Debtors focused their financing efforts on securing financing from either KeyBank or the Second Lien Noteholders.

27.    The Debtors received proposals from both KeyBank and the Ad Hoc Group and ultimately concluded that the Ad Hoc Group offered a more favorable option to the Debtors.  KeyBank conditioned its proposal on a full roll-up and on the Debtors agreeing to pay back KeyBank in cash for the full amount borrowed upon the effective date of a plan of reorganization.  Due to their liquidity constraints, the Debtors would need to refinance whatever postpetition financing ultimately was provided by KeyBank, and would need to receive funding in an amount that would allow the Debtors to fund their operations after exit.  In contrast, the Ad Hoc Group offered to provide a postpetition financing that (i) is of sufficient size to provide the

22

Debtors with the required liquidity to meet its operational demands upon emergence, and that (ii) the Debtors can convert into an exit facility pursuant to a plan of reorganization acceptable to the DIP Lenders.  KeyBank's proposal also contemplated significant upfront fees, yet provided for a limited term of not more than sixty (60) days.  *See* Hannan Decl. ¶ 11.  Accordingly, the Debtors determined that the Ad Hoc Group's proposal was more favorable in comparison to the loan proposed by KeyBank, most importantly, because KeyBank's proposal did not provide the Debtors the necessary financial flexibility to successfully and promptly emerge from chapter 11.

28.    Moreover, the deleveraging transaction that the Debtors seek to effectuate will equitize the Second Lien Notes Claims, and the Debtors were working with the Ad Hoc Group to maximize the value of the enterprise and negotiate a reorganization transaction that was interconnected with the DIP Facility.  Evercore, on behalf of the Debtors, also independently evaluated the Ad Hoc Group's proposal relative to market rates and concluded that the economic terms of the Ad Hoc Group's proposal were fair and reasonably priced.  *See* Hannan Decl. ¶ 12. For all of these reasons, the Debtors ultimately determined that the Ad Hoc Group offered a superior proposal.

29.    For several weeks, the Debtors and their advisors engaged in rigorous negotiations with the Ad Hoc Group and their advisors to obtain the best financing terms available.  The negotiations were conducted in good faith and at arm's length and may properly be characterized as "hard bargaining" by all interested parties.  Notably, the Debtors were successfully able to (a) ensure that all Second Lien Noteholders can participate in the DIP Facility, and (b) achieve meaningful reductions in the costs and fees initially proposed by the Ad Hoc Group.  On October 19, 2016, the Debtors and the Initial DIP Lenders entered into the Commitment Letter.

30.     The DIP Term Sheet attached to the Commitment Letter reflects the most favorable terms on which the members of the Ad Hoc Group were willing to extend the DIP Financing, and those terms are fair and reasonable.  *See* Hannan Declaration ¶ 14.  Importantly, the DIP Facility provides for payment in full of prepetition amounts owed to KeyBank upon entry of the Interim Order.  This allows the Debtors to avoid an expensive priming dispute while still achieving the benefits of the deleveraging transaction.  Thus, the DIP Facility is the only realistic financing available to the Debtors under the circumstances and is critical to the Debtors' going concern value.

## DIP Facility

31.     The DIP Credit Agreement provides the Debtors with interim funding of $22.5 million, net of original issue discount and backstop payments payable to the Initial DIP Lenders, upon entry of the Interim Order and, upon entry of the Final Order, allows the Debtors to make an additional draw of $7.5 million.  The initial draw will be used to repay the amounts owed under the First Lien Credit Agreement plus accrued interest and fees.  The remaining $7.5 million drawn will be used for general corporate and administration purposes, subject to an agreed upon budget.  During the interim period, the Debtors will use the cash on their balance sheet and generated from operations, with the consent of the Requisite Noteholders and Second Lien Trustee on the terms and conditions in the Interim Order.

32.     The Debtors' obligations under the DIP Facility will be secured by a first-priority perfected senior priming lien on all pre- and postpetition assets of the Debtors and the Debtors' estates.  The DIP Facility will be entitled to super-priority administrative expense status.

24

33.    Upon emergence from bankruptcy, pursuant to the Prepackaged Plan and subject to the terms and conditions thereof, all principal borrowings under the DIP Facility will be converted into the Exit Facility leaving an estimated $9.8 million (assuming a December 31, 2016 emergence date) of cash and cash equivalents on the Debtors' balance sheet that will allow the Company to maintain its operations and satisfy its obligations in the ordinary course of business.  The Ad Hoc Group's commitments are fundamental to the Debtors' reorganization strategy because they provide the Debtors certainty to implement their restructuring, emerge from these chapter 11 cases on a timely basis, and operate post-emergence with flexibility to thrive both operationally and financially.

## Relief Requested Should be Granted

### A.    Debtors Should Be Authorized to Obtain Postpetition Financing

34.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  The Debtors were unable to procure sufficient financing in the form of unsecured or junior credit, which would be allowable under section 503(b) (1) or as an administrative expense, in accordance with section 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1).  Having determined that postpetition financing only is available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the Ad Hoc Group to secure the DIP Financing on the terms set forth herein.  *See* Hannan Decl. ¶¶ 13– 14.  The DIP Facility is tailored to the Debtors' needs and will allow the Debtors to effectively execute their restructuring.  If the relief requested herein is not granted, the Debtors' ability to continue to operate their business and reorganize will be in serious jeopardy.  For these reasons,

25

as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

### i.    Entry into DIP Facility Is a Sound Exercise of Business Judgment

35.    Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr.  S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr.  S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr.  W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

36.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code."  *In re Curley Valley Assoc.'s*, 14 B.R. 506, 513-514 (Bankr.  D. Utah.  Oct 8, 1981) (footnote omitted). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar

circumstances.'"  *In re Dura Auto.  Sys.  Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97

(Bankr.  D. Del. Aug. 15, 2007) (citation omitted).

37.    In  determining  whether  the  Debtors  have  exercised  sound  business

judgment in selecting the DIP Facility and entering into the DIP Loan Documents, the Court

should consider the economic terms of the DIP Facility in light of current market conditions.  *See*

Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr.  S.D.N.Y. February 27,

2009) (recognizing that "the terms that are now available for DIP Financing in the current

economic  environment  aren't  as  desirable"  as  in  the  past).    Moreover,  the  Court  may

appropriately take into consideration non-economic benefits to the Debtors offered by a proposed

postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for

the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  Relevant features
> of  the  financing  must  be  evaluated,  including  non-economic
> elements such as the timing and certainty of closing, the impact on
> creditor  constituencies  and  the  likelihood  of  a  successful
> reorganization.  This is particularly true in a bankruptcy setting
> where cooperation and established allegiances with creditor groups
> can  be  a  vital  part  of  building  support  for  a  restructuring  that
> ultimately  may  lead  to  a  confirmable  reorganization  plan.    That
> which  helps  foster  consensus  may  be  preferable  to  a  notionally
> better  transaction  that  carries  the  risk  of  promoting  unwanted
> conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr.  S.D.N.Y. July 6, 2009).

38.    The Debtors' determination to secure DIP Financing is a business decision

guided by the Debtors' financial and operational needs.  As discussed, none of the sixteen (16)

third party financial institutions that Evercore contacted on behalf of the Debtors as potential

lenders were willing to extend postpetition financing to the Debtors that would be junior to the

27

first-priority liens under the First Lien Credit Agreement. In addition, the Prepetition Lenders would not consent to a senior priming debtor in possession loan. Accordingly, the Debtors focused their efforts to procure financing from KeyBank and the Ad Hoc Group.

39.    KeyBank and the Ad Hoc Group both submitted proposals. For the reasons stated in paragraph 27 above and the Hannan Declaration ¶¶ 11-12, the Ad Hoc Group's offer provided more favorable terms for the Debtors. Most importantly, KeyBank's proposal did not provide the Debtors the necessary financial flexibility to successfully and promptly emerge from chapter 11.

40.    In addition, in light of the interrelated agreements comprising the Debtors' reorganization strategy, the negotiations that the Debtors undertook with the Prepetition Lenders, and the need for certainty during and upon exit from chapter 11, the Debtors' selection of certain Prepetition Lenders to provide the DIP Loans on a consensual basis was the most logical and favorable choice. Given the benefits of the Prepackaged Plan, the Debtors did not wish to commence these cases with a highly contested and expensive priming litigation, which almost certainly would have occurred had the Debtors obtained financing from another lender. *See* Hannan Decl. ¶¶ 12, 14.

41.    After determining that the Ad Hoc Group offered the most favorable proposal, the Debtors then engaged in negotiations to secure the most favorable terms possible under the circumstances. *See* Hannan Decl. ¶¶ 13–14. Such negotiations resulted in not only obtaining the best postpetition financing available to the Debtors, but also in securing a commitment to provide the Debtors with sufficient cash to emerge from bankruptcy in a way that best serves the long-term future of their business.

42.     Additionally, as noted in paragraph 28 above, Evercore independently evaluated the Ad Hoc Group's proposal relative to market rates and concluded that the economic terms of the Ad Hoc Group's proposal were fair and reasonably priced.  Accordingly, entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

### ii.     Debtors Should Be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis

43.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien [.]

11 U.S.C. § 364(c).

44.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also*

29

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr.  N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs.  Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected most favorable of two offers it received).

45.    As stated, the Debtors contacted sixteen (16) financial institutions, in addition to KeyBank and the Ad Hoc Group, to seek proposals for postpetition financing.  Other than KeyBank, no other offers were submitted on a priming, unsecured, or junior lien basis.  The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with superpriority administrative expense status for any obligations arising under their respective DIP Loan Documents as provided for in section 364(c)(1) of the Bankruptcy Code.

### iii.    Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Priming Liens Senior to Prepetition Liens

46.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

47.    Here, the parties who are being primed are the Second Lien Noteholders, and the Second Lien Trustee, on behalf of the Second Lien Noteholders, consents to the priming of the Second Lien Notes.  When determining whether to authorize a debtor to obtain credit secured by a lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.  Courts consider a number of factors, including, without limitation:

> (a)    whether the party subject to a priming lien has consented to such treatment;
>
> (b)    whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids, or timely proposals are before the court);

(c)  whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(d)  whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

(e)  whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *In re Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 879–81, Hr'g Tr. at 733:3, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009); *In re Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed. rev. 2016). The DIP Loan Documents satisfy all of these factors.

48.    <u>First</u>, all Second Lien Noteholders are deemed to have consented to being primed by the DIP Facility. *See* Proposed Order ¶ (F)(ii). The Debtors therefore submit that such treatment is appropriate.

49.    <u>Second</u>, the Debtors and their advisors explored other financing sources. The Ad Hoc Group offered the best terms available. The Debtors conducted arm's length negotiations with the Ad Hoc Group on the terms of the DIP Facility. The DIP Loan Documents reflect the most favorable terms on which the Ad Hoc Group was willing to extend the DIP Financing. The Debtors have not been able to obtain financing on better terms from the Ad Hoc Group, or any other lender.

50.    <u>Third</u>, the Debtors require the proceeds of the DIP Facility to effectuate their reorganization strategy. Gaining access to the liquidity necessary to preserve the going

concern value of the Debtors' estates through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

51.    Fourth, upon entry of the Final Order, the DIP Financing will provide access to $7.5 million in incremental liquidity, in addition to the use of existing cash on the Debtors' balance sheet and generated revenues, which the Debtors and their advisors have determined is sufficient and necessary to allow the Debtors to maintain their operations and meet the various obligations they owe to key constituents notwithstanding the commencement of these cases.  Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities during their chapter 11 cases.

52.    Fifth, as described in greater detail above and in the Hannan Declaration, the Debtors and the Ad Hoc Group negotiated the DIP Loan Documents in good faith and at arm's length.  The Debtors' entry into the DIP Loan Documents is an exercise of their sound business judgment.  The DIP Facility is the only viable source of the liquidity the Debtors need to fund their reorganization, and it also sets the foundation for the Debtors' successful emergence from chapter 11 and post-emergence growth and profitability.  See Hannan Decl. ¶¶ 13, 24.

### iv.    Interests of Prepetition Secured Parties Are Adequately Protected

53.    Parties with an interest in cash collateral or collateral that may be used to secure postpetition financing are entitled to adequate protection.  See 11 U.S.C. § 363(e).  In addition, a debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  See 11 U.S.C. § 364(d)(1)(B).  Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what

33

constitutes adequate protection is decided on a case-by-case basis.  *See Resolution Trust Corp. v.*

*Swedeland Dev. Group, Inc.* (*In re Swedeland Dev. Group, Inc.*), 16 F.3d 552, 564 (3d Cir. 1994)

("[A] determination of whether there is adequate protection is made on a case by case basis."); *In*

*re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr.

D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In*

*re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr.  D. Del. Feb.

18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases

demonstrate that what interest is entitled to adequate protection and what constitutes adequate

protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R.

389, 394 (Bankr.  D.N.H. 1993) (*citing* 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed.

1993) (explaining that adequate protection can take many forms and "must be determined based

upon equitable considerations arising from the particular facts of each proceeding").

      54.    In *Swedeland*, the Third Circuit pointedly noted that the purpose of

adequate protection "is to insure that the creditor receives the value for which he bargained

prebankruptcy."  *In re Swedeland*, 16 F.3d at 564 (*quoting In re O'Connor,* 808 F.2d 1393, 1396

(10th Cir. 1987)); *see also Shaw Indus., Inc. v.  First Nat'l Bank of PA* (*In re Shaw Indus., Inc.*),

300 B.R. 861, 865 (Bankr.  W.D. Pa. 2003) (noting that "[t]he purpose of providing 'adequate

protection' is to insure that a secured creditor receives in value essentially what he bargained

for"); *In re Beeker Indus. Corp.*, 58 B.R. 725, 736 (Bankr.  S.D.N.Y. 1986) (noting that

application of adequate protection "is left to the vagaries of each case, but its focus is protection

of the secured creditor from diminution in the value of its collateral during the reorganization

process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).  The Third

Circuit has held that whether protection is adequate "depends directly on how effectively it

compensates the secured creditor for loss of value" caused by the priming lien granted to the new lender. *In re Swedeland*, 16 F.3d at 564 (quoting *In re Am. Mariner Inds., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).

55.    Consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Lenders with more than sufficient adequate protection to protect them to the extent of any diminution in value of their interests in the Prepetition Collateral during the pendency of these chapter 11 cases.  With respect to KeyBank, the DIP Credit Agreement provides that the Debtors will pay KeyBank in full for the amount outstanding under the First Lien Credit Agreement upon entry of the Interim Order.  Postpetition financing has been used to pay out prepetition obligations in other chapter 11 cases in this and other districts. *See, e.g.*, *In re New Gulf Res., LLC*, No. 15-12566 (BLS) (Bank. D. Del. Dec. 18, 2015) [Docket No. 41] (using debtor in possession financing facilities to repay prepetition secured credit obligations); *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr.  D. Del. Oct. 2, 2014) [Docket No. 54] (same); *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr.  S.D.N.Y. May 6, 2016) [Docket No. 99] (same); *In re Bear Island Paper Co., LLC*, No. 10-31202 (DOT) (Bankr.  E.D. Va. Feb. 26, 2010) [Docket No. 66] (same); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr.  S.D.N.Y. Jan. 8, 2009) [Docket No. 79] (same); *cf. In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bank.  D. Del. June 6, 2014) [Docket No. 859]; *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) [Docket No. 43].

56.    In the instant case, the Debtors initially received a proposal from KeyBank.  However, KeyBank was unwilling to finance any borrowings after emergence from bankruptcy.  This proved unworkable for the Debtors given that the Debtors would not have

sufficient liquidity to repay the postpetition financing upon exit and would need additional liquidity to run its business after the close of these chapter 11 cases.  This led the Debtors to seek a proposal from the Ad Hoc Group, who offered a superior proposal to KeyBank that would allow the Debtors to refinance their borrowings upon exit, pursuant to the Prepackaged Plan, and would provide the Debtors sufficient liquidity to fund operations during and after the case, as well as the administration of the cases themselves.

57.    In considering the various options for structuring the DIP Financing, the Debtors determined that KeyBank would be unwilling to consent to any priming of the Prepetition Credit Facility Liens by the DIP Liens.  Moreover, no party was willing to provide any financing that would be unsecured or junior to the First Lien Credit Agreement.  Therefore, the only way that the Debtors could obtain financing from the Ad Hoc Group would be to either prime the First Lien Credit Agreement over KeyBank's objection, or pay KeyBank off in full with the proceeds from the DIP Facility.

58.    The DIP Facility's current structure is therefore the most logical postpetition financing available to the Debtors.  Further, no party will be prejudiced by the DIP Facility as it is currently structured.  The Prepackaged Plan contemplates that the only class of creditors that will be impaired are the Second Lien Noteholders which includes the members of the Ad Hoc Group who have already voted in favor of the Prepackaged Plan.  Moreover, under the Bankruptcy Code, the Debtors would have to pay the borrowings under the First Lien Credit Agreement in full or otherwise leave KeyBank unimpaired before any other constituency could receive recoveries.  The DIP Facility therefore only alters the timing, not the amount, to be paid to KeyBank.

RLF1 15532572v.1

59.     With respect to the Second Lien Noteholders, the DIP Facility provides for the following form of adequate protection, in each case, subject to the Carve-Out (collectively, the "**Adequate Protection**"):

> (a)     replacement liens on all assets of the Debtors, subject to the DIP Liens;
>
> (b)     superpriority administrative expense claims, subject to the superpriority claims granted to the DIP Agent and DIP lenders; and
>
> (c)     adequate protection payments to the Second Lien Noteholders for all reasonable and documented out-of-pocket fees, costs, and expenses, including the fees and expenses of their counsel and financial advisors.

60.     The Adequate Protection appropriately safeguards the Second Lien Noteholders from the diminution in the value of their interests in the Prepetition Collateral, and, as such, is fair and reasonable and satisfies the requirements of section 364 of the Bankruptcy Code.  The Second Lien Trustee, on behalf of the Second Lien Noteholders, consents to the priming of the Prepetition Second Lien Notes and has no objection to the adequate protection thereof as provided in the Interim Order.

**B.      Debtors Should Be Authorized to Use Cash Collateral**

61.     For the reasons set forth herein, the Debtors require use of cash collateral for working capital and to implement the transactions contemplated by the Prepackaged Plan. Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

37

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

62.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the cash collateral. Importantly, the Second Lien Trustee on behalf of the Second Lien Noteholders has consented to the use of the cash collateral, subject to the Approved Budget and the Carve-Out. Additionally, and as described above, the Debtors are providing the Second Lien Noteholders with Second Lien Noteholder Adequate Protection Liens and Second Lien Noteholder Superpriority Claims for and equal in amount to any aggregate diminution in the value of each Second Lien Noteholder's respective interests in the Prepetition Collateral. Accordingly, the Court should grant the Debtors the authority to use their cash collateral under section 363(c)(2) of the Bankruptcy Code.

**C.      Debtors Should Be Authorized to Pay Fees Required by Ad Hoc Group and Honor Obligations Under Commitment Letter**

63.     As described above, pursuant to the Commitment Letter, and subject to Court approval, the Debtors have agreed to pay certain fees to the Ad Hoc Group in exchange for their agreement to backstop the DIP Facility. The Debtors have also agreed to a 1% fee payable to all DIP Lenders for converting the DIP Loans into the Exit Facility, pursuant to the Prepackaged Plan and subject to the terms and conditions thereof. The Debtors carefully considered and negotiated these fees. The DIP Facility is fair and reasonably priced and consistent with postpetition financings of this nature. The incremental cost of the DIP Facility is far outweighed by the flexibility it affords the Debtors to continue their operations in the ordinary course of business during the pendency of these chapter 11 cases and the benefits of the

38

reorganization transaction.  The Debtors submit that the terms of the DIP Facility, including the fees thereunder, constitute the best terms on which the Debtors could obtain the postpetition financing necessary to successfully execute their reorganization strategy.  Paying these fees in order to obtain the DIP Financing is in the best interests of all stakeholders. *See* Hannan Decl. ¶¶ 15, 18, 19.

**D.    Carve-Out Is Appropriate**

64.    The proposed DIP Facility subjects the DIP Lenders' security interests and administrative expense claims to the Carve-Out.  The Carve-Out is similar to other terms created for professional fees that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr.  D. Del. Aug. 19, 2016) [Docket No. 130]; *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr.  D. Del. Nov. 2, 2015) [Docket No. 248]; *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr.  D. Del. Oct. 2, 2014) [Docket No. 54]; *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr.  S.D.N.Y. May 6, 2016) [Docket No. 99]; *In re Bear Island Paper Co., LLC*, No. 10-31202 (DOT) (Bankr.  E.D. Va. Feb. 26, 2010) [Docket No. 66]; *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr.  S.D.N.Y. Dec. 13, 2010) [Docket No. 43].

65.    Without the Carve-Out, the Debtors' estates or other parties-in-interest may be deprived of possible rights and powers because the services for which Professionals may be paid in these cases is restricted.  *Id.* at 38 (observing that courts insist on Carve-Outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that

assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

**E.    DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

66.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

67.    As explained in detail herein and in the Hannan Declaration, the DIP Loan Documents are the result of the Debtors' reasonable and informed determination that the Ad Hoc Group offered the most favorable terms pursuant to which the Debtors could obtain necessary postpetition financing.  All negotiations of the DIP Facility were conducted in good faith and at arm's length.  The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.  *See* Hannan Decl. ¶¶ 21–24.

**F.        Modification of Automatic Stay Is Warranted**

68.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:  (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Documents), after the expiration of the applicable grace period, if any, or the occurrence of the DIP Maturity Date, as applicable, certain remedies under the DIP Loan Documents at any time five (5) business days after giving notice to the Debtors; and (iii) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Loan Documents. The modification of the automatic stay also permits the DIP Secured Parties, Prepetition Agents, and Prepetition Lenders to retain and apply payments made in accordance with the DIP Loan Documents.

69.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g.*, *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr.  D. Del. Aug. 19, 2016) [Docket No. 130] (modifying stay to authorize exercise of remedies upon default); *In re RCS Capital Corp.*, No. 16-10223 (MFW) (Bank.  D. Del. Apr. 11, 2016) [Docket No. 516] (same); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr.  D. Del. Nov. 2, 2015) [Docket No. 248] (same); *In re Coldwater Creek, Inc.*, No. 14-10867 (BLS) (Bankr.  D. Del. June 12, 2014) [Docket No. 573] (same); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr.  D. Del. Feb. 16, 2010) [Docket No. 55] (same).

41

**G.**    **Debtors Require Immediate Access to Cash Collateral and DIP Financing**

70.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See In re Ames Dep't Stores*, 115 B.R. at 36.

71.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow an aggregate principal amount of $22.5 million under the DIP Facility, is not granted promptly after the Commencement Date.  The Debtors have an immediate need for access to cash collateral to continue the operation of their business, maintain their key business relationships, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.  Additionally, the Debtors require the interim relief under the DIP Facility in order to repay KeyBank in full at the Commencement Date.  Repayment of KeyBank is a crucial component of the agreement the Debtors' negotiated with the Ad Hoc Group, and absence of this relief will trigger defaults under the DIP Credit Agreement and RSA.  Accordingly, the Debtors require immediate repayment of KeyBank in order to ensure that they can meet their obligations under the RSA and DIP Credit Agreement and move forward with the Restructuring.  For the reasons stated, there is no prejudice to any stakeholder from such payment.

72.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g.*, *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr.  D. Del. July 29, 2016) [Docket No. 46] (authorizing debtors to obtain postpetition financing on an interim basis); *In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr D. Del. Mar. 11, 2016) [Docket No. 65] (same); *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr.  D. Del. Mar. 12, 2015) [Docket No. 70] (same); *In re QCE Finance LLC*, No. 14-10543 (PJW) (Bankr.  D. Del. Mar. 17, 2014) [Docket No. 39] (same); *In re AbitbiBowater, Inc.*, No. 09-11296 (KJC) (Bankr.  D. Del. Apr. 17, 2009) [Docket No. 64] (same); *In re Dura Auto.  Sys., Inc.*, No. 06-11202 (KJC) (Bankr.  D. Del. Oct. 31, 2006) [Docket No. 88] (same). Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2) as well as Bankruptcy Rule 6003(b).

**H.      Request for Final Hearing**

73.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.

74.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

<u>Reservation of Rights</u>

75.     Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any

43

appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Request for Bankruptcy Rule 6004(a) and (h) Waivers

76.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Granda Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day (14) stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Notice

77.    Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware (Attn:  Natalie Cox); (ii) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; (iii) counsel to the First Lien Credit Agreement Agent, KeyBank National Association:  (a) Durham Jones & Pinegar, P.C., 111 East Broadway, Suite 900, Salt Lake City, UT 84111 (Attn:  Steven J. McCardell) and (b) Buchanan Ingersoll & Rooney PC (Attn:  Mary F. Caloway and Kathleen A. Murphy), 919 North Market Street, Suite 1500, Wilmington, DE 19801-3046;  (iv) counsel to the Consenting Second Lien

RLF1 15532572v.1

Noteholders:  (a) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038 (Attn:  Kristopher M. Hansen and Erez E. Gilad) and (b) Young Conaway Stargatt & Taylor LLP, 1000 N. King Street, Rodney Square, Wilmington, DE 19801 (Attn:  Matthew B. Lunn); (v) counsel to the Consenting AGHC Interest Holders:  (a) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY, 10017 (Attn:  Elisha D. Graff) and (b) Fox Rothschild LLP, 919 North Market St., Suite 300, Wilmington, DE 19899-2323 (Attn:  Jeffrey Schlerf); (vi) counsel to the DIP Agent, Wilmington Trust, National Association:  Covington & Burling LLP, 620 Eighth Avenue, New York, NY 10018 (Attn:  Ronald A. Hewitt); (vii) counsel to the Second Lien Trustee, Wilmington Trust, National Association:  Pryor Cashman LLP, 7 Times Square, New York, NY 10036 (Attn:  Seth H. Lieberman and Patrick Sibley); (viii) the Securities and Exchange Commission; (ix) the Internal Revenue Service; (x) the United States Attorney's Office for the District of Delaware; (xi) any other party entitled to notice pursuant to Local Rule 9013-1(m); (xii) the Banks; and (xiii) the Bureau of Land Management, the Division of Oil, Gas and Mining, and all other counterparties with an interest in the Debtors' assets (the "**Notice Parties**").

78.    The Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Debtors to this or any other court.

RLF1 15532572v.1

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and the Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: October 24, 2016
         Wilmington, Delaware

/s/ *Mark D. Collins*
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Amanda R. Steele (No. 5530)
Andrew M. Dean (No. 6147)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:   (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr
Sunny Singh
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**Exhibit A**

**Commitment Letter**

October 19, 2016

American Gilsonite Company
29950 S. Bonanza Highway
Bonanza, UT 84008
Attention:  Chief Financial Officer

**American Gilsonite Company**
**$30,000,000 Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement**
**Commitment Letter**

Ladies and Gentlemen:

We understand that American Gilsonite Company, an Oklahoma corporation (the "***Company***"), its parent entity, American Gilsonite Holding Company, a Delaware corporation ("***Holdings***"), and the direct and indirect subsidiaries of the Company and Holdings (such subsidiaries, together with the Company and Holdings, collectively, the "***Loan Parties***"), anticipate filing voluntarily petitions under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") (collectively the "***Chapter 11 Cases***").  In connection with the Chapter 11 Cases, each of the financial institutions and other entities listed on Annex A hereto (each, a "***Commitment Party***" and collectively, the "***Commitment Parties***") hereby, severally but not jointly, commits to provide, directly and/or through one or more affiliates or related funds, its share of commitments set forth opposite such Commitment Party's name on <u>Annex A</u> hereto (collectively, the "***Commitments***") of a senior secured super-priority priming debtor-in-possession credit agreement in an aggregate principal amount of up to $30,000,000 (the "***DIP Facility***"), in each case on the terms set forth in the Summary of Terms and Conditions attached hereto as <u>Exhibit I</u> (the "***DIP Term Sheet***" and collectively with this letter and any annexes or attachments thereto or hereto, this "***Commitment Letter***").  Capitalized terms used in this letter but not defined herein shall have the meanings given to them in the DIP Term Sheet.

The Company agrees that a financial institution selected by the Commitment Parties, and agreed to by the Company in its reasonable discretion, will act as the sole administrative agent and collateral agent for the DIP Facility (in such capacity, together with its successors and permitted assigns, the "***DIP Agent***").  The fees of the DIP Agent will be set forth in a fee letter agreement between the DIP Agent and the Company (the "***Agent Fee Letter***").  No arrangers, bookrunners, or other agents or co-agents will be appointed, or other titles conferred, except as expressly provided in the DIP Term Sheet, in each case, without the consent of the Commitment Parties hereunder.  It is contemplated that the DIP Facility will be syndicated after the Closing Date as provided in the DIP Term Sheet.

## A.    <u>Information Requirements</u>

The Company represents and warrants that (i) all written information that has been or will hereafter be made available to the DIP Agent or any Commitment Party or their financial or legal advisors by or on behalf of the Company or any of their respective affiliates or representatives in connection with the transactions contemplated hereby (other than the Projections (as defined below), the "***Information***"), when taken as a whole, is or will be, when furnished, correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made, and (ii) all financial projections that have been or will be prepared by or on behalf of the Company or any of their respective representatives and made available to the DIP Agent or

any Commitment Party or their financial or legal advisors in connection with the transactions contemplated hereby (collectively, the "***Projections***") have been or will be prepared in good faith based upon assumptions believed to be reasonable at the time made and at the time the related Projections are made available to such parties (it being understood that such Projections are subject to uncertainties and contingencies, many of which are beyond the Loan Parties' control, and that no assurance can be given that the Projections will be realized).  If at any time from the date hereof until the effectiveness of the DIP Loan Documents, any of the representations and warranties in the preceding sentence would be incorrect if the Information or Projections were then being furnished, and such representations and warranties were then being made, at such time, then the Loan Parties will promptly supplement, or cause to be promptly supplemented, the Information and the Projections so that such representations and warranties contained in this paragraph will be correct at such time; provided, that any such supplementation shall cure any breach of such representations.  In issuing this Commitment Letter and in arranging the DIP Facility (including any syndication of the DIP Facility), the DIP Agent and the Commitment Parties will be entitled to use, and to rely on the accuracy of, the Information and Projections furnished to them by or on behalf of the Company and their respective affiliates without responsibility for independent verification thereof.  Notwithstanding anything to the contrary contained in this Commitment Letter or the Agent Fee Letter, none of the making of any representation under this Section A, the provision of any supplement thereto, or the accuracy of any such representation or supplement shall constitute a condition precedent to the availability and/or initial funding of the DIP Facility on the Closing Date.

## B.  Conditions

The several and not joint undertakings and obligations of each Commitment Party under this Commitment Letter are subject to the satisfaction (or waiver by the Commitment Parties in their sole discretion) of each of the following conditions precedent:

(i)     the execution and delivery of the DIP Loan Documents in form and substance acceptable to the Commitment Parties reflecting the terms and conditions set forth in this Commitment Letter and the DIP Term Sheet;

(ii)     the absence since June 30, 2016 of any event or circumstance, which has resulted in or could reasonably be expected to result in a Material Adverse Effect; for such purpose "Material Adverse Effect" shall mean, with respect to any event, change, effect, occurrence, development, circumstance or change of fact, a material adverse effect on (a) the business, results of operations, condition (financial or otherwise), assets or liabilities of the Loan Parties and their Subsidiaries, taken as a whole, (b) the legality, validity or enforceability of any DIP Loan Document, the Interim Order  or the Final Order, the Loan Parties' respective obligations under any DIP Loan Document, the Interim Order or the Final Order, or the rights and remedies of the DIP Agent and the DIP Lenders under any DIP Loan Document, the Interim Order or the Final Order, (c) the ability of the Loan Parties to perform their respective material obligations under the DIP Loan Documents, (d) the value of the material DIP Collateral, (e) the perfection or priority of the DIP Liens granted pursuant to the DIP Loan Documents, the Interim Order or the Final Order, or (f) the ability of the DIP Agent or the DIP Lenders to enforce the DIP Loan Documents; provided, however, that "Material Adverse Effect" shall not include any event, change, effect, occurrence, development, circumstance or change of fact arising out of, resulting from or relating to (i) the commencement or existence of the Chapter 11 Cases, (ii) the announcement of the Plan and the transactions contemplated hereby, (iii) compliance by any Loan Party with the covenants and agreements contained in the DIP Loan Documents or the RSA or in the Plan, (iv) any change in applicable laws of general applicability or interpretations thereof by any courts or other governmental authorities (except to the extent such change affects the Loan Parties, taken a whole, in a disproportionately adverse manner relative to other participants in the industries in which the Loan Parties participate (provided that any such

change may only be considered to the extent of such disproportionate impact)), (v) any action or omission of a Loan Party taken with the express prior written consent of the Required Commitment Parties, (vi) any expenses incurred by the Company in connection with transactions contemplated hereby or (vii) changes in commodity prices prior to October 19, 2016;

(iii)    the representations and warranties contained in the DIP Loan Documents or this Commitment Letter shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as though made on and as of such date;

(iv)    the Bankruptcy Court shall have entered an Interim Order not later than the fifth calendar day after the Petition Date, in form and substance satisfactory to the Initial DIP Lenders, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Initial DIP Lenders;

(v)    payment by the Company, on or prior to the Closing Date, of all reasonable and documented out-of-pocket fees and expenses owing and payable to the DIP Agent and the DIP Lenders as of the Closing Date (including fees and expenses of their counsel and advisors), in each case to the extent invoiced at least two Business Days' prior to the Closing Date pursuant to this Commitment Letter and the DIP Credit Agreement;

(vi)    the DIP Agent and the DIP Lenders shall have received to the extent requested at least five days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act;

(vii)    all first day motions related to the DIP Credit Agreement and the approval thereof shall be in form and substance reasonably satisfactory to the Required Commitment Parties;

(viii)    since the date of this Commitment Letter, the Loan Parties not (x) receiving any proceeds from any offering, placement or arrangement of any debt securities or bank financing (other than the DIP Facility) or (y) issuing, offering, placing or arranging any debt securities or bank financing (other than the DIP Facility); and

(ix)    this Commitment Letter not having been terminated in accordance with Section D(1) below.

**C.    Fees; Indemnification; Expenses**

1.    Fees.  In addition to the fees described in the DIP Term Sheet, the Company will pay (or cause to be paid) the fees set forth in the Agent Fee Letter.  The Company also agrees to pay, or to reimburse each Commitment Party for, all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent and the Commitment Parties in connection with the DIP Facility (but limited, in the case of legal and advisory fees and expenses to the reasonable and documented out-of-pocket fees, costs, disbursements and expenses of (a) Stroock & Stroock & Lavan LLP; Young Conaway Stargatt & Taylor, LLP; and Parsons Behle & Latimer, (b) Houlihan Lokey Capital, Inc.) and (c) any engineers, consultants, or other professional advisors retained by the Commitment Parties or their counsel with the consent of the Company, which consent shall not be unreasonably withheld, delayed or conditioned.

3

2.      <u>Indemnification</u>. The Company agrees to (a) indemnify and hold harmless the DIP Agent, each Commitment Party, their respective affiliates and their officers, directors, employees, agents, legal counsel (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("***Losses***") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Agent Fee Letter, the DIP Facility, the use of proceeds thereof or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Company or its respective affiliates or equity holders), and (b) reimburse each such Indemnified Person promptly upon demand for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with investigating or defending any of the foregoing; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from the willful misconduct, fraud or gross negligence of such Indemnified Person or arises from a dispute among Indemnified Persons (other than any claims against any Commitment Party or the DIP Agent in its capacity or in fulfilling its role as an agent under the DIP Facility). The Company agrees that, notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its subsidiaries or affiliates or to the Company's or its subsidiaries' respective equity holders or creditors or to any other person or entity arising out of, related to or in connection with any aspect of the DIP Facility, except to the extent of direct (as opposed to special, indirect, consequential or punitive) damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud or willful misconduct.

**D.      <u>Miscellaneous</u>**

1.      <u>Termination</u>. This Commitment Letter and all commitments and undertakings of the Commitment Parties under this Commitment Letter shall terminate and expire upon the earliest of the following to occur:

(a)      11:59 p.m., New York, New York time, on October 19, 2016 (as such time may be extended by mutual written agreement of the Company and the Commitment Parties in their respective sole discretion) unless by such time the Company and each of the Commitment Parties executes and delivers this Commitment Letter;

(b)      so long as the Company has received a draft of the Agent Fee Letter by 5:00 p.m., New York, New York time, on October 21, 2016, prior to the commencement of the hearing to approve the Interim Order (as such time may be extended by mutual written agreement of the Company and the Commitment Parties in their respective sole discretion) unless by such time the Company executes and delivers the Agent Fee Letter;

(c)      5:00 p.m., New York, New York time, on November 4, 2016 (as such time may be extended by mutual written agreement of the Company and the Commitment Parties in their respective sole discretion) unless by such time all the DIP Loan Documents relating to the DIP Facility have been executed and delivered by all parties thereto and the initial borrowing under the DIP Facility has occurred;

(d)      the Closing Date;

4

(e)    the commencement by the Loan Parties of an avoidance action with respect to the Second Lien Obligations (as defined in the DIP Term Sheet), or the filing by the Loan Parties of any motion or request in the Chapter 11 Cases or in any other legal proceeding seeking, or the entry by the Bankruptcy Court or any other court with appropriate jurisdiction of, an order invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (i) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens securing the Second Lien Obligations, or (ii) the validity, enforceability, characterization or nonavoidability of any of the Second Lien Obligations; or

(f)    the RSA is terminated in accordance with its terms and is no longer in full force and effect.

In addition to the foregoing, (i) this Commitment Letter may be terminated at any time by mutual agreement of the Company and the Commitment Parties and (ii) all commitments and undertakings of the Commitment Parties hereunder may be terminated by Commitment Parties representing more than 50% of the commitments hereunder if the Company fails to perform any of its obligations under this Commitment Letter on a timely basis.

2.    <u>No Third-Party Beneficiaries</u>.  This Commitment Letter is solely for the benefit of the Company and the other Loan Parties, the DIP Agent, the Commitment Parties and the Indemnified Persons; no provision hereof shall be deemed to confer rights on any other person or entity.

3.    <u>No Assignment; Amendment</u>.  This Commitment Letter and the Agent Fee Letter may not be assigned by the Company to any other person or entity, but all of the obligations of the Company hereunder and under the Agent Fee Letter shall be binding upon the successors and assigns of the Company.  This Commitment Letter and the Agent Fee Letter may not be amended or modified except in writing executed by each of the parties hereto.  Assignments by any Commitment Party (other than assignments to another Commitment Party, an affiliate of any Commitment Party or any fund that is administered or managed by (a) a Commitment Party, (b) an affiliate of a Commitment Party or (c) an entity or an affiliate of an entity that administers or manages a Commitment Party) shall be subject to the prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned) of the Company and of Commitment Parties representing more than 50% of the commitments hereunder (excluding for such purposes the commitment proposed to be assigned).  Any assignment by a Commitment Party shall not be deemed to release the assigning Commitment Party from its obligations hereunder (except as may otherwise be agreed by the Company and all other Commitment Parties).

4.    <u>Use of Name and Information</u>.  The Company agrees that any references to the DIP Agent, any Commitment Party or any of their respective affiliates made in connection with the DIP Facility (other than any such references made to the Bankruptcy Court in connection with the Chapter 11 Cases) are subject to the prior approval of the DIP Agent or such Commitment Party, as applicable, which approval shall not be unreasonably withheld.  Each Commitment Party shall be permitted to use information related to the arrangement of the DIP Facility in connection with marketing, press releases or other transactional announcements or updates provided to investor or trade publications, including, but not limited to, the placement of "tombstone" advertisements, or otherwise describing the names of the Company and its affiliates, and the amount, type and closing date of the DIP Facility, in publications of its choice at its own expense and subject to the Company's consent (not to be unreasonably withheld).

5.    <u>Governing Law</u>.  This Commitment Letter, the Agent Fee Letter and any claim, controversy or dispute arising under or related to the Commitment Letter or the Agent Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York.  Each of the parties

5

hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any jurisdiction thereof, in any suit, action or proceeding arising out of or relating to this Commitment Letter, the Agent Fee Letter or the transactions contemplated hereby or thereby, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined only in the Bankruptcy Court or such New York State court or, to the extent permitted by law, in such Federal court, and any appellate court from any jurisdiction thereof, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Agent Fee Letter or the transactions contemplated hereby or thereby in the Bankruptcy Court or any New York State court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Service of any process, summons, notice or document by registered mail addressed to the Company at the address above shall be effective service of process for any suit, action or proceeding brought in any such court.

6.    <u>Survival</u>.  The obligations of the parties hereto under the indemnification, expense reimbursement, confidentiality, use of name, absence of fiduciary relationship and governing law provisions of this Commitment Letter shall survive the expiration and termination of this Commitment Letter; <u>provided</u>, <u>however</u>, that upon closing of the DIP Facility, such provisions shall be superseded by the comparable provisions in the DIP Loan Documents.

7.    <u>Confidentiality</u>.  This Commitment Letter is delivered to the Company on the understanding that neither this Commitment Letter nor the Agent Fee Letter nor any of their terms or substance, shall be disclosed to any other person except (a) to the Company's equity sponsors, officers, directors, employees, attorneys, agents, accountants and advisors in connection with the DIP Facility on a confidential basis, (b) as required by applicable law or compulsory legal process (in which case the Company agrees to inform the Commitment Parties promptly thereof prior to such disclosure, to the extent permitted by applicable law), (c)  to the extent required by the Bankruptcy Court; provided, however, that if this Commitment Letter is required to be filed with the Bankruptcy Court or disclosed to the U.S. Trustee, the Company will take all reasonable actions necessary to prevent Annex A to this Commitment Letter from becoming publicly available, including, without limitation, filing such Annex A under seal; (d) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter or the enforcement of rights hereunder and (e) otherwise with the prior written consent of the Commitment Parties.

Each Commitment Party agrees that neither this Commitment Letter nor the Agent Fee Letter nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person except (a) to each Commitment Party's respective officers, directors, employees, agents, attorneys, accountants and advisors on a confidential and need to know basis, (b) as required by applicable law or compulsory legal process (in which case the Company shall be promptly informed thereof prior to such disclosure, to the extent permitted by applicable law), (c) with prospective lenders and their affiliates in connection with any syndication of the DIP Facility (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such items and instructed to keep such items confidential), (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter or the enforcement of rights hereunder and (e) otherwise with the prior written consent of the Company.

6

8.      Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

The Company acknowledges that each Commitment Party may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which the Company and its subsidiaries may have conflicting interests regarding the transactions described herein or otherwise.  None of the Commitment Parties will furnish confidential information obtained from the Company by virtue of the transactions contemplated by this Commitment Letter or the other relationships of such Commitment Party with the Company to other companies.  The Company also acknowledges that none of the Commitment Parties have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to the Company, confidential information obtained by such Commitment Party from other companies.

The Company acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Company and any Commitment Party is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether any Commitment Party has advised or is advising the Company on other matters, (b) each Commitment Party, on the one hand, and the Company, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor does the Company rely on, any fiduciary duty on the part of each Commitment Party, (c) the Company is capable of evaluating and understanding, and the Company understands and accepts, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) the Company has been advised that each Commitment Party is engaged in a broad range of transactions that may involve interests that differ from the Company's interests and that no Commitment Party has any obligation to disclose such interests and transactions to the Company by virtue of any fiduciary, advisory or agency relationship and (e) the Company waives, to the fullest extent permitted by law, any claims it may have against each Commitment Party for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that no Commitment Party shall have any liability (whether direct or indirect) to the Company in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including the Company's equity holders, employees or creditors. Additionally, the Company acknowledges and agrees that no Commitment Party is advising the Company as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including, without limitation, with respect to any consents needed in connection with the transactions contemplated hereby).  The Company shall consult with the Company's own advisors concerning such matters and shall be responsible for making the Company's own independent investigation and appraisal of the transactions contemplated hereby (including, without limitation, with respect to any consents needed in connection therewith), and no Commitment Party shall have any responsibility or liability to the Company with respect thereto. Any review by any Commitment Party of the Loan Parties, the Company and the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of such Commitment Party and shall not be on behalf of the Company or any of the Company's affiliates.

9.      Counterparts; Section Headings.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.  Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

10.      Entire Agreement.  This Commitment Letter embodies the entire agreement and understanding among the Commitment Parties, the Company and their affiliates with respect to the DIP

Facility, and supersedes all prior understandings and agreements among the parties relating to the subject matter hereof.

11.    <u>Patriot Act</u>.  The Commitment Parties hereby notify the Company that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***PATRIOT Act***"), each Commitment Party and each of their respective affiliates are required to obtain, verify and record information that identifies the Company and each other Loan Party, which information includes the name, address, tax identification number and other information regarding the Company and each other Loan Party that will allow each Commitment Party to identify the Company and each other Loan Party in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Commitment Parties.

12.    <u>Waiver of Jury Trial</u>.

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE AGENT FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.**

*[Signature pages follow]*

8

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**Axar Master Fund Ltd**

By: _____

Name: Andrew Axelrod
Title: Director

*[Signature Page to Commitment Letter]*

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**Star V Partners LLC**

By: _____

    Name:  Andrew Axelrod
    Title:   Managing Partner - Axar Capital
             Management LP as its investment manager

*[Signature Page to Commitment Letter]*

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**PENNANTPARK FLOATING RATE CAPITAL LTD.**

By:_____
    Name: Arthur H. Penn
    Title: Chief Executive Officer

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**PENNANTPARK INVESTMENT CORPORATION**

By: _____
    Name: Arthur H. Penn
    Title: Chief Executive Officer

*[Signature Page to Commitment Letter]*

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**PENNANTPARK CREDIT OPPORTUNITIES FUND II, LP**

By:_____

Name: Arthur H. Penn

Title: Managing Member of PennantPark Capital, LLC, the General Partner of the Fund

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**River Birch Capital, LLC**

By: _____
   Name: James Seery
   Title: President

*[Signature Page to Commitment Letter]*

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**Tinicum Incorporated**

By: _____

Name:    Alfred C. Zedlitz III

Title:    Partner

The Commitment Parties are pleased to have been given the opportunity to assist the Company in connection with this important transaction.

Very truly yours,

**Ponderosa Investco LCC**

By: _____
    Name: Scott Hartman
    Title: Senior Managing Director

ACCEPTED AND AGREED
this 19th day of October, 2016:

**American Gilsonite Company**

By: _____
    Name: Steven A. Grande
    Title: Vice President & CFO

Exhibit I

DIP Term Sheet

**AMERICAN GILSONITE COMPANY**
**$30,000,000 SENIOR SECURED PRIMING DEBTOR-IN-POSSESSION**
**TERM LOAN FACILITY**
**Summary of Principal Terms and Conditions**

This Summary of Terms and Conditions (the "DIP Term Sheet"), dated as of October 19, 2016, sets forth certain terms of the DIP Facility (as defined below) proposed to be provided, subject to the conditions set forth below and in the Commitment Letter (as defined below), by the DIP Lenders (as defined below) and referred to as the "DIP Facility" in that certain Commitment Letter dated October 19, 2016 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Commitment Letter") executed by the Commitment Parties party thereto. This DIP Term Sheet is part of, and subject to, the Commitment Letter and, except as may be set forth in the Commitment Letter, this DIP Term Sheet does not constitute a commitment, a contract to provide a commitment, or any agreement by the DIP Lenders or the Commitment Parties referred to in the DIP Term Sheet. This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to be a summary outline of certain basic items, which shall be set forth in final definitive documentation, which shall be in form and substance consistent with this DIP Term Sheet and acceptable in all respects to the DIP Lenders and the Borrower. Capitalized terms used but not defined in this DIP Term Sheet shall have the meanings assigned in the Commitment Letter.

| | |
|---|---|
| **Borrower** | American Gilsonite Company (the "Borrower"), in its capacity as a debtor and debtor-in-possession in a case (together with the cases of its affiliated debtors and debtors-in-possession, the "Chapter 11 Cases") to be commenced under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). |
| **Guarantors** | American Gilsonite Holding Company ("Holdings") and the direct and indirect subsidiaries of the Borrower and Holdings (the "Guarantors" and together with the Borrower, each a "Loan Party" and collectively, the "Loan Parties") each in their capacities as debtors and debtors-in-possession in the Chapter 11 Cases. |
| **DIP Administrative Agent/ Collateral Agent:** | A financial institution selected by the Commitment Parties, and agreed to by the Borrower (the "DIP Agent"). |
| **Initial DIP Lenders:** | Each of the "Commitment Parties" listed on the signature pages to the Commitment Letter and/or one or more of their affiliates or related funds. |
| **DIP Lenders:** | The (a) Initial DIP Lenders, (b) those Eligible Noteholders (to be defined in the DIP Credit Agreement) that, prior to the Syndication Deadline (to be defined in the DIP Credit Agreement), validly elect to participate in the DIP Facility in accordance with and subject to the syndication procedures to be attached to the DIP Credit Agreement, which shall be in form and substance satisfactory to the Initial DIP Lenders and the Loan Parties (the "Syndication Procedures"), and (iii) any Lender that acquires DIP Loans and DIP Commitments in by assignment pursuant to the terms and conditions of the DIP Credit Agreement (in each case, together with their successors and permitted assigns, the "DIP Lenders"). |
| **DIP Facility:** | A new money non-amortizing superpriority multiple draw senior secured priming term loan facility in an aggregate principal amount of $30,000,000 (the |

"DIP Facility"; the DIP Lenders' commitments under the DIP Facility, the "DIP Commitments"; the loans made under the DIP Facility, the "DIP Loans"; and the transactions contemplated by this Term Sheet and the Commitment Letter, the "Transactions").  The DIP Loans will be made solely for the purposes set forth under "Use of Proceeds" below.

The Borrower shall incur the DIP Loans during the Availability Period (as defined below) as follows: (i) following entry by the Bankruptcy Court of an order (the "Interim Order") in form and substance acceptable to the DIP Agent and the Initial DIP Lenders, in their sole discretion, approving the DIP Facility on an initial basis, approving the initial borrowing under the DIP Facility (the "Initial Borrowing"), the Initial Borrowing shall occur on the Closing Date in an aggregate principal amount of $22,500,000 (which includes the Original Issue Discount (defined below), which will not be funded by the Commitment Parties but which is included in such aggregate principal amount); and (ii) after entry by the Bankruptcy Court of a final order (the "Final Order") in form and substance acceptable to the Initial DIP Lenders, in their sole discretion, approving the DIP Facility on a final basis and approving one additional borrowing under the DIP Facility (the "Additional Borrowing"), the Additional Borrowing shall occur within three business days following entry of the Final Order in the aggregate principal amount of $7,500,000 (the date of borrowing under the DIP Facility pursuant to clause (i) or (ii), a "Borrowing Date").  Once repaid, the DIP Loans incurred under the DIP Facility cannot be reborrowed.

The Initial Borrowing shall be funded by the Initial DIP Lenders net of a discount equal to four percent (4.00%) of the total DIP Commitments ($1,200,000) (the "Original Issue Discount"), which discount shall be allocated pro rata among the DIP Lenders based on their respective DIP Commitments on the Closing Date.  The full principal amount of the Initial Borrowing (after adding back such Original Issue Discount) shall be deemed the aggregate principal amount of such DIP Loans and shall be deemed outstanding on and after the Closing Date, and the Loan Parties shall be obligated to repay 100% of the principal amount of such DIP Loans (as well as any other amounts due and outstanding) as provided in the DIP Loan Documents (as defined below).

**Availability Period:**   Subject to the terms, conditions and covenants to be contained in the DIP Credit Agreement and the other DIP Loan Documents (as defined below), the DIP Loans may be drawn during the period from and including the Closing Date up to but excluding the DIP Termination Date (as defined below) (such period, the "<u>Availability Period</u>").  The DIP Commitments will expire at the end of the Availability Period.  The DIP Commitments shall be permanently reduced on each Borrowing Date by the aggregate principal amount of the DIP Loans made on such Borrowing Date.

**Mandatory Prepayments**   The Borrower may be required, at the election of the Required DIP Lenders, to repay the DIP Loans upon the occurrence of certain mandatory prepayment events including (i) net cash proceeds from asset dispositions, (ii) net proceeds of issuances of indebtedness (other than as permitted under the DIP Credit Agreement), (iii) extraordinary receipts, (iv) any proceeds of business interruption insurance and (v) any net cash proceeds of insurance; provided, however, that, so long as no Event of Default shall have occurred and be continuing, the Loan Parties shall have the option to apply such insurance proceeds to the costs of repair or replacement of the assets that are the subject of such loss if such repair or replacement, has been made within 90 days after initial receipt of such proceeds; provided that, no such mandatory prepayment shall be required to the extent the net cash proceeds received by the Loan Parties do not exceed $1,000,000 for any single mandatory prepayment event, and $2,000,000 in the aggregate for all mandatory prepayment events occurring while the  DIP Credit Agreement is in effect.

**Voluntary Prepayments**   The Borrower may voluntarily prepay the DIP Loans in whole, but not in part, at any time, together with accrued interest.

**Closing Date:**   The date (the "<u>Closing Date</u>") on which the conditions precedent set forth in the "Conditions Precedent to Closing" section of this DIP Term Sheet have been satisfied (or waived in writing by the DIP Agent and the Required Lenders (as defined below)).

**Use of Proceeds:**   Proceeds of the DIP Loans under the DIP Facility will be used only for the following purposes, in each case, in accordance with and subject to the Approved Budget (subject to Permitted Variances) (each as defined below):  (i) to provide working capital for the Loan Parties during the Chapter 11 Cases in the ordinary course of business, (ii) for the payment of prepetition amounts as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties that are in form and substance reasonably acceptable to the Required DIP Lenders, (iii) to pay costs and expenses of administration of the Chapter 11 Cases, (iv) to indefeasibly pay in full the First Lien Obligations, (v) to pay fees and expenses related to the DIP Facility, including, without limitation, as set forth in the DIP Commitment Letter and the Agent Fee Letter, (vi) to make the adequate protection payments provided for in the Interim Order, and (vii) for general corporate purposes.

The Interim Order and the Final Order (as applicable, the "<u>DIP Order</u>") and the DIP Credit Agreement will contain restrictions on use of proceeds of the DIP Loans and other funds of the Loan Parties in form and substance satisfactory to

the DIP Lenders.  Such restrictions will include (but not be limited to): (a) prohibitions against the use of Cash Collateral or proceeds of the DIP Loans other than as provided in the Interim Order or Final Order or the DIP Loan Documents and (b) prohibitions against any DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out or any other amounts from being used directly or indirectly by any of the Loan Parties, any Official Committee of unsecured creditors appointed in the Chapter 11 Cases (the "Official Committee"), if any, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i) to prevent, hinder, or delay the DIP Agent's, the DIP Lenders', the Prepetition Agents' or the Prepetition Lenders' enforcement or realization upon any of the DIP Collateral once a Termination Event occurs (other than with respect to rights otherwise granted herein with respect to the Remedies Notice Period (as defined below);

(ii) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claim; or

(iii) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Released Parties (as defined below) with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Superpriority DIP Claim, the DIP Liens, the DIP Loan Documents, the First Lien Loan Documents, the First Lien Obligations, the Second Lien Note Documents or the Second Lien Obligations, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the First Lien Obligations or the Second Lien Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agent or the DIP Lenders under the DIP Order or under any of the DIP Loan Documents, the First Lien Agent or the First Lien Lenders under any of the First Lien Loan Documents or the Second Lien Agent or the Second Lien Noteholders under any of the Second Lien Note Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and the Interim Order and/or the Final Order (as applicable)), (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) has occurred;

*provided*, *however*, that no more than $25,000 in the aggregate of the DIP Collateral, the Carve-Out, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by any Official Committee to investigate claims and/or liens of the First Lien Agent and the First Lien Lenders under the First Lien Loan Documents and the Second Lien Agent and the Second Lien Noteholders under the Second Lien Note Documents.

**Restrictions on Disposition of DIP Collateral**    The DIP Credit Agreement, the Interim Order and the Final Order will contain restrictions on the disposition of DIP Collateral, including, without limitation, prohibitions against any sale or other disposition of DIP Collateral outside the ordinary course of business, except to the extent expressly permitted by the terms of the DIP Loan Documents, without the consent of the Required DIP Lenders

**DIP Termination Date:**    All DIP Obligations will be due and payable in full, and the DIP Commitments will terminate, on the date (the "<u>DIP Termination Date</u>") that is the earliest to occur of: (i) the date that is twelve months after the Closing Date (the "<u>Maturity Date</u>"), (ii) the date on which the Commitments terminate or the DIP Loans become due and payable in accordance with the DIP Credit Agreement, (iii) the sale of all or substantially all of a Loan Party's assets through a 363 sale, a plan of reorganization, or otherwise, (iv) unless waived by the Required DIP Lenders in their sole discretion, any date on which any of the Loan Parties files a motion with the Bankruptcy Court for authority to proceed with the sale or liquidation of any of the Loan Parties (or any material portion of the assets or all of the equity of any of the Loan Parties) or files a plan of reorganization, in each case, without the prior consent of the Required DIP Lenders and (v) the effective date of a chapter 11 plan of reorganization for the Loan Parties (the "<u>Plan Effective Date</u>").  The DIP Obligations will be paid in full in cash on the DIP Termination Date; *provided that*, to the extent that an Acceptable Plan (as defined below) becomes effective and such Acceptable Plan provides for other treatment of the DIP Obligations on the Plan Effective Date, the DIP Loans will receive such other treatment on the Plan Effective Date.

**Interest Rate:**    LIBOR Rate plus 900 bps per annum, payable monthly in cash in arrears, calculated on an actual 360-day basis. LIBOR Floor: 100 bps.

**Default Rate:**    +200 bps per annum, calculated on an actual 360-day basis.

**Amortization:**    None.

**Backstop Payment:**    The Borrower will pay to the Initial DIP Lenders on the Closing Date a backstop payment equal to 3.50% of the aggregate DIP Commitments, payable in cash on the Closing Date (the "<u>Backstop Payment</u>").  The Backstop Payment will be allocated among the Initial DIP Lenders on a pro rata basis.

**Documentation:**    The DIP Facility will be evidenced by a credit agreement (as amended, supplemented, restated or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), security agreements, guarantees and all other documents, instruments and certificates executed, delivered or filed in connection therewith,

5

as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof (collectively, together with the DIP Credit Agreement, the "<u>DIP Loan Documents</u>") as may be required by the DIP Agent and the Initial DIP Lenders, which DIP Loan Documents shall be prepared by counsel to the Initial DIP Lenders and shall be in form and substance and on terms satisfactory to, the DIP Agent, the Initial DIP Lenders and the Loan Parties.

**DIP Priority Account or Controlled Account**

As a condition to the funding of the Additional Borrowing, on or prior to such funding date, the Borrower shall provide the DIP Agent with a fully executed deposit account control agreement acceptable to the DIP Agent with respect to its operating accounts which establishes "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the DIP Agent for the benefit of the DIP Lenders and the Required DIP Lenders (the "<u>Controlled Account</u>")Withdrawals from the Controlled Account, as applicable shall only be used for the permitted purposes described in the "Use of Proceeds" above.

**DIP Obligations**

The DIP Loan Documents shall evidence the DIP Obligations, which DIP Obligations, shall upon execution of the DIP Loan Documents, be valid, binding and enforceable against the Loan Parties, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of the DIP Order and the DIP Loan Documents. No obligation, payment, transfer, or grant of security under the DIP Order or the DIP Loan Documents (including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counter-claim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

**DIP Collateral:**

All "Obligations" (as defined in the DIP Credit Agreement), including, without limitation, principal, interest, fees, costs, expenses, charges, any obligations in respect of indemnity claims, whether contingent or absolute, due under the DIP Loan Documents and any other amounts that are or may become due under the DIP Loan Documents (collectively, the "<u>DIP Obligations</u>"), shall be secured by first priority continuing, valid, binding, enforceable, non-avoidable, and automatically perfected security interests and liens (the "<u>DIP Liens</u>") on all assets and properties of the Loan Parties (the "<u>DIP Collateral</u>"), subject to certain exceptions set forth in the DIP Credit Agreement and the DIP Order and

excluding, unless authorized by the Final Order, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any proceeds thereof.

To secure the DIP Obligations, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted DIP Liens in the DIP Collateral as follows, in each case, subject to the Carve-Out (defined below):

(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date;

(ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (iii) of this "DIP Collateral" Section) that is subject to Permitted Prior Liens; and

(iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral that also constitutes Prepetition Collateral securing the Prepetition Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Agent shall be senior to the Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens (as defined below) granted under the DIP Order, subject to any priority liens permitted under the DIP Credit Agreement.

**DIP Superpriority Claim:** Subject to the Carve-Out, immediately upon, and effective as of, entry of the Interim Order, the DIP Agent and the DIP Lenders will be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "Superpriority DIP Claim"), for all of the DIP Obligations, (a) with priority over any and all administrative expense claims, unsecured claims and all other claims against the Loan Parties or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents, and (iii) the Second Lien Noteholders' Adequate Protection Claim (as defined below), and (b) which shall at all times be senior to the rights of the Loan Parties or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law. The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Loan Party on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (excluding, unless authorized by the Final Order, all claims and causes of action arising

7

under chapter 5 of the Bankruptcy Code and any proceeds thereof).

Except as expressly set forth in the DIP Order, the DIP Liens and the DIP Superpriority Claim (as defined below):  (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Loan Parties, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code.

**Milestones:**

The Loan Parties shall be required to comply with the following milestones (the "Milestones"):

(a) On or before October 24, 2016 (the date on which the Chapter 11 Cases are commenced being referred to as the "Petition Date"), the Loan Parties shall have commenced the Chapter 11 Cases and filed with the Bankruptcy Court a motion (the "DIP Motion") seeking entry of the Interim Order and Final Order, which DIP Motion shall be in form and substance reasonably satisfactory to the Required DIP Lenders.

(b) On the Petition Date, the Loan Parties shall have filed with the Bankruptcy Court (i) a plan of reorganization in form and substance acceptable to the Required DIP Lenders in their sole discretion (an "Acceptable Plan"); (ii) a disclosure statement in respect of such Acceptable Plan in form and substance acceptable to the Required DIP Lenders in their sole discretion (an "Acceptable Disclosure Statement") in each case, it being understood that the chapter 11 plan and disclosure statement attached to the restructuring support agreement entered into among the Loan Parties, the "Consenting Noteholders" referred to therein and the "Consenting Sponsors" referred to therein (as amended, supplemented or otherwise modified from time to time, the "RSA") as Exhibits A and B, respectively, pursuant to which the DIP Lenders would surrender all claims for payment of principal of the DIP Facility as of the Effective Date in exchange for claims for payment of principal of the Exit Facility in an aggregate principal amount equal to the aggregate principal amount of the DIP Facility as of the Effective Date, in full and final satisfaction of the principal portion of the DIP Loan Claims, subject to the terms and conditions thereof, shall be deemed an "Acceptable Plan" and "Acceptable Disclosure Statement" respectively; and (iii) a motion, in form and substance reasonably acceptable to the Required DIP Lenders, to approve solicitation of such Acceptable Plan and such Acceptable Disclosure Statement and schedule a joint hearing for approval of such Acceptable Plan and such Acceptable Disclosure Statement (a "Solicitation Motion").

(c) On or before the date that is five (5) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order, in form and substance

satisfactory to the Required DIP Lenders.

(d) On or before the date that is thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to the Required DIP Lenders.

(f) On or before the date that is seven (7) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order in form and substance reasonably satisfactory to the Required DIP Lenders approving the Solicitation Motion.

(g) On or before the date that is thirty (30) calendar days after the commencement of solicitation of the Acceptable Plan, the Borrower shall have completed such solicitation.

(h) On or before the date that is fifty-five (55) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Required DIP Lenders, confirming an Acceptable Plan and approving an Acceptable Disclosure Statement.

(i) On or before the date that is seventy (70) calendar days after the Petition Date, an Acceptable Plan shall have become effective pursuant to its terms.

| | |
|---|---|
| **Representations and Warranties:** | Representations and warranties, subject to customary materiality qualifiers, including, without limitation: valid existence, qualification and requisite power, no contravention, governmental authorization and other consents, binding effect, financial statements, absence of a Material Adverse Effect (as defined below), litigation, no default, ownership of property, liens, environmental compliance, insurance, taxes, ERISA compliance, subsidiaries, margin regulations, investment company act, disclosure, compliance with laws, intellectual property and licenses, broker's fees, labor matters, business locations, perfection of security interests in the collateral, reorganization matters, material contracts, deposit accounts, mining, patriot act, FCPA and sanctions, licensing and budget. |
| **Affirmative Covenants:** | The DIP Loan Documents will contain affirmative covenants, which shall be subject, in certain cases, to materiality qualifiers, including, without limitation, affirmative covenants relating to: delivery of financial statements, certificates and other financial information as may be mutually agreed, notices of certain material events, payment of obligations, preservation of existence, maintenance of properties, maintenance of insurance and commercially reasonable efforts to promptly obtain insurance endorsements, compliance with laws, books and records, inspection and access rights, use of proceeds, ERISA compliance, pledged assets, environmental matters, real property, lender meetings, compliance with the Milestones, cash management, form of final order and post-closing matters. |
| **Negative Covenants:** | The DIP Loan Documents will contain negative covenants, which shall be subject, in certain cases, to exceptions, qualifications and baskets, including, without limitation, negative covenants relating to the following:<br><br>(a)    creating or permitting to exist any liens on any assets, other than liens |

9

securing the DIP Facility and any permitted liens set forth in the DIP Credit Agreement or the DIP Order, including adequate protection liens (which permitted liens shall include certain scheduled liens in existence on the Closing Date);

(b)      creating or permitting to exist any other superpriority claim which is *pari passu* with or senior to the liens or claims of the DIP Lenders under the DIP Facility, except for the Carve-Out (as defined below);

(c)      disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363);

(d)      engaging in any line of business other than those lines of business conducted by the Loan Parties and their subsidiaries on the Closing Date and the lines of business reasonably related thereto;

(e)      amending, modifying or changing its organizational documents in any manner that could be adverse to the interests of the DIP Agent or any DIP Lender;

(f)      prepaying, redeeming, purchasing or exchanging any pre-petition indebtedness, or amending or modifying any of the terms of any such pre-petition indebtedness, except as expressly permitted pursuant to the Interim Order, the Final Order, or the "first day" orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Required DIP Lenders, subject in each case to the Approved Budget (subject to Permitted Variances);

(g)      incurring or assuming additional debt or contingent obligations or giving guaranties;

(h)      merging or consolidating with any other person (other than the merger of Holdings into the Borrower pursuant to an Acceptable Plan) or changing the corporate structure (other than as aforesaid);

(i)      permitting to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Loan Parties; in each case;

(j)      making any loans, advances, capital contributions or acquisitions of capital stock or indebtedness, form any joint ventures or partnerships, or making any other investments in subsidiaries or any other person;

(k)      making or committing to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions;

(l)      entering into any transactions with affiliates except on terms equivalent to those obtained in arm's length transactions, including, without limitation, restrictions on management fees to affiliates;

(m)      amending, supplementing, extending or otherwise modifying the Interim Order or the Final Order without the prior written consent of the Required DIP Lenders in their sole discretion;

(n)      making or asserting any claims under Section 506(c) or section 552(b) of the Bankruptcy Code against the DIP Agent or DIP Lenders, the Prepetition Agent or the Prepetition Lenders; and

10

(o)      permitting any change in its fiscal year.

**Approved Budget Covenants:**

<u>Approved Budgets</u>.  Amounts available under the DIP Facility shall be subject to a budget in form and substance satisfactory to the DIP Agent and the Initial DIP Lenders and the Borrower (the "<u>Initial Budget</u>"), which shall be updated monthly thereafter in a manner satisfactory to the DIP Agent and the Required Lenders as detailed in the DIP Credit Agreement (any such budget as in effect at any time, together with the Initial Budget, each an "<u>Approved Budget</u>").

<u>Variance Reporting</u>:  The Loan Parties shall deliver to the DIP Agent and the DIP Lenders bi-weekly variance reports in form and substance satisfactory to the Required Lenders and the Borrower reflecting variances from the then-current Approved Budget (each, a "<u>Variance Report</u>").

<u>Permitted Variances</u>:  The DIP Credit Agreement shall permit variances from the Approved Budgets pursuant to terms and conditions satisfactory to the Initial DIP Lenders and the Borrower ("<u>Permitted Variances</u>").

**Conditions Precedent to Closing:**

The DIP Credit Agreement will contain conditions agreed by the Initial DIP Lenders and the Borrower to be appropriate, including, but not limited to the following:

- the execution and delivery of the DIP Loan Documents in form and substance acceptable to the Commitment Parties (the "<u>DIP Loan Documents</u>") reflecting the terms and conditions set forth in the DIP Term Sheet;

- the absence since June 30, 2016 of any event or circumstance, which has resulted in or could reasonably be expected to result in a Material Adverse Effect; for such purpose "<u>Material Adverse Effect</u>" shall mean, with respect to any event, change, effect, occurrence, development, circumstance or change of fact, a material adverse effect on (a) the business, results of operations, condition (financial or otherwise), assets or liabilities of the Loan Parties and their Subsidiaries, taken as a whole, (b) the legality, validity or enforceability of any DIP Loan Document, the Interim Order  or the Final Order, the Loan Parties' respective obligations under any DIP Loan Document, the Interim Order or the Final Order, or the rights and remedies of the DIP Agent and the DIP Lenders under any DIP Loan Document, the Interim Order or the Final Order, (c) the ability of the Loan Parties to perform their respective material obligations under the DIP Loan Documents, (d) the value of the material DIP Collateral, (e) the perfection or priority of the DIP Liens granted pursuant to the DIP Loan Documents, the Interim Order or the Final Order, or (f) the ability of the DIP Agent or the DIP Lenders to enforce the DIP Loan Documents; <u>provided</u>, <u>however</u>, that "Material Adverse Effect" shall not include any event, change, effect, occurrence, development, circumstance or change of fact arising out of, resulting from or relating to (i) the commencement or existence of the Chapter 11 Cases, (ii) the announcement of the Plan and the transactions contemplated hereby, (iii) compliance by any Loan Party with the covenants and agreements contained in the DIP Loan Documents

11

or the RSA or in the Plan, (iv) any change in applicable laws of general applicability or interpretations thereof by any courts or other governmental authorities (except to the extent such change affects the Loan Parties, taken a whole, in a disproportionately adverse manner relative to other participants in the industries in which the Loan Parties participate (provided that any such change may only be considered to the extent of such disproportionate impact)), (v) any action or omission of a Loan Party taken with the express prior written consent of the Required Commitment Parties, (vi) any expenses incurred by the Company in connection with transactions contemplated hereby or (vii) changes in commodity prices prior to October 19, 2016;

- the representations and warranties contained in the DIP Loan Documents shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as though made on and as of such date;

- the absence, as of the Closing Date and after giving effect to all of the transactions contemplated hereby, including, without limitation, the payment of all Closing Date fees and expenses, of any default or event of default under the DIP Credit Agreement;

- delivery of UCC financing statements and other filings and of search results reflecting the absence of liens on the DIP Collateral (other than any liens permitted under the DIP Credit Agreement);

- the DIP Agent, for the benefit of itself and the Secured Parties, shall hold, pursuant to the Interim Order or the Final Order, as applicable, perfected and first priority liens in and to all real and personal property and proceeds thereof now owned or hereafter acquired by any Loan Party with respect to which liens in favor of the DIP Agent are granted pursuant to and in accordance with the terms of the DIP Loan Documents other than any property excluded pursuant to the terms of the DIP Loan Documents;

- the DIP Agent shall have a received a payoff letter or a release of the First Lien Obligations (as defined below) in any case reasonably satisfactory in form and substance to the DIP Agent and the DIP Lenders;

- payment by the Company, on or prior to the Closing Date, of all reasonable and documented out-of-pocket fees and expenses owing and payable to the DIP Agent and the DIP Lenders as of the Closing Date (including fees and expenses of their counsel (and any necessary additional local counsel) and advisors), in each case to the extent invoiced at least two Business Days' prior to the Closing Date pursuant to this Commitment Letter and the DIP Credit Agreement;

- the DIP Agent and the DIP Lenders shall have received to the extent requested at least five days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations,

including the Patriot Act;

- a cash management system reasonably acceptable to the Initial DIP Lenders shall have been established or be in place;

- the Company and the DIP Lenders shall have agreed upon an Approved Budget;

- all first day motions related to the DIP Credit Agreement and the approval thereof shall be in form and substance reasonably satisfactory to the Required Commitment Parties;

- the Bankruptcy Court shall have entered an Interim Order not later than the fifth calendar day after the Petition Date, in form and substance satisfactory to the Initial DIP Lenders, which Interim Order be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Initial DIP Lenders; and

- compliance by the Loan Parties with the RSA, and the RSA shall remain in full force and effect.

**Modification of Automatic Stay**

The DIP Order shall provide that the automatic stay imposed by section 362(a) of the Bankruptcy Code is modified as necessary to permit:  (a) the Loan Parties to grant the DIP Liens and the Superpriority DIP Claim, and to perform such acts as the DIP Agent or the Required DIP Lenders may request to assure the perfection and priority of the DIP Liens; (b) the Loan Parties to take all appropriate action to grant the Second Lien Noteholder Adequate Protection Liens and the Second Lien Noteholder Superpriority Claims set forth herein, and to take all appropriate action to ensure that the Second Lien Noteholder Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Loan Parties to incur all liabilities and obligations, including all the DIP Obligations, to the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP Lenders as contemplated under the DIP Order and the DIP Loan Documents; (d) the Loan Parties to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents, the DIP Commitment Letter, the Agent Fee Letter and the DIP Order; (e) the DIP Secured Parties and the Prepetition Agents and the Prepetition Lenders to retain and apply payments made in accordance with the DIP Loan Documents and the DIP Order; (f) subject to the DIP Order, the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein; and (g) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of the DIP Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of, or hearing before, the Bankruptcy Court, subject to the terms of the DIP Order including as to the Remedies Notice Period.

**Perfection of DIP Liens**

The DIP Agent and DIP Lenders shall be satisfied that all liens granted for the

13

**and Post-Petition Liens**     benefit of the DIP Agent and the DIP Lenders, shall be valid, enforceable, non-avoidable, and perfected, effective as of the Closing Date, and no further action shall be required to effect such perfection.  The DIP Order shall provide that such Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all liens granted herein, including, without limitation, the DIP Liens and the Second Lien Noteholder Adequate Protection Liens, without the necessity of executing, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Prepetition Agents, the Prepetition Lenders, the DIP Agent or the DIP Lenders to the priorities granted herein.  Notwithstanding the foregoing, the DIP Order shall provide that each of the DIP Agent and the Prepetition Agents, without any further consent of any party, is authorized to execute, file or record, and the DIP Agent may require the execution, filing or recording, as each, in its sole discretion deems necessary, of such financing statements, mortgages, notices of lien, and other similar documents to enable the DIP Agent and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens or other liens and security interests granted under the DIP Order, perfect in accordance with applicable law or to otherwise evidence the DIP Liens and/or Second Lien Noteholder Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been executed, filed or recorded as of the Petition Date; *provided*, *however*, that no such execution, filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Second Lien Noteholder Adequate Protection Liens.  The DIP Order shall authorize the Loan Parties to execute and deliver promptly upon demand to the DIP Agent or the Prepetition Agents all such financing statements, mortgages, notices, and other documents as the DIP Agent or the Prepetition Agents may reasonably request.  The DIP Order shall authorize the DIP Agent or the Prepetition Agents, each in its discretion, to file a photocopy of the DIP Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

**Expenses:**     The Loan Parties shall pay: all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the (i) DIP Agent (including fees, costs, disbursements and expenses of the Lender Professionals) and (ii) the Initial DIP Lenders (including fees, costs, disbursements and expenses of its counsel, but limited to one primary counsel and one local counsel in each relevant jurisdiction as needed) including, without limitation, all such fees, costs, disbursements and expenses associated with the preparation, negotiation, execution and delivery of the Commitment Letter, the Agent Fee Letter and this DIP Term Sheet and associated with the preparation, negotiation, execution, delivery and administration of the DIP Loan Documents, including syndication, and any amendment or waiver with respect thereto and in connection with the Chapter 11 Cases and enforcement of the DIP Loan Documents.

**Indemnification:**     The DIP Loan Documents shall contain provisions providing for the

14

indemnification of the DIP Agent and the DIP Lenders, in form and substance acceptable to the DIP Agent, the DIP Lenders and the Loan Parties.

**Stipulations, Admissions, Waivers:**    In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange for and in recognition of the priming of the Prepetition Second Lien Note Liens (as defined below), subject to the section "Challenge Period" below, the Loan Parties shall admit, stipulate, acknowledge and agree that:

(i)      *First Lien Credit Facility.*    Pursuant to the Credit and Guaranty Agreement, dated as of August 28, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "First Lien Credit Agreement", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including the Intercreditor Agreement (defined below) collectively, the "First Lien Loan Documents"), among American Gilsonite Company, as borrower (the "First Lien Borrower"), the guarantors party thereto (the "First Lien Guarantors", and together with the First Lien Borrower, the "First Lien Loan Parties"), KeyBank National Association, as administrative agent and swingline lender (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), the First Lien Lenders provided a revolving credit facility (the "First Lien Credit Facility") to the First Lien Borrower.

(ii)      *First Lien Obligations.*    As of the Petition Date, without defense, counterclaim or offset of any kind, the First Lien Loan Parties were jointly and severally indebted to the First Lien Lenders in the aggregate principal amount of $20,000,000, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the First Lien Note Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the First Lien Loan Documents (collectively, the "First Lien Obligations").

(iii)      *First Lien Collateral.*    To secure the First Lien Obligations, the First Lien Loan Parties granted to the First Lien Agent, for the benefit of itself and the First Lien Lenders, properly perfected continuing liens, mortgages and security interests (collectively, the "Prepetition Credit Facility Liens") in all "Collateral" as defined in the First Lien Credit Agreement (collectively, the "Prepetition First Lien Collateral").

(iv)      *Second Lien Notes.*    Pursuant to the Indenture, dated as of August 28, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Second Lien Note Indenture", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including, the Second Lien Security and Pledge

Agreement, dated as of August 28, 2012, and the Intercreditor Agreement (as defined below), collectively, the "Second Lien Note Documents", and together with the First Lien Loan Documents, the "Prepetition Loan Documents"), among American Gilsonite Company, as issuer (the "Second Lien Note Issuer"), Wilmington Trust, National Association, as indenture trustee and collateral agent (the "Second Lien Agent", and together with the First Lien Agent, the "Prepetition Agents"), and the guarantors party thereto (the "Second Lien Guarantors", and together with the Second Lien Note Issuer, collectively, the "Second Lien Note Parties", and together with the First Lien Loan Parties, collectively, the "Prepetition Loan Parties"), the Second Lien Issuer issued the 11.5% Senior Secured Notes due 2017 (the "Second Lien Notes"; the holders of such Second Lien Notes, the "Second Lien Noteholders", and together with the First Lien Lenders, collectively, the "Prepetition Lenders"), and the Second Lien Guarantors guaranteed the "Guaranteed Obligations" as defined in the Second Lien Note Indenture.

(v)    *Second Lien Obligations.*    As of the Petition Date, without defense, counterclaim or offset of any kind, the Second Lien Note Parties were jointly and severally indebted to the Second Lien Agent and the Second Lien Noteholders in the aggregate principal amount of least $270,000,000 in Second Lien Notes, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Second Lien Note Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, including all "Obligations" as defined in the Second Lien Note Indenture (collectively, the "Second Lien Obligations", and together with the First Lien Obligations, collectively, the "Prepetition Obligations").

(vi)    *Prepetition Second Lien Collateral.*    To secure the Second Lien Obligations, the Second Lien Note Parties granted to the Second Lien Agent, for the benefit of itself and the Second Lien Noteholders, properly perfected continuing liens, mortgages and security interests in (collectively, the "Prepetition Second Lien Note Liens", and together with the Prepetition Credit Facility Liens, the "Prepetition Liens") all "Collateral" as defined in the Second Lien Note Indenture (collectively, the "Prepetition Second Lien Collateral", and together with the Prepetition First Lien Collateral, the "Prepetition Collateral"), subject to the terms of the Intercreditor Agreement, dated as of August 28, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Intercreditor Agreement"), by and between each of the First Lien Agent and the Second Lien Agent.

(vii)    *Validity of Prepetition Liens and Prepetition Obligations*.    Subject to the Carve-Out, (a) the Prepetition Liens are valid, binding, enforceable, non-avoidable and perfected liens, with priority over any and all other liens (other than liens expressly permitted to be senior to all Prepetition Liens under the First

16

Lien Credit Agreement and the Second Lien Note Indenture, solely to the extent such permitted liens were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "<u>Permitted Prior Liens</u>")), subject to the terms of the Intercreditor Agreement; (b) the First Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the First Lien Loan Parties, enforceable in accordance with the terms of the First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (c) the Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Second Lien Note Parties, enforceable in accordance with the terms of the Second Lien Note Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (d) the Loan Parties and their estates hold no (and waive, discharge and release any) valid or enforceable claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind, and waive, discharge and release any right they may have to (A) challenge the validity, enforceability, priority, security and perfection of any of the Prepetition Obligations, the Prepetition Loan Documents or the Prepetition Liens, respectively, and (B) assert any and all claims (as defined in the Bankruptcy Code) or causes of action against the Prepetition Agents or the Prepetition Lenders, and each of their respective officers, directors, equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultant, agents, and other representatives (collectively, the "<u>Released Parties</u>"), whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, in each case, arising out of, based upon or related to the Prepetition Loan Documents, the Prepetition Liens or the Prepetition Obligations, as applicable.

(viii)    Cash Collateral.  All of the Loan Parties' cash, whether existing on the Petition Date or thereafter, wherever located, including, without limitation, any cash in deposit accounts of the Loan Parties or otherwise, constitutes cash collateral of the Prepetition Agents and the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

(ix)    *Default.* The Prepetition Loan Parties are in default of certain terms and provisions of the Prepetition Loan Documents as of the Petition Date.

**Adequate Protection:**    In consideration for the Loan Parties' use of the Prepetition Collateral (including Cash Collateral), and to protect the Second Lien Agent and the Second Lien Noteholders against the diminution in value, if any, of the Prepetition Second Lien Collateral (including Cash Collateral) resulting from *inter alia*, (a) the use, sale or lease by the Loan Parties (or other decline in value) of the Prepetition Second Lien Collateral (including Cash Collateral), (b) the imposition of the Carve-Out (defined below) and the DIP Liens (as defined below) and the priming of the Prepetition Second Lien Note Liens, and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "<u>Diminution in Value</u>"), the Second Lien Agent and the Second Lien

17

Noteholders shall receive, solely to the extent of any such Diminution in Value, the following adequate protection:

(a)      *Second Lien Noteholder Adequate Protection Liens*.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, effective as of the entry of the Interim Order, shall be granted continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP Collateral (the "Second Lien Noteholder Adequate Protection Liens"), which liens will be junior only to the DIP Liens and the Carve-Out, and shall be senior in priority to all other liens, including the Prepetition Liens.  Except for the DIP Liens and the Carve-Out, the Second Lien Noteholder Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Loan Parties, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.  The Second Lien Noteholder Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Second Lien Noteholder Adequate Protection Liens.

(b)      *Second Lien Noteholder Superpriority Claim*.  Pursuant to section 507(b) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, effective as of the entry of the Interim Order, shall be further granted an allowed superpriority administrative expense claim (the "Second Lien Noteholder Superpriority Claim"), which claim shall be junior to the DIP Superiority Claim and the Carve-Out, but shall be senior to and have priority over any other administrative expense claims, unsecured claims and all other claims against the Loan Parties or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents.   The Second Lien Noteholder Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Loan Party on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (excluding, unless authorized by the Final Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof).  Except for the DIP Superiority Claim and the Carve-Out, the Second Lien Noteholder Superpriority Claim shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and

shall be valid and enforceable against the Loan Parties, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.

As further adequate protection for the Second Lien Agent and the Second Lien Noteholders:

(a)    The Loan Parties shall pay all prepetition and postpetition reasonable and documented out-of-pocket fees, costs and expenses incurred by (i) the Second Lien Agent (including all reasonable and documented fees and expenses of one outside counsel), and (ii) the members of the ad hoc committee of certain Second Lien Noteholders (the "Ad Hoc Committee") and the fees, costs and expenses of their respective legal and financial advisors (but no more than: (a) Stroock & Stroock & Lavan LLP, (b) Houlihan Lokey Capital, Inc. ("Houlihan"), pursuant to that certain letter of engagement dated as of June 22, 2016 by and among Stroock, Houlihan and the Loan Parties, (c) Young Conaway Stargatt & Taylor, LLP, (d) Parsons Behle & Latimer and (e) such other consultants or other professionals as may be retained by the Ad Hoc Committee, with the consent of the Loan Parties, such consent not to be unreasonably withheld, delayed, or conditioned), in each case, without duplication of the DIP Lenders' advisor fees as provided In the Interim Order (collectively, the "Lender Professionals").  The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only, and shall be provided to counsel to the Loan Parties, with a copy to the U.S. Trustee and counsel to any Official Committee (collectively, the "Fee Notice Parties"). If no objection to payment of the requested fees and expenses are made, in writing by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "Fee Objection Period"), then, without further order of, or application to, the Bankruptcy Court or notice to any other party, such fees and expenses shall be promptly paid by the Loan Parties.  If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Bankruptcy Court, and the undisputed portion shall be promptly paid by the Loan Parties.

(c)    The Loan Parties shall comply with the Approved Budget, subject to Permitted Variances and all Budget Variance Reporting requirements set forth in the Interim Order and the Final Order, as applicable, and in the DIP Loan Documents.

(d)    The Loan Parties will provide to the DIP Agent and the DIP Lenders, such reports and information required to be delivered pursuant to the DIP Credit Agreement, and such other reports and information as may be reasonably requested by the DIP Agent or the Required DIP Lenders and required to be delivered pursuant to the DIP Credit Agreement.  In addition, without limiting the rights of access and information afforded the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP Lenders under the Interim Order

and/or the DIP Loan Documents, the Loan Parties shall be required to afford representatives, agents and/or employees of the Second Lien Agent and the Second Lien Noteholders reasonable access to the Loan Parties' premises and their books and records and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Loan Parties authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the Second Lien Agent and the Ad Hoc Committee (subject to execution of appropriate confidentiality agreement) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Loan Parties.

The receipt by the Second Lien Agent and the Second Lien Noteholders of the adequate protection described herein shall not be deemed an admission that the interests of the Second Lien Agent and the Second Lien Noteholders are indeed adequately protected. Further, the DIP Order shall not prejudice or limit the rights of the Second Lien Agent and the Second Lien Noteholders to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection; provided that any such additional or alternative adequate protection approved by the Bankruptcy Court shall at all times be subordinate and junior to the DIP Obligations and the DIP Liens granted under the DIP Order and the DIP Loan Documents. Without limiting the foregoing, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided under the DIP Order is insufficient to compensate for any Diminution in Value during any of the Chapter 11 Cases subject to the Carve-Out.

(e) *Adequate Protection of Contingent First Lien Obligations*. Until the Discharge Date, and as adequate protection against the post-petition diminution in value of any contingent obligations that may be owed to the First Lien Agent or the First Lien Lenders, the Debtors shall establish an account (the "Credit Facility Reimbursement Account") into which the sum of $25,000 (or such other amount to which the Initial DIP Lenders may agree) shall be deposited as collateral security for any documented reimbursement or indemnity obligations that the Debtors may have to the First Lien Agent and the First Lien Lenders under the terms of the First Lien Loan Documents as to which a claim or demand for payment is made in writing (upon five (5) business days' notice to the Debtors, the DIP Agent and the DIP Lenders) prior to the Discharge Date. The First Lien Agent (for itself and the First Lien Lenders) shall have a first-priority lien (the "Credit Facility Reimbursement Account Liens") on the Credit Facility Reimbursement Account and all amounts held therein. Upon the Discharge Date, the Credit Facility Reimbursement Account Liens shall automatically terminate and cease to exist, and all remaining amounts held in the Credit Facility Reimbursement Account or credited thereto, after reserve for or satisfaction of any reimbursement obligations as to which a claim or demand was made prior to the Discharge Date and are due and payable, shall be released to the Debtors by wire transfer, in immediately available funds, as soon as possible, in any event no later than the date that is five (5) business days after the Discharge Date.

The "Discharge Date" shall be the date that is the first day after the expiration of the Challenge Period without a timely Challenge having been brought, or upon the final resolution of a Challenge brought in compliance with the provisions of the Interim Order and applicable law (where such Challenge did not have the effect of successfully impairing any of the First Lien Obligations).

**Carve-Out:**    The term "Carve-Out" shall mean the following:

(i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717;

(ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000;

(iii) to the extent allowed by the Bankruptcy Court, all accrued and unpaid fees and expenses incurred on or prior to the delivery of a Carve-Out Trigger Notice (as defined below) by professionals or professional firms retained by the Loan Parties (the "Estate Professionals"), pursuant to a final order of the Bankruptcy Court (which order has not been vacated or stayed) under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, including any success or transaction fees payable to Evercore Group, LLC or FTI Consulting Inc., solely to the extent such success or transaction fee is earned and payable pursuant to a court-approved engagement letter between the Borrower and such professional; and

(iv) all unpaid fees and expenses incurred by Estate Professionals after the date of delivery of the Carve-Out Trigger Notice (such date, the "Carve-Out Trigger Date"), to the extent allowed by the Bankruptcy Court at any time, in an aggregate amount not to exceed $one million plus any success or transaction fees that may become due and payable to Evercore Group, LLC or FTI Consulting Inc., solely to the extent such success or transaction fee is earned and payable pursuant to a court-approved engagement letter between the Borrower and such professional (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"); *provided*, *however*, that nothing herein shall be construed as a consent to the allowance of any Estate Professionals' fees or expenses or impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any such Estate Professionals.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Required DIP Lenders to counsel to the Loan Parties, the U.S. Trustee, and lead counsel to any Official Committee appointed in these Chapter 11 Cases, which notice may be delivered following the occurrence of a Termination Event and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  Any payment or reimbursement made on or after the date and time of the Carve-Out Trigger Date to an Estate Professional shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  To the extent that any payment to an Estate Professional is subsequently disallowed and/or disgorged, the proceeds of any claim against the Estate Professional for amounts so disallowed or disgorged shall constitute DIP Collateral and as such, shall be subject to DIP Liens and DIP

Superpriority Claims under the DIP Order.

Upon the receipt of the Carve-Out Trigger Notice, the Loan Parties shall provide immediate notice to all Estate Professionals informing them that such notice was delivered and further advising them that the Loan Parties' ability to pay such Estate Professionals is subject to and limited by the Carve-Out and the Loan Parties shall be required to transfer into a segregated account (the "<u>Carve-Out Account</u>") not subject to the control of the DIP Agent or the Prepetition Agents an amount equal to the Post-Carve-Out Trigger Notice Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described above in clauses 30(a)(iii), in each case, as determined by a good faith estimate of the applicable Estate Professional. The proceeds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders (i) shall not sweep or foreclose on cash of the Loan Parties necessary to fund the Carve-Out Account and (ii) shall only have a security interest in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve-Out.  For the avoidance of doubt and notwithstanding anything to the contrary in the DIP Loan Documents, the Carve Out shall be senior to all liens securing the DIP Obligations, the Second Lien Noteholder Adequate Protection Liens, the Second Lien Noteholder Superpriority Claim, and any and all other forms of adequate protection, liens or claims granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders under the DIP Order.

None of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases under any chapter of the Bankruptcy Code.

**Challenge Period**          Any Official Committee or any other party in interest, if granted requisite standing by the Bankruptcy Court within the Challenge Period (as defined below), to seek, solely in accordance with the provisions the DIP Order, to assert claims against the Released Parties (or their successors or assigns), on behalf of the Loan Parties or the Loan Parties' creditors or to otherwise challenge the Loan Parties' stipulations, including, but not limited to those in relation to (i) the validity, extent, priority, or perfection of the mortgages, security interests, and Prepetition Liens of the Prepetition Agents or any Prepetition Lenders (or their successors or assigns), (ii) the validity, allowability, priority, or amount of the Prepetition Obligations, or (iii) any liability of either the Prepetition Agents and/or any Prepetition Lenders (or their successors or assigns) with respect to anything arising from the Prepetition Loan Documents.  Any Official Committee or any other party in interest must, after obtaining requisite standing approved by the Bankruptcy Court, commence a contested matter or adversary proceeding raising such claim, objection, or challenge, including, without limitation, any claim or cause of action against the Released Parties (each, a "<u>Challenge</u>") the earlier of (1) (A) with respect to any Official Committee, the date that is thirty (30) days after the Official Committee's formation, or (B) with respect to other parties in interest, no later than the date that is forty-five (45) days after the entry of the Interim Order and (2) five (5) days before the hearing to

22

consideration confirmation of the Loan Parties' proposed prepackaged chapter 11 plan (such time period shall be referred to as the "Challenge Period").  The Challenge Period may only be extended with the written consent of the Ad Hoc Committee (and, if the Challenge applies to the First Lien Obligations or the Prepetition Credit Facility Liens, with the additional written consent of the First Lien Agent) or by further order of the Bankruptcy Court for good cause shown, in each case prior to the expiration of the Challenge Period.  Only those parties in interest who properly commence a Challenge within the Challenge Period may prosecute such Challenge.  As to (x) any parties in interest, including any Official Committee, who fail to file a Challenge within the Challenge Period, or if any such Challenge is filed and overruled, or (y) any and all matters that are not expressly the subject of a timely Challenge:  (1) any and all such Challenges by any party (including, without limitation, any Official Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Chapter 11 Cases, or any chapter 7 trustee, any examiner or any other estate representative appointed in any Successor Cases), shall be deemed to be forever waived and barred, (2) all of the findings, Loan Parties' stipulations, waivers, releases, affirmations and other stipulations under the DIP Order as to the priority, extent, allowability, validity and perfection as to the Prepetition Liens, the Prepetition Obligations or the Prepetition Loan Documents shall be of full force and effect and forever binding upon the applicable Loan Parties' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases, and (3) any and all claims or causes of action against the Prepetition Agents or the Prepetition Lenders shall be released by the Loan Parties' estates, all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases.

**Events of Default:**  The DIP Facility shall be subject to usual and customary events of default including, but not limited to, the following and subject in certain cases to cure periods and notice requirements:

(a)    nonpayment of principal;

(b)    nonpayment of interest or other amounts, subject to a 3 business day cure period;

(c)    violation of covenants;

(d)    incorrectness of representations and warranties in any material respect;

(e)    material judgments in excess of certain amounts;

(f)    material ERISA events;

(g)    actual or asserted invalidity of the DIP Loan Document or liens or claims created thereunder or under the Interim Order or the Final Order;

(h)    a revocation of any material license, permit, lease or agreement necessary to its business to the extent that such revocation could reasonably be expected to have a Material Adverse Effect;

(i)    change of control;

(j)    filing of a motion by any Loan Party, without the consent of the Required DIP Lenders, (i) revoking or amending any DIP Loan Document, the

23

Interim Order or the Final Order, (ii) obtaining any financing not permitted under the DIP Credit Agreement, (iii) granting any lien not permitted under the DIP Credit Agreement, (iv) modifying or terminating the use of cash collateral (except as set forth in the Interim Order or the Final Order) or (v) seeking or authorizing any other actions directly and materially adverse to the DIP Lenders and the DIP Agent;

(k)    the filing by or support of a Loan Party of a motion to reject or entry of an order approving the rejection of, the RSA;

(l)    dismissal of the Chapter 11 Case of the Borrower, conversion of the Chapter 11 Case of the Borrower to a chapter 7 case or termination or modification of the Loan Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(m)    the Final Order is not entered on or before 35 calendar days after the Petition Date;

(n)    the filing or entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that is not an Acceptable Plan;

(o)    the filing of a motion or the entry of any order permitting or granting (i) any administrative expense or any claim to have administrative priority equal or senior to that of the DIP Agent and the DIP Lenders in respect of the DIP Obligations or the Second Lien Obligations, except as permitted in the Interim Order or the Final Order, or (ii) any lien that is equal or senior in priority to the liens securing the DIP Obligations or the Second Lien Obligations, except as permitted in the Interim Order or the Final Order;

(p)    commencement of any adversary proceeding, contested matter or other action by any Loan Party asserting any claims or defenses against any of the Second Lien Agent or Second Lien Noteholders with respect to the Second Lien Obligations or the liens securing the Second Lien Obligations;

(q)    the payment or application by any Loan Party for authority to pay any prepetition claim other than as provided in an Acceptable Plan, any "first day order" reasonably acceptable to Required Lenders and as set forth in the Approved Budget or as permitted under the DIP Credit Agreement, in each case without the Required Lenders' prior written consent;

(r)    entry of an order appointing or application by any Loan Party for an order seeking the appointment of a trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties or with the power to conduct an investigation of the DIP Agent or the DIP Lenders;

(s)    the entry of an order granting relief from or modifying the automatic stay (i) to allow any creditor to execute upon or enforce a lien on any material portion of the DIP Collateral, or (ii) with respect to any lien of or the granting of any Lien on any material portion of the DIP Collateral to any state or local environmental or regulatory agency or authority in excess of $2,000,000;

(t)    the Loan Parties file a motion to amend, supplement extend or otherwise modify the Interim Order or the Final Order without the prior written consent of

24

the Required DIP Lenders in their sole discretion;

(u)    payment of or granting adequate protection for any prepetition indebtedness, except as set forth in the Interim Order or the Final Order;

(v)    the Loan Parties' failure to comply with and perform any of the terms, subject to customary notice and/or cure periods in certain cases, provisions, conditions, covenants or other obligations under the Interim Order or the Final Order;

(w)    the failure by the Loan Parties to comply with any Milestone; and

(x)    filing of a motion requesting, or the entry of an order authorizing, approving or granting a claim against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code, or relief under the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Liens or the DIP Obligations.

**Remedies:**    Each of the following shall constitute a termination event under the DIP Order and the DIP Loan Documents (each a "Termination Event"), unless waived in writing by the Required DIP Lenders:  (a) the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement; (b) the date of acceleration of the DIP Loans under the DIP Facility in accordance with the DIP Credit Agreement; and (c) the DIP Termination Date.  The DIP Agent and the DIP Lenders shall have customary remedies upon a Termination Event, including as described in this section.

Any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, shall be modified, without further notice to, hearing of, or order from the Bankruptcy Court, to the extent necessary to permit the DIP Secured Parties, to exercise the following rights and remedies upon the occurrence and during the continuance of any Termination Event and the delivery of written notice (including by e-mail) by the Required DIP Lenders to counsel to the Loan Parties, counsel for any Official Committee, and the United States Trustee of the occurrence of a Termination Event:  (a) immediately terminate the Loan Parties' use of any Cash Collateral; (b) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Loan Parties' accounts; (e) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, foreclosure on all or any portion of the DIP Collateral, collection of accounts receivable, occupying the Loan Parties' premises, sale or disposition of the DIP Collateral; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Order, the DIP Loan Documents or applicable law; *provided*, *however*, that prior to the exercise of any right or remedy in <u>clauses (a)</u> through <u>(f)</u> of this paragraph (the "<u>Default Remedies</u>"), the DIP Agent shall be required to provide five (5) business days' written notice to counsel to the Loan Parties, counsel to any Official Committee

and the U.S. Trustee of the DIP Agent's intent to exercise its rights and remedies (the "Remedies Notice Period").  Unless the Bankruptcy Court orders during the Remedies Notice Period that a Termination Event has not in fact occurred, the DIP Agent and the DIP Lenders, shall be deemed to have received relief from the automatic stay and may exercise Default Remedies without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise. The Loan Parties and any Official Committee shall not challenge or raise any objections to the exercise of such rights or remedies other than to challenge whether a Termination Event has in fact occurred; provided that none of the DIP Secured Parties shall object to a request by the Loan Parties for an expedited hearing before the Bankruptcy Court. The Loan Parties and the
Official Committee shall cooperate with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise and during the Remedies Notice Period, in addition to the Carve-Out, the Loan Parties may use Cash Collateral only to pay the following amounts and expenses solely in accordance with the respective Approved Budget line items: (i) amounts that the Loan Parties have determined in good faith are in the ordinary course and necessary to the preservation of the Loan Parties and their estates; and (ii) such other amounts as have been approved in advance in writing by the Required DIP Lenders.

Without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) business days' written notice to counsel to the Loan Parties and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property, that a Termination Event has occurred and is continuing, subject to applicable non-bankruptcy law the DIP Agent, (i) may, unless otherwise expressly provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent or Second Lien Agent, as applicable (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Loan Parties for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Loan Parties' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Loan Parties, which are owned by or subject to a lien of any third party and which are used by Loan Parties in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; *provided*, *however*, that the DIP Agent (on behalf of the DIP Secured Parties) shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Loan Parties that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by DIP Agent calculated on a per diem basis.  Nothing herein shall require the Loan Parties, the DIP Agent or the other DIP Secured Parties, to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in the DIP Order.

| | |
|---|---|
| **Assignments and Participations:** | Any assignee of a DIP Lender under the DIP Credit Agreement shall be required to become party to the RSA by executing a joinder agreement and delivering an executed copy of such joinder agreement to the DIP Agent, Stroock, and Weil as a condition to the effectiveness of such assignment. |
| | On or before the Syndication Purchase Date (to be defined in the Syndication Procedures), consent of the Borrower and each other Initial DIP Lender is required for an assignment by an Initial DIP Lender unless such Initial DIP Lender assigns to an Eligible Lender in accordance with the Syndication Procedures and the DIP Credit Agreement, in which case no consent of any person is required. |
| | After the Syndication Purchase Date and prior to the occurrence of an Event of Default, assignments (other than assignments to another DIP Lender, an affiliate of any DIP Lender, or an Approved Fund (to be defined substantially in the DIP Credit Agreement) and certain other exceptions) shall be subject to the consent of the Loan Parties, which consent shall not be unreasonably withheld, delayed or conditioned. Following the occurrence of an Event of Default, no consent of the Loan Parties shall be required for any assignment. Each DIP Lender shall have the right to sell participations in its DIP Loans, subject to customary voting limitations. |
| **Required DIP Lenders:** | As of the date of determination, each of the following: (i) DIP Lenders holding more than 50% of the outstanding DIP Commitments and DIP Loans; (ii) Värde Partners Inc. or any of its affiliates and related funds that are lenders under the DIP Credit Agreement on the Closing Date ("Värde"), for so long as Värde holds at least 50% of the principal amount of the Notes held by Värde on the Closing Date; and (iii) one Initial DIP Lender other than Värde. |
| **Section 506(c), Section 552(b), Marshalling, Credit Bid** | *Section 506(c).* Subject to the entry of the Final Order, in partial consideration for, among other things, the Carve Out and the payments made under the Approved Budget to administer the Chapter 11 Cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against any Prepetition Agent or any Prepetition Lenders or any of the Prepetition Obligations or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Prepetition Lenders upon the Prepetition Collateral, as applicable, without the prior express written consent of the affected Prepetition Agent and/or affected Prepetition Lender, in their sole discretion. For the avoidance of doubt, consent to the Carve-Out or the approval of any budget shall not be deemed a consent under this paragraph. |
| | *Section 552(b).* Subject to the entry of the Final Order, the Prepetition Agents and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Agents, the Prepetition Lenders or the Prepetition Obligations. Accordingly, any valid, perfected and non-avoidable liens created by the Prepetition Loan Documents in |

any Prepetition Collateral shall attach with the same validity, priority, and perfection in and to any and all proceeds of such Prepetition Collateral, subject to Permitted Prior Liens (if any).

*No Marshaling/Application of Proceeds.*  In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Order.  In the event that the DIP Obligations are paid full in cash by the Loan Parties pursuant to the terms of a confirmed chapter 11 plan or from the proceeds of a sale that includes assets of the Loan Parties, if any, that were not the subject of a valid perfected lien or security interest on the Petition Date ("Unencumbered Assets"), the proceeds of such Unencumbered Assets shall be deemed applied first to the DIP Obligations until the DIP Obligations are paid in full.

*Right to Credit Bid.*  Each of the DIP Secured Parties (subject to the terms of the DIP Loan Documents) and subject to the entry of the Final Order, the Second Lien Agent (at the direction of the Ad Hoc Committee) shall have the unqualified right to "credit bid" up to  the full amount of the DIP Obligations or the Second Lien Obligations, respectively, in connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Second Lien Note Collateral, respectively, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Loan Parties under section 725 of the Bankruptcy Code.  The DIP Secured Parties have the absolute right to assign, transfer, sell or otherwise dispose of their rights to credit bid, except as may be prohibited by the DIP Loan Documents.

| | |
|---|---|
| **Governing Law, Etc.:** | The State of New York.  The Loan Parties, the DIP Agent and the DIP Lenders will waive their right to jury trial. |

<u>Annex A</u>

<u>Commitment Parties and Commitments</u>

**(Sealed)**

**Exhibit B**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ x
                                                             :
*In re:*                                                     :        **Chapter 11**
                                                             :
**AMERICAN GILSONITE**                                       :        **Case No. 16– _____ (      )**
**COMPANY,** *et al.,*                                       :
                                                             :
                    Debtors.[1]                              :        **(Joint Administration Requested)**
                                                             :
------------------------------------------------------------ x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507**
**(1) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED PRIMING**
**SUPERPRIORITY POSTPETITION FINANCING, (2) AUTHORIZING USE OF CASH**
**COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION,**
**(5) MODIFYING AUTOMATIC STAY, (6) SCHEDULING A FINAL HEARING,**
**AND (7) GRANTING RELATED RELIEF**

Upon the motion dated October 24, 2016 (the "DIP Motion"),[2] of the above-captioned

debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11

cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim

Order") and the Final Order (defined below) pursuant to sections 105, 361, 362, 363(c),

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: American Gilsonite Holding Company (2164), American Gilsonite Company (1788), DPC Products, Inc. (7329), Lexco Acquisition Corp. (9699), and Lexco Holding, LLC (9699).  The Debtors' mailing address is 16200 Park Row Drive, Suite 250, Houston, Texas 77084.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable DIP Loan Documents (as defined herein).

and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(1)    authorizing the Debtors to obtain senior secured postpetition financing on a priming, superpriority basis (the "DIP Facility"; the loans under the DIP Facility, the "DIP Loans") pursuant to the terms and conditions of this Interim Order and that certain Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement substantially in the form attached hereto as Exhibit A (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement", and together with all agreements, documents, instruments and certificates executed, delivered or filed in connection therewith, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, collectively, the "DIP Loan Documents"), by and among American Gilsonite Company ("AGC"), each of the other Debtors, as guarantors (the "Guarantors", and together with AGC, the "DIP Loan Parties"), Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), the lenders party to the DIP Credit Agreement as of the Closing Date (as defined in the DIP Credit Agreement) (the "Initial DIP Lenders") and such other lenders, if any, that become lenders under the DIP Facility in accordance with and subject to the DIP Loan Documents and this Interim Order (such lenders, together with the Initial DIP Lenders, the "DIP Lenders", and together with the DIP Agent, the "DIP Secured Parties"), providing for the borrowing of term loans in an aggregate maximum principal amount not to exceed $30,000,000, of which (i) an aggregate principal amount of $22,500,000 (which includes original issue discount ("OID") in the amount of $1,200,000, which will not be funded but which is included in the aggregate principal amount) shall be available to and shall be borrowed by the Debtors on the Closing Date, and (ii) within three (3) business days following entry of the Final Order, the remaining balance of the DIP Facility in an aggregate principal amount of $7,500,000 shall be advanced (the "Additional Borrowing");

(2)    authorizing the Debtors to execute, deliver to the DIP Secured Parties, and perform under the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Loan Documents;

(3)    authorizing and directing the Debtors to incur and pay all DIP Obligations (as defined below);

(4)    providing for the indefeasible payment in full of the First Lien Obligations (as defined below) due in respect of the First Lien Credit Agreement (as defined below), subject to the terms hereof;

(5)    granting to the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected priming liens on and security interests in all DIP Collateral (as defined below), including, without limitation, all Cash Collateral (as defined below), to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth herein;

2

(6)    granting to the DIP Secured Parties allowed superpriority administrative expense claims in respect of all DIP Obligations, as set forth herein;

(7)    authorizing the Debtors' use of the proceeds of the DIP Facility and Cash Collateral solely in accordance with the Approved Budget (as defined below), this Interim Order and the DIP Loan Documents;

(8)    providing adequate protection to the Second Lien Trustee (as defined below) and the Second Lien Noteholders (as defined below) for any Diminution in Value (as defined below) of their interests in the Prepetition Second Lien Collateral (as defined below), including Cash Collateral;

(9)    modifying or vacating the automatic stay imposed by section 362 to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, and providing for the immediate effectiveness of this Interim Order; and

(10)    scheduling a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing the relief requested in the DIP Motion on a final basis, and approving the form of notice with respect to the Final Hearing, which order shall be in form and substance and on terms satisfactory in all respects to the Required Lenders (as defined in the DIP Credit Agreement);

and the Court having considered the DIP Motion, the DIP Loan Documents on file with the Court, the Declaration of Steven A. Granda in Support of the Debtors' Chapter 11 Petitions and First Day Relief and any exhibits thereto, the Declaration of Stephen Hannan in support of the DIP Motion, the pleadings filed with the Court, and the evidence proffered or adduced at the interim hearing held on October [  ], 2016 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the

3

Debtors' businesses; and upon the record of these Chapter 11 Cases; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]

A.    *Petition Date*.  On October 24, 2016, (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "Court") commencing these Chapter 11 Cases.

B.    *Debtors-in-Possession*.  The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.    *Committee Formation*.  As of the date hereof, the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "Official Committee").

D.    *Jurisdiction and Venue*.  The Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief set forth herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.  Venue for these Chapter 11 Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] Where appropriate in this Interim Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

4

E.      *Debtors' Stipulations*.  In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange for and in recognition of the priming of the Prepetition Second Lien Note Liens (as defined below), subject to paragraph 32 hereof, the Debtors hereby admit, stipulate, acknowledge and agree that:

(i)      *First Lien Credit Facility*. Pursuant to the Credit and Guaranty Agreement, dated as of August 28, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "First Lien Credit Agreement", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including the Intercreditor Agreement (defined below) and that certain Forbearance Agreement dated as of September 30, 2016, collectively, the "First Lien Loan Documents"), among American Gilsonite Company, as borrower (the "First Lien Borrower"), the guarantors party thereto (the "First Lien Guarantors", and together with the First Lien Borrower, the "First Lien Loan Parties"), KeyBank National Association, as administrative agent and swingline lender (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), the First Lien Lenders provided a revolving credit facility (the "First Lien Credit Facility") to the First Lien Borrower.

(ii)      *First Lien Obligations*.  As of the Petition Date, without defense, counterclaim, or offset of any kind, the First Lien Loan Parties were jointly and severally indebted to the First Lien Lenders in the aggregate principal amount of $20,000,000, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the First Lien Loan Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the First Lien Loan Documents (collectively, the "First Lien Obligations").

(iii)      *First Lien Collateral*.  To secure the First Lien Obligations, the First Lien Loan Parties granted to the First Lien Agent, for the benefit of itself and the First Lien Lenders, properly perfected continuing liens, mortgages and security interests (collectively, the "Prepetition Credit Facility Liens") in all "Collateral" as defined in the First Lien Credit Agreement (collectively, the "Prepetition First Lien Collateral").

(iv)      *Second Lien Notes*.  Pursuant to the Indenture, dated as of August 28, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Second Lien Note Indenture", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including, the Second Lien Security and Pledge Agreement, dated as of August 28, 2012, and the Intercreditor Agreement

5

(as defined below), collectively, the "Second Lien Note Documents", and together with the First Lien Loan Documents, the "Prepetition Loan Documents"), among American Gilsonite Company, as issuer (the "Second Lien Note Issuer"), Wilmington Trust, National Association, as indenture trustee and collateral agent (the "Second Lien Trustee", and together with the First Lien Agent, the "Prepetition Agents"), and the guarantors party thereto (the "Second Lien Guarantors", and together with the Second Lien Note Issuer, collectively, the "Second Lien Note Parties", and together with the First Lien Loan Parties, collectively, the "Prepetition Loan Parties"), the Second Lien Issuer issued the 11.5% Senior Secured Notes due 2017 (the "Second Lien Notes"; the holders of such Second Lien Notes, the "Second Lien Noteholders", and together with the First Lien Lenders, collectively, the "Prepetition Lenders"), and the Second Lien Guarantors guaranteed the "Guaranteed Obligations" as defined in the Second Lien Note Indenture.

(v)     *Second Lien Obligations.*   As of the Petition Date, without defense, counterclaim, or offset of any kind, the Second Lien Note Parties were jointly and severally indebted to the Second Lien Trustee and the Second Lien Noteholders in the aggregate principal amount of at least $270,000,000 in Second Lien Notes, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Second Lien Note Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, including all "Obligations" as defined in the Second Lien Note Indenture (collectively, the "Second Lien Obligations", and together with the First Lien Obligations, collectively, the "Prepetition Obligations").

(vi)     *Prepetition Second Lien Collateral.*   To secure the Second Lien Obligations, the Second Lien Note Parties granted to the Second Lien Trustee, for the benefit of itself and the Second Lien Noteholders, properly perfected continuing liens, mortgages and security interests in (collectively, the "Prepetition Second Lien Note Liens", and together with the Prepetition Credit Facility Liens, the "Prepetition Liens") all "Collateral" as defined in the Second Lien Note Indenture (collectively, the "Prepetition Second Lien Collateral", and together with the Prepetition First Lien Collateral, the "Prepetition Collateral"), subject to the terms of the Intercreditor Agreement, dated as of August 28, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Intercreditor Agreement"), by and between each of the First Lien Agent and the Second Lien Trustee.

(vii)     *Validity of Prepetition Liens and Prepetition Obligations.*   Subject to the Carve-Out (defined in paragraph 30 hereof), (a) the Prepetition Liens are valid, binding, enforceable, non-avoidable and perfected liens, with priority over any and all other liens (other than liens expressly permitted to be senior to all Prepetition Liens under the First Lien Credit Agreement and the Second Lien Note Indenture, solely to the extent such permitted liens were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the

"Permitted Prior Liens")), subject to the terms of the Intercreditor Agreement; (b) the First Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the First Lien Loan Parties, enforceable in accordance with the terms of the First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (c) the Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Second Lien Note Parties, enforceable in accordance with the terms of the Second Lien Note Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (d) the Debtors and their estates hold no (and hereby waive, discharge and release any) valid or enforceable claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind, and waive, discharge and release any right they may have to (A) challenge the validity, enforceability, priority, security and perfection of any of the Prepetition Obligations, the Prepetition Loan Documents or the Prepetition Liens, respectively, and (B) assert any and all claims (as defined in the Bankruptcy Code) or causes of action against the Prepetition Agents or the Prepetition Lenders, and each of their respective officers, directors, equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultant, agents, and other representatives (collectively, the "Released Parties"), whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, in each case, arising out of, based upon or related to the Prepetition Loan Documents, the Prepetition Liens or the Prepetition Obligations, as applicable.

(viii)    *Cash Collateral.*  All of the Debtors' cash, whether existing on the Petition Date or thereafter, wherever located, including, without limitation, any cash in deposit accounts of the Debtors or otherwise, constitutes cash collateral of the Prepetition Agents and the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(ix)    *Default.*  The Prepetition Loan Parties are in default of certain terms and provisions of the Prepetition Loan Documents as of the Petition Date.

F.    *Findings Regarding Postpetition Financing.*

(i)    *Request for Postpetition Financing.*  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, and (b) use Cash Collateral on the terms described herein and in the DIP Loan Documents to administer the Chapter 11 Cases and fund the operation of their businesses.  At the Final Hearing, the Debtors will seek final approval of the DIP Loan Documents and the proposed postpetition financing arrangements and use of Cash Collateral arrangements pursuant to the

7

Final Order, and notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.  Good cause has been shown for the entry of this Interim Order.

(ii)     *Priming of Prepetition Second Lien Note Liens.*   The priming of the Prepetition Second Lien Note Liens on the Prepetition Second Lien Collateral under section 364(d)(1) of the Bankruptcy Code, as contemplated by this Interim Order and the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and, among other benefits, to continue to operate their businesses for the benefit of their estates and stakeholders.  The Second Lien Trustee and the Second Lien Noteholders are entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Second Lien Collateral (including Cash Collateral) resulting from, *inter alia*, (a) the use, sale or lease by the Debtors (or other decline in value) of the Prepetition Second Lien Collateral (including Cash Collateral), (b) the imposition of the Carve-Out (defined below) and the DIP Liens (as defined below) and the priming of the Prepetition Second Lien Note Liens, and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Diminution in Value"), as and to the extent set forth herein.  The Second Lien Trustee, on behalf of the Second Lien Noteholders, consents to the priming of the Prepetition Second Lien Notes Liens and has no objection to the adequate protection thereof as provided in this Interim Order.

(iii)     *Need for Postpetition Financing and Use of Cash Collateral.*     The Debtors' need to use Cash Collateral on an interim basis and to obtain credit pursuant to the DIP Facility as provided for herein on an interim basis is urgent and necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their

8

estates.  The ability of the Debtors to maintain business relationships with their vendors, suppliers and customers, pay their employees and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  Without the ability to access the Interim Financing (as defined below) under the DIP Facility and the authority to use Cash Collateral, the Debtors, their estates and their creditors would suffer immediate and irreparable harm, and the Debtors' chances for a successful exit and reorganization from the Chapter 11 Cases would be jeopardized.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *No Credit on More Favorable Terms.*    Given their current financial condition, financing arrangements and capital structure, and the present state of the industry within which the Debtors operate, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents.  The Debtors have been unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain sufficient credit (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Postpetition financing is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders:  (1) perfected priming security interests in and liens on (each as provided herein) all of the Debtors' prepetition and post-petition assets with the

9

priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in this Interim Order. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and is in the best interests of all of their stakeholders.

(v)     *Use of Proceeds of the DIP Facility.* As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and the authorization to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), the DIP Agent and the DIP Lenders require, and the Debtors have agreed, that Cash Collateral and the proceeds of the DIP Facility shall be used solely: (a) to provide working capital for the Debtors during the Chapter 11 Cases in the ordinary course of business, (b) for the payment of prepetition amounts as authorized by the Court pursuant to orders approving the first day motions filed by the Debtors that are in form and substance reasonably acceptable to the Required Lenders, (c) to pay costs and expenses of administration of the Chapter 11 Cases, (d) to indefeasibly pay in full the First Lien Obligations, (e) to pay fees and expenses related to the DIP Facility, including, without limitation, as set forth in that certain Commitment Letter, dated October 19, 2016 from the DIP Lenders or their affiliates to American Gilsonite Company (the "DIP Commitment Letter") and that certain fee letter, dated as of October [  ], 2016, between the Debtors and the DIP Agent (the "Agent Fee Letter"), (f) to make the adequate protection payments provided for in this Interim Order, and (g) for general corporate purposes, in each case, solely in accordance with the Approved Budget (defined below), this Interim Order and the DIP Loan Documents.

G.      *Adequate Protection.* The Second Lien Trustee and the Second Lien Noteholders are each entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive adequate protection against Diminution in Value of their respective interests in the Prepetition

10

Second Lien Collateral, including, among other things, adequate protection liens and claims, the payment of the reasonable and documented fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses, of the Second Lien Trustee and the Ad Hoc Committee (as defined below), compliance with the Approved Budget (as defined below), subject to Permitted Variances (as defined below), Budget and Variance Reporting (as defined below) and certain other forms of adequate protection, as set forth in more detail herein.

H.    _New Loan_.  The DIP Facility (including the Interim Financing) constitutes new loans and financial accommodations from the DIP Lenders to the Debtors, separate and distinct from the loans and financial accommodations provided prior to the Petition Date under the Prepetition Loan Documents, and the proceeds of the DIP Facility may only be borrowed, and such proceeds and the use of Cash Collateral may only be used, in compliance with this Interim Order and the DIP Loan Documents.

I.    [Reserved]

J.    _Sections 506(c) and 552(b)_.  As a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out (as defined below), and (b) the Prepetition Agents' and the Prepetition Lenders' agreement to (i) subordinate their Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens (defined below) to the DIP Liens and the Carve-Out, and (ii) consent to the use of Cash Collateral in accordance with and subject to the Approved Budget (as defined below) and the terms of this Interim Order, the Debtors will seek entry of a Final Order that provides that each of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders are entitled to receive (1) a waiver of any "equities of the case" exceptions or claims under section

11

552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the DIP Agent and the DIP Lenders that section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to section 364 of the Bankruptcy Code).

K.   *Good Faith of the DIP Agent and the DIP Lenders*.

(i)   *Willingness to Provide Financing.*   The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to:  (a) the entry by the Court of this Interim Order and the Final Order; (b) approval by the Court of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by the Court that such financing is essential to the Debtors' estates, that the DIP Lenders are extending postpetition credit to the Debtors pursuant to the DIP Loan Documents and this Interim Order in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)   *Business Judgment and Good Faith Pursuant to Section 364(e).*   The terms and conditions of the DIP Facility, including the extension of credit, the fees paid and to be paid thereunder, and the Cash Collateral arrangements described therein and herein:  (a) are fair and reasonable; (b) are the best available to the Debtors under the circumstances; (c) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (d) are supported by reasonably equivalent value and fair consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP

12

Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders.  The credit to be extended under the DIP Facility shall be deemed to have been so advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

L.    _Notice_.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties-in-interest, including:  (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of their twenty (20) largest unsecured creditors; (v) Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the Ad Hoc Committee (defined below) and the Initial DIP Lenders; (vi) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (vii) all financial institutions at which the Debtors maintain deposit accounts; (viii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

M.    _Immediate Entry_.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  The Court concludes that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors.

13

Based upon the foregoing findings and conclusions, the DIP Motion and the record made before the Court with respect to the DIP Motion at the Interim Hearing and otherwise, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, THAT:

1.     <u>DIP Motion Approved</u>.  The DIP Motion is hereby granted on an interim basis in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  All objections to the interim relief sought in the DIP Motion to the extent not withdrawn or resolved are hereby overruled on the merits.

2.     <u>Authorization of the DIP Facility</u>.

(a)     The DIP Facility is hereby approved.  The Debtors are hereby expressly and immediately authorized to establish the DIP Facility, to execute, deliver and perform under the DIP Loan Documents, and to borrow, incur, guarantee (as applicable), perform and pay the DIP Obligations (as defined below), in each case, in accordance with and subject to the terms of this Interim Order, the Approved Budget (as defined below) and the DIP Loan Documents, and to execute, deliver and perform under any and all other instruments, certificates, agreements and documents which may be requested by the DIP Agent or the Initial DIP Lenders or which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Facility or the DIP Loan Documents, the creation and perfection of the DIP Liens (as defined below) or to implement any of the transactions contemplated by the DIP Loan Documents.  The Debtors are hereby authorized to pay, in accordance with this Interim Order, all DIP Obligations (including, without limitation, the Backstop Payment and amounts provided in the Agent Fee Letter), which amounts are hereby approved, shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect.  Upon execution and

14

delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates, and the DIP Obligations shall be due and payable, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(b)      For purposes hereof, the term "DIP Obligations" means all "Obligations" as defined in the DIP Credit Agreement, and shall include, without limitation, principal, interest, fees, the Backstop Payment, fees and other amounts under the Agent Fee Letter, costs, expenses, charges, any obligations in respect of indemnity claims, whether contingent or absolute, due under the DIP Loan Documents and any other amounts that are or may become due under the DIP Loan Documents.

(c)      The Interim Financing (defined below) shall be funded by the DIP Lenders net of OID equal to $1,200,000, which OID shall be allocated *pro rata* among the DIP Lenders based on their respective Commitments.  The full principal amount of the Interim Financing (after adding back such OID) shall be deemed the aggregate principal amount of such DIP Loans and shall be deemed outstanding on and after the Closing Date, and the DIP Loan Parties shall be obligated to repay 100% of the principal amount of such DIP Loans as provided hereunder and the DIP Loan Documents.

3.      <u>Authorization of the Interim Financing</u>.  To prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby immediately authorized to borrow under the DIP Facility up to an aggregate principal amount of $22,500,000 (the "<u>Interim Financing</u>"), subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

4.      <u>DIP Obligations</u>.  The DIP Loan Documents shall evidence the DIP Obligations, which DIP Obligations, shall upon execution of the DIP Loan Documents, be valid, binding and

15

enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases (collectively, the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.  No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents (including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counter-claim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

    5.    DIP Liens.

    (a)    As security for the DIP Obligations, immediately upon, and effective as of, entry of this Interim Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "DIP Liens") all DIP Collateral (as defined below) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise of the DIP Obligations). The term "DIP Collateral" means all assets and properties (real and personal) of the Debtors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors

16

(including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation:  (i) all Prepetition Collateral; (ii) all cash and cash equivalents; (ii) all funds in any deposit account, securities account or other account of the Debtors and all cash and other property deposited therein or credited thereto from time to time; (iii) all accounts and other receivables; (iv) all contract rights; (v) all instruments, documents and chattel paper; (vi) all securities (whether or not marketable); (vii) all goods, as-extracted collateral, equipment, inventory and fixtures; (viii) all real property interests; (ix) all interests in leaseholds, (x) all franchise rights; (xi) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xii) all general intangibles; (xiii) all capital stock, limited liability company interests, partnership interests and financial assets; (xiv) all investment property; (xv) all supporting obligations; (xvi) all letters of credit issued to the Loan Parties and letter of credit rights; (xvii) all commercial tort claims; (xviii) all other claims and causes of action and the proceeds thereof (excluding, unless authorized by the Final Order, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof); (xix) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xx) to the extent not covered by the foregoing, all other assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxi) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; provided, however, that the DIP Collateral shall not include Excluded Property (as defined in the DIP Credit Agreement);

17

provided, further, however, that the DIP Collateral shall include all proceeds and products of Excluded Property.

(b)    To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order or in favor of the Prepetition Agents and the Prepetition Lenders in accordance with this Interim Order.

6.    <u>Priority of DIP Liens</u>.

(a)    To secure the DIP Obligations, immediately upon, and effective as of, entry of this Interim Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows in each case subject to the Carve-Out:

(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date;

(ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (iii) of this paragraph), subject to Permitted Prior Liens; and

18

(iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral that also constitutes Prepetition Collateral securing the Prepetition Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Agent shall be senior to the Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens (as defined below) granted hereunder, subject to liens permitted under the DIP Credit Agreement.

(b)    Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claim (as defined below):  (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code.

7.    Superpriority DIP Claim.  Subject to the Carve-Out, immediately upon, and effective as of, entry of this Interim Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "Superpriority DIP Claim"), for all of the DIP Obligations, (a) with priority over any and all administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365,

19

503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents, and (iii) the Second Lien Noteholders' Adequate Protection Claim (as defined below), and (b) which shall at all times be senior to the rights of the Debtors or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law.  The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (excluding, unless authorized by the Final Order, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any the proceeds thereof).

8.        [Reserved]

9.        No Obligation to Extend Credit.  The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance under the DIP Loan Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the Required Lenders (as defined in the DIP Credit Agreement).

10.       Use of DIP Facility Proceeds; Controlled Account.

(a)        *Use of DIP Facility Proceeds and Cash Collateral*.  From and after the Closing Date, the proceeds of the DIP Facility and Cash Collateral shall be only for the following purposes, in each case, solely in accordance with and subject to this Interim Order and the Approved Budget (as defined below) subject to Permitted Variances (as defined below):  (a) to

20

provide working capital for the Debtors during the Chapter 11 cases in the ordinary course of business, (b) for the payment of prepetition amounts as authorized by the Court pursuant to orders approving motions filed by the Debtors that are in form and substance reasonably acceptable to the Required Lenders, (c) to pay costs and expenses of administration of the Chapter 11 Cases, (d) to indefeasibly pay in full the First Lien Obligations, (e) to pay fees and expenses related to the DIP Facility, including, without limitation, as set forth in the DIP Commitment Letter and the Agent Fee Letter, (f) to make the adequate protection payments provided for in this Interim Order, and (g) for general corporate purposes.

(b)      *Payoff of First Lien Obligations and Automatic Termination of Prepetition Credit Facility Liens*.  Immediately upon, and effective as of, entry of this Interim Order, the Debtors are hereby authorized to draw on the DIP Facility to pay in full the First Lien Obligations (including, without limitation, accrued and unpaid interest (at the default rate), fees, expenses, legal fees, disbursements and other amounts properly chargeable thereunder).  The repayment of the First Lien Obligations provided for herein shall be subject to the reservation of rights of parties-in-interest set forth in paragraph 32 hereof.  The Prepetition Credit Facility Liens on the Prepetition First Lien Collateral shall automatically and irrevocably terminate, and all First Lien Obligations shall be deemed indefeasibly paid in full and irrevocably released and discharged, only upon the date (the "Discharge Date") that is the first day after the expiration of the Challenge Period without a timely Challenge (as defined below) having been brought, or upon the final resolution of any and all Challenges brought in compliance with the provisions of this Interim Order and applicable law (where such Challenge did not have the effect of successfully impairing any of the First Lien Obligations).  On the Discharge Date, the First Lien Agent shall be deemed to have transferred and assigned possession and control of any Controlled Shared

21

Collateral (as defined in the Intercreditor Agreement) to the Second Lien Trustee. Within five (5) business days after the Discharge Date, the First Lien Agent shall execute and deliver any necessary endorsements or other documents required to effectuate such transfer and assignment to the Second Lien Trustee. To the extent necessary to maintain the perfection of the Second Lien Notes Liens, the First Lien Agent's status as bailee for the Second Lien Trustee with respect to the Controlled Shared Collateral shall continue until such Controlled Shared Collateral is actually assigned and transferred in accordance with this paragraph 10(b) hereof.

(c)    *Adequate Protection of Contingent First Lien Obligations*. Until the Discharge Date, and as adequate protection against the post-petition diminution in value of any contingent obligations that may be owed to the First Lien Agent or the First Lien Lenders, the Debtors shall establish an account (the "Credit Facility Reimbursement Account") into which the sum of $50,000 shall be deposited as collateral security for any documented reimbursement or indemnity obligations that the Debtors may have to the First Lien Agent and the First Lien Lenders under the terms of the First Lien Loan Documents as to which a claim or demand for payment is made in writing (upon five (5) business days' notice to the Debtors, the DIP Agent and the DIP Lenders) prior to the Discharge Date. The First Lien Agent (for itself and the First Lien Lenders) shall have a first-priority lien (the "Credit Facility Reimbursement Account Liens") on the Credit Facility Reimbursement Account and all amounts held therein. Upon the Discharge Date, the Credit Facility Reimbursement Account Liens shall automatically terminate and cease to exist, and all remaining amounts held in the Credit Facility Reimbursement Account or credited thereto, after reserve for or satisfaction of any reimbursement obligations as to which a claim or demand was made prior to the Discharge Date and are due and payable, shall be

22

released to the Debtors by wire transfer, in immediately available funds, as soon as possible, in any event no later than the date that is five (5) business days after the Discharge Date.

(d)    As a condition to the funding of the Additional Borrowing, on or prior to such funding date, the Debtors shall provide the DIP Agent with a fully executed deposit account control agreement, in form and substance acceptable to the Required Lenders, with respect to its operating accounts which establishes "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the DIP Agent for the benefit of the DIP Lenders (the "Controlled Accounts").  Withdrawals from the Controlled Accounts, as applicable shall only be used for the permitted purposes permitted hereunder and the under the DIP Loan Documents.

## Authorization to Use Cash Collateral and Adequate Protection

11.    Authorization to Use Cash Collateral.  The Debtors are authorized to use Cash Collateral in accordance with the Approved Budget and subject to the terms and conditions of the DIP Loan Documents and this Interim Order.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order and the DIP Loan Documents and in accordance with the Approved Budget (as defined below).  The Prepetition Liens in the Prepetition Collateral shall continue to attach to the Cash Collateral irrespective of the commingling of the Cash Collateral with other cash of the Debtors (if any).  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in respect of any Cash Collateral shall not be used as a basis to

23

challenge the Prepetition Obligations, or the extent, validity, enforceability or perfected status of the Prepetition Liens.

12.    <u>Adequate Protection</u>.    In consideration for the Debtors' use of the Prepetition Collateral (including Cash Collateral), and to protect the Second Lien Trustee and the Second Lien Noteholders against the Diminution in Value of their interests in the Prepetition Second Lien Collateral, the Second Lien Trustee and the Second Lien Noteholders shall receive, solely to the extent of any such Diminution in Value, the following adequate protection:

(a)    *Second Lien Noteholder Adequate Protection Liens*.    Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Second Lien Trustee and the Second Lien Noteholders, effective as of the entry of this Interim Order, are hereby granted continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP Collateral (the "<u>Second Lien Noteholder Adequate Protection Liens</u>"), which liens will be junior only to the DIP Liens and the Carve-Out, and shall be senior in priority to all other liens, including the Prepetition Liens.    Except for the DIP Liens and the Carve-Out, the Second Lien Noteholder Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.    The Second Lien Noteholder Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.    No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy

24

Code shall be *pari passu* with or senior to the Second Lien Noteholder Adequate Protection Liens.

(b)     *Second Lien Noteholder Superpriority Claim.*  Pursuant to section 507(b) of the Bankruptcy Code, the Second Lien Trustee and the Second Lien Noteholders, effective as of the entry of this Interim Order, are hereby further granted an allowed superpriority administrative expense claim (the "Second Lien Noteholder Superpriority Claim"), which claim shall be junior to the DIP Superiority Claim and the Carve-Out, but shall be senior to and have priority over any other administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents.  The Second Lien Noteholder Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (excluding, unless authorized by the Final Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof).  Except for the DIP Superiority Claim and the Carve-Out, the Second Lien Noteholder Superpriority Claim shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any

25

Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.

13.  <u>Additional Adequate Protection</u>.  As further adequate protection for the Second Lien Trustee and the Second Lien Noteholders:

(a)  the Debtors shall pay all prepetition and postpetition reasonable and documented fees, costs and expenses incurred by (i) the Second Lien Trustee (including all reasonable and documented fees and expenses of Pryor Cashman LLP and one local counsel), and (ii) the members of the ad hoc committee of certain Second Lien Noteholders (the "<u>Ad Hoc Committee</u>") and the fees, costs and expenses of their respective legal and financial advisors (but no more than: (A) Stroock, (B) Houlihan Lokey Capital, Inc. ("<u>Houlihan</u>"), pursuant to that certain letter of engagement dated as of June 22, 2016, by and among Stroock, Houlihan and the Debtors, (C)  Young Conaway Stargatt & Taylor, LLP, as Delaware counsel, (D) Parsons Behle & Latimer ("<u>Parsons</u>") and (E) such other consultants or other professionals as may be retained by the Ad Hoc Committee with the consent of the Debtors, such consent not to be unreasonably withheld, delayed, or conditioned), in each case, without duplication of the DIP Lenders' advisor fees as provided in paragraph 27 of this Interim Order (collectively, the "<u>Lender Professionals</u>"). The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only, and shall be provided to counsel to the Debtors, with a copy to the U.S. Trustee and counsel to any Official Committee (collectively, the "<u>Fee Notice Parties</u>").  If no objection to payment of the requested fees and expenses are made, in writing by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the

26

"Fee Objection Period"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors.  If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.

(b)    *Budget Compliance*.    The Debtors shall comply with the Approved Budget (defined below), subject to Permitted Variances (as defined below), and all Budget Variance Reporting (defined below) requirements set forth herein and in the DIP Loan Documents.

(c)    *Information; Access to Books and Records*.    The Debtors will provide to the DIP Agent and the DIP Lenders, such reports and information required to be delivered pursuant to the DIP Credit Agreement, and such other reports and information as may be reasonably requested by the DIP Agent or the DIP Lenders.    In addition, without limiting the rights of access and information afforded the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP Lenders under this Interim Order and/or the DIP Loan Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the Second Lien Trustee and Second Lien Noteholders reasonable access to the Debtors' premises and their books and records and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.    In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the Second Lien Trustee and Second Lien Noteholders (subject to execution of appropriate confidentiality agreement) all such information as may be

27

reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors.

14.    <u>Adequate Protection Reservation</u>.  The receipt by the Second Lien Trustee and the Second Lien Noteholders of the adequate protection provided pursuant to paragraphs 12 and 13 of this Interim Order shall not be deemed an admission that the interests of the Second Lien Trustee and the Second Lien Noteholders are indeed adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Second Lien Trustee and the Second Lien Noteholders to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection; <u>provided</u> that any such additional or alternative adequate protection approved by the Court shall at all times be subordinate and junior to the DIP Obligations and the DIP Liens granted under this Interim Order and the DIP Loan Documents.  Without limiting the foregoing, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate for any Diminution in Value during any of the Chapter 11 Cases subject to the Carve-Out.

15.    <u>Amendments</u>.  The Debtors, the DIP Agent and the DIP Lenders are hereby authorized to enter into the DIP Loan Documents and implement, in accordance with the terms of the DIP Loan Documents, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents, in each case in such form as the Debtors and the Required Lenders may agree, and no further approval of the Bankruptcy Court shall be required for non-material amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any reasonable fees paid in connection therewith); <u>provided</u>, <u>however</u>, that the DIP Loan Documents shall not be amended or modified in a manner materially adverse to the

28

respective rights and protections granted herein to a Prepetition Secured Party without consent of such Prepetition Secured Party or to the Debtors; <u>provided</u>, <u>further</u>, <u>however</u>, that the Debtors shall provide notice of any amendment, waiver, consent or other modification under the DIP Loan Documents to counsel to the Official Committee (if any) and the United States Trustee three days prior to the effective date thereof to the extent practicable.

16.    <u>Budget Covenants</u>.

(a)    *Initial Budget and Updated Budget.*  The Debtors have prepared and delivered to the DIP Agent and the Initial DIP Lenders, and the DIP Agent and Initial DIP Lenders have approved, an initial budget, a copy of which is attached hereto as <u>Exhibit A</u> (the "<u>Initial Budget</u>"), which reflects the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date.  The Initial Budget (and each subsequent Approved Budget hereunder) shall be deemed the "Approved Budget" for all purposes hereof until superseded by another Approved Budget pursuant to the provisions set forth below.

(b)    *Updated Budget.*  Commencing with Thursday, November 17, 2016, and every fourth Thursday thereafter, the Debtors shall prepare in good faith and deliver to the DIP Agent and the professionals for the Initial DIP Lenders an updated cash flow forecast for the subsequent thirteen (13) week-period, consistent with the form and level of detail of the Initial Budget and otherwise in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders) (each such updated forecast, an "<u>Updated Budget</u>"), reflecting the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the thirteen (13) calendar week period beginning on the Sunday following

29

the deadline for delivery of the applicable Updated Budget. Upon (and subject to) the approval of any such Updated Budget by the DIP Agent (at the direction of the Required Lenders), which is deemed to have been approved if the DIP Agent or Required Lenders do not provide written notice to the Debtors otherwise within ten (10) days of receipt, such Updated Budget shall constitute the then-Approved Budget for purposes hereof; provided, however, that in the event the DIP Agent or the Required Lenders provide written notice to the Debtors (including, by email) that the proposed Updated Budget is not acceptable, and the DIP Agent and the Debtors are unable to reach agreement regarding such Updated Budget, then the Approved Budget most recently in effect shall remain the Approved Budget.

(c) *Variance Reporting*. Commencing with Thursday, November 10, 2016, and every second Thursday thereafter, the Debtors shall deliver to Houlihan a variance report, in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders) (each a "Variance Report", and together with the Approved Budget requirements described herein, the "Budget and Variance Reporting"), setting forth actual cash receipts and disbursements of the Debtors for the previous two calendar weeks ended on the immediately preceding Saturday (or, in the case of the first such Variance report, for the period since the Petition Date), and setting forth all the variances, on a line-item and aggregate basis, as compared to the corresponding amounts set forth in the then-current Approved Budget for such week/period, in each case, on a bi-weekly basis and on a cumulative basis from the beginning of the period covered by the then-current Approved Budget, together with an explanation of (x) in reasonable detail, all variances from the then current Approved Budget for such week/period and (y) in the case of a Variance Report immediately following the end of any Testing Period (as defined below), the Debtors' compliance with the Permitted Variances for such Testing Period or identifying and explaining

30

in reasonable detail any non-compliance by the Debtors with the Permitted Variances for such Testing Period.

(d)     *Permitted Variances.*  At no time shall the difference between (i) the Net Cash Flow during the Testing Period ending on any Testing Date and (ii) the Net Cash Flow projected in the Approved Budget for such Testing Period ending on any Testing Date exceed 20% in an unfavorable manner.

(e)     *Approval Required for Variances.*  Variances in excess of Permitted Variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to written agreement by the Debtors and the DIP Agent (at the direction of the Required Lenders), in each case without further notice, motion or application to, order of, or hearing before, the Court.

(f)     *Defined Terms.*  The term "Testing Period" shall refer to (i) the two calendar week period ending Saturday, November 5, 2016, (ii) the four calendar week period ending Saturday, November 19, 2016, and (iii) thereafter, each rolling four calendar week period ending two weeks after the end of the preceding Testing Period.  The term "Testing Date" shall refer to the Saturday of every second week occurring after the Petition Date, beginning Saturday, November 5, 2016.  The term "Net Cash Flow" means the aggregate amount of (i) cash receipts deposited by the Debtors during the Testing Period ending on the Testing Date minus (ii) operating expenses, payroll expenses, and other expenses and capital expenditures (excluding any fees, deposits, costs, or expenses related to the Chapter 11 Cases or the DIP Loan Documents) paid in cash during the Testing Period ending on the Testing Date, which shall be reflected in the line item "Cash Flow pre Interest Payments and Restructuring Costs" in the Approved Budget.

31

17.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit:  (a) the Debtors to grant the Liens and the Superpriority DIP Claim, and to perform such acts as the DIP Agent or the Required Lenders may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to take all appropriate action to grant the Second Lien Noteholder Adequate Protection Liens and the Second Lien Noteholder Superpriority Claims set forth herein, and to take all appropriate action to ensure that the Second Lien Noteholder Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP Lenders as contemplated under this Interim Order and the DIP Loan Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents, the DIP Commitment Letter, the Agent Fee Letter and this Interim Order; (e) the DIP Secured Parties and the Prepetition Agents and the Prepetition Lenders to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) subject to paragraph 24 hereof, the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein; and (g) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of, or hearing before, this Court, subject to the terms of this Interim Order including as to the Remedies Notice Period.

RLF1 15532601v.1

18.    <u>Perfection of DIP Liens and Postpetition Liens</u>.   This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all liens granted herein, including, without limitation, the DIP Liens and the Second Lien Noteholder Adequate Protection Liens, without the necessity of executing, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Prepetition Agents, the Prepetition Lenders, the DIP Agent or the DIP Lenders to the priorities granted herein.   Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Agents, without any further consent of any party, is authorized to execute, file or record, and the DIP Agent may require the execution, filing or recording, as each, in its sole discretion deems necessary, of such financing statements, mortgages, notices of lien, and other similar documents to enable the DIP Agent and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the DIP Liens and/or Second Lien Noteholder Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been executed, filed or recorded as of the Petition Date; <u>provided</u>, <u>however</u>, that no such execution, filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Second Lien Noteholder Adequate Protection Liens.   The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent or the Prepetition Agents all such financing statements, notices, and other documents as the DIP Agent or the Prepetition Agents may reasonably request.   The DIP Agent or the

33

Prepetition Agents, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

19.    <u>Protection of DIP Lenders' Rights and Adequate Protection Liens</u>.  So long as there are any DIP Obligations outstanding, the Prepetition Agents and the Prepetition Lenders shall (a) absent the written consent of the Required Lenders, have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Interim Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan Documents or Second Lien Noteholder Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the Prepetition Loan Documents), (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (c) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the DIP Loan Documents and/or this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing, and (d) deliver or cause to be delivered, at the Debtors' costs and expense (for which the Prepetition Lenders shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in

34

favor of the DIP Agent and the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of Second Lien Noteholder Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

20.    <u>Proceeds of Subsequent Financing</u>.    Without limiting the provisions of the immediately preceding paragraph, if the Debtors, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents at any time prior to the indefeasible payment in full in cash of all of the Prepetition Obligations and the indefeasible payment in full in cash of all of the DIP Obligations, the satisfaction of the Superpriority DIP Claim, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility and this Interim Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then unless otherwise agreed by the Required Lenders, (i) all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations and (ii) after payment in full of all DIP Obligations, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Second Lien Trustee to be applied to the Second Lien Obligations.

21.    <u>Maintenance of DIP Collateral</u>.    The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents.  The Debtors shall provide the DIP Agent and its counsel (for distribution to the DIP Lenders) with evidence of such insurance within five (5) calendar days after entry of this Interim

35

Order.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.  The Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any order of the Court authorizing the continued use of the cash management system that is reasonably acceptable to the Required Lenders or as otherwise required by the DIP Loan Documents.

22.    <u>Disposition of or New Liens on DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) other than in the ordinary course of business without the prior written consent of the Required Lenders, or as otherwise provided for in the DIP Loan Documents.

23.    <u>DIP Termination Date</u>.  Each of the following shall constitute a termination event under this Interim Order (each a "<u>Termination Event</u>", and the date upon which such Termination Event occurs, the "<u>DIP Termination Date</u>"), unless waived in writing by the Required Lenders: (a) the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement; (b) the date of acceleration of the DIP Loans under the DIP Facility in accordance with the DIP Credit Agreement; and (c) the Termination Date (as defined in the DIP Credit Agreement).

24.    <u>Rights and Remedies Upon Termination Event</u>.  Any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order

36

from this Court, to the extent necessary to permit the DIP Secured Parties, to exercise the following rights and remedies upon the occurrence and during the continuance of any Termination Event and the delivery of written notice (including by e-mail) by the Required Lenders to counsel to the Debtors, counsel for any Official Committee, and the United States Trustee of the occurrence of a Termination Event:  (a) immediately terminate the Debtors' use of any Cash Collateral; (b) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts; (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, foreclosure on all or any portion of the DIP Collateral, collection of accounts receivable, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (f) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law; provided, however, that prior to the exercise of any right or remedy in clauses (a) through (f) of this paragraph (the "Default Remedies"), the DIP Agent shall be required to provide five (5) business days' written notice to counsel to the Debtors, counsel to any Official Committee and the U.S. Trustee of the DIP Agent's intent to exercise its rights and remedies (the "Remedies Notice Period").  Unless the Court orders during the Remedies Notice Period that a Termination Event has not in fact occurred, the DIP Agent and the DIP Lenders, shall be deemed to have received relief from the automatic stay and may exercise Default Remedies without further notice to, hearing of, or order from this Court, and

37

without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or

otherwise.  The Debtors and any Official Committee shall not challenge or raise any objections

to the exercise of such rights or remedies other than to challenge whether a Termination Event

has in fact occurred; provided that none of the DIP Secured Parties shall object to a request by

the Debtors for an expedited hearing before the Court.  The Debtors and the Official Committee

shall cooperate with the DIP Agent and the DIP Lenders in their exercise of rights and remedies,

whether against the DIP Collateral or otherwise and during the Remedies Notice Period, subject

to paragraph 30(b) hereof, the Debtors may use Cash Collateral only to pay the following

amounts and expenses solely in accordance with the respective Approved Budget line items:

(i) expenses that the Debtors have determined in good faith are in the ordinary course and critical

to the preservation of the Debtors and their estates; and (ii) such other amounts as have been

approved in advance in writing by the Required Lenders.

25.    Landlord Agreements; Access.  Without limiting any other rights or remedies of

the DIP Agent or the other DIP Secured Parties, or otherwise available at law or in equity, and

subject to the terms of the DIP Loan Documents, upon five (5) business days' written notice to

counsel to the Debtors and any landlord, lienholder, licensor, or other third party owner of any

leased or licensed premises or intellectual property, that a Termination Event has occurred and is

continuing, subject to applicable non-bankruptcy law, the DIP Agent, (i) may, unless otherwise

expressly provided in any separate agreement by and between the applicable landlord or licensor

and the DIP Agent or Second Lien Trustee, as applicable (the terms of which shall be reasonably

acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for

the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall

be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable

38

license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph 25 without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the DIP Agent (on behalf of the DIP Secured Parties) shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by DIP Agent calculated on a per diem basis.  Nothing herein shall require the Debtors, the DIP Agent or the other DIP Secured Parties, to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this paragraph 25.

26.    Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, reversed, amended or vacated by a subsequent order of the Court or any other court, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, reversal, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any

39

liens or claims granted to the DIP Agent and the DIP Lenders arising prior to the effective date of any such modification, reversal, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

27.    <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay, in cash and on a current basis, all reasonable and documented fees, costs, disbursements and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Interim Order.  The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only, and shall not be subject to application or allowance by the Court.  Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

28.    <u>Indemnification</u>.  The Debtors are authorized to jointly and severally indemnify and hold harmless the DIP Agent (solely in its capacity as a DIP Agent), each DIP Lender (solely in its capacity as a DIP Lender) and each other Indemnified Party (as defined in the DIP Credit Agreement) in accordance and subject to the terms and conditions set forth in the DIP Loan Documents.

29.    <u>Proofs of Claim</u>.  The DIP Agent, the DIP Lenders, the First Lien Lenders, the Second Lien Trustee and the Second Lien Noteholders shall not be required to file proofs of claim in any of the Chapter 11 Cases for any claim allowed herein.  Any proof of claim filed by the DIP Agent, the DIP Lenders, the Second Lien Trustee or the Second Lien Noteholders shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.  Any order entered by the Court in relation to the establishment of a bar date in

40

any of the Chapter 11 Cases shall not apply to the DIP Agent, the DIP Lenders, the Second Lien

Trustee or the Second Lien Noteholders.

30.    <u>Carve-Out; Payment of Estate Professionals</u>.

(a)    *Carve-Out*.  For the purposes of this Interim Order, the term "<u>Carve-Out</u>" shall

mean the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of

the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717;

(ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy

Code in an aggregate amount not to exceed $25,000; (iii) to the extent allowed by the Court at

any time, all accrued and unpaid fees and expenses incurred on or prior to the delivery of a

Carve-Out Trigger Notice (as defined below) by professionals or professional firms retained by

the Debtors or Official Committee (if any) (the "<u>Estate Professionals</u>"), pursuant to a final order

of the Court (which order has not been vacated or stayed) under sections 327, 328, 363 or

1103(a) of the Bankruptcy Code, whether allowed by the Court prior to or after delivery of a

Carve-Out Trigger Notice, including any success or transaction fees payable to Evercore Group,

LLC or FTI Consulting Inc., solely to the extent such success or transaction fee is earned and

payable pursuant to a court-approved engagement letter between the Debtors and such

professional; and (iv) all unpaid fees and expenses incurred by Estate Professionals after the date

of delivery of the Carve-Out Trigger Notice (such date, the "<u>Carve-Out Trigger Date</u>"), to the

extent allowed by the Court at any time, in an aggregate amount not to exceed $1,000,000 plus

any success or transaction fees that may become due and payable to Evercore Group, LLC or

FTI Consulting Inc., solely to the extent such success or transaction fee is earned and payable

pursuant to a court-approved engagement letter between the Debtors and such professional (the

amount set forth in this <u>clause (iv)</u> being the "<u>Post-Carve-Out Trigger Notice Cap</u>"); <u>provided</u>,

41

<u>however</u>, that nothing herein shall be construed as a consent to the allowance of any Estate Professionals' fees or expenses or impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any such Estate Professionals.  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by the Required Lenders to counsel to the Debtors, the U.S. Trustee, and lead counsel to any Official Committee appointed in these Chapter 11 Cases, which notice may be delivered following the occurrence of a Termination Event and stating that the Post-Carve-Out Trigger Notice Cap has been invoked. Any payment or reimbursement made on or after the date and time of the Carve-Out Trigger Date for fees and expenses incurred after the Carve-Out Trigger Date to an Estate Professional shall permanently reduce the Post-Carve-Out Trigger Notice Cap on a dollar-for-dollar basis.  To the extent that any payment to an Estate Professional is subsequently disallowed and/or disgorged, the proceeds of any claim against the Estate Professional for amounts so disallowed or disgorged shall constitute DIP Collateral and as such, shall be subject to DIP Liens and DIP Superpriority Claims hereunder.

(b)     Upon the receipt of the Carve-Out Trigger Notice, the Debtors shall provide immediate notice to all Estate Professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve-Out, and the Debtors shall be required to transfer into a segregated account (the "<u>Carve-Out Account</u>") not subject to the control of the DIP Agent or the Prepetition Agents an amount equal to the Post-Carve-Out Trigger Notice Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described above in clause 30(a)(iii), in each case, as determined by a good faith estimate of the applicable Estate Professional. The proceeds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from

42

the Carve-Out, and the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall only have a security interest in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve-Out. For the avoidance of doubt and notwithstanding anything to the contrary or in the DIP Loan Documents, the Carve Out shall be senior to all liens securing the DIP Obligations, the Second Lien Noteholder Adequate Protection Liens, the Second Lien Noteholder Superpriority Claim, and any and all other forms of adequate protection, liens or claims granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders hereunder.

(c)    None of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases under any chapter of the Bankruptcy Code.

31.    <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the Carve-Out</u>.  No DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Debtors, any Official Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):  (a) to prevent, hinder, or delay the DIP Agent's, the DIP Lenders', the Prepetition Agents' or the Prepetition Lenders' enforcement or realization upon any of the DIP Collateral once a Termination Event occurs (other than with respect to rights otherwise granted herein with respect to the Remedies Notice Period); (b) to use or seek to use Cash Collateral other than as

43

provided pursuant to this Interim Order or the Final Order or, except to the extent expressly permitted by the terms of the DIP Loan Documents, selling or otherwise disposing of DIP Collateral, in each case, without the consent of the Required Lenders; (c) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claim; or (d) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Released Parties with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Superpriority DIP Claim, the DIP Liens, the DIP Loan Documents, the First Lien Loan Documents, the First Lien Obligations, the Second Lien Note Documents or the Second Lien Obligations, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the First Lien Obligations or the Second Lien Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents, the First Lien Agent or the First Lien Lenders under any of the First Lien Loan Documents or the Second Lien Trustee or the Second Lien Noteholders under any of the Second Lien Note Documents (in each case, including, without limitation, claims, proceedings or actions that might

44

prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and this Interim Order and/or the Final Order (as applicable)), (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) has occurred; provided, however, that no more than $50,000 in the aggregate of the DIP Collateral, the Carve-Out, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by any Official Committee to investigate claims and/or liens of the First Lien Agent and the First Lien Lenders under the First Lien Loan Documents and the Second Lien Trustee and the Second Lien Noteholders under the Second Lien Note Documents.

32.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)    Subject to paragraph 32(b) hereof, each stipulation, admission, and agreement contained in this Interim Order including, without limitation, the Debtors' stipulations, shall be binding upon the applicable Debtors, their estates and any successor thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.

(b)    Nothing in this Interim Order shall prejudice the rights of any Official Committee or any other party in interest, if granted requisite standing by the Court within the Challenge Period (as defined below), to seek, solely in accordance with the provisions of this paragraph 32(b), to assert claims against the Released Parties (or their successors or assigns), on behalf of the Debtors or the Debtors' creditors or to otherwise challenge the Debtors' stipulations, including, but not limited to those in relation to (i) the validity, extent, priority, or perfection of

45

the mortgages, security interests, and Prepetition Liens of the Prepetition Agents or any

Prepetition Lenders (or their successors or assigns), (ii) the validity, allowability, priority, or

amount of the Prepetition Obligations, or (iii) any liability of either the Prepetition Agents and/or

any Prepetition Lenders (or their successors or assigns) with respect to anything arising from the

Prepetition Loan Documents.   Any Official Committee or any other party in interest must, after

obtaining requisite standing approved by the Court, commence a contested matter or adversary

proceeding raising such claim, objection, or challenge, including, without limitation, any claim

or cause of action against the Released Parties (each, a "<u>Challenge</u>") the earlier of (1) (A) with

respect to any Official Committee, the date that is thirty (30) days after the Official Committee's

formation, or (B) with respect to other parties in interest, no later than the date that is forty-

five (45) days after the entry of this Interim Order and (2) five (5) days before the hearing to

consideration confirmation of the Debtors' proposed prepackaged chapter 11 plan (such time

period shall be referred to as the "<u>Challenge Period</u>").   The Challenge Period may only be

extended with the written consent of the Second Lien Trustee at the direction of the Requisite

Noteholders (and, if the Challenge applies to the First Lien Obligations or the Credit Facility

Liens, with the additional written consent of the First Lien Agent) or by further order of the

Court for good cause shown, in each case prior to the expiration of the Challenge Period.   Only

those parties in interest who properly commence a Challenge within the Challenge Period may

prosecute such Challenge.   As to (x) any parties in interest, including any Official Committee,

who fail to file a Challenge within the Challenge Period, or if any such Challenge is filed and

overruled, or (y) any and all matters that are not expressly the subject of a timely Challenge:

(1) any and all such Challenges by any party (including, without limitation, any Official

Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in

46

the Chapter 11 Cases, or any chapter 7 trustee, any examiner or any other estate representative appointed in any Successor Cases), shall be deemed to be forever waived and barred, (2) all of the findings, Debtors' stipulations, waivers, releases, affirmations and other stipulations hereunder as to the priority, extent, allowability, validity and perfection as to the Prepetition Liens, the Prepetition Obligations or the Prepetition Loan Documents shall be of full force and effect and forever binding upon the applicable Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases, and (3) any and all claims or causes of action against the Prepetition Agents or the Prepetition Lenders shall be released by the Debtors' estates, all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases.

(c)    Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Official Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

33.    No Third Party Rights.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

34.    Section 506(c).    Subject to the entry of the Final Order, in partial consideration for, among other things, the Carve Out and the payments made under the Approved Budget to administer the Chapter 11 Cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, the Prepetition Agents, the DIP Lenders or the Prepetition Lenders, any of the DIP Obligations or Prepetition Obligations, or any of the DIP Collateral or

47

the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lenders upon the DIP Collateral or Prepetition Lenders upon the Prepetition Collateral, as applicable, without the prior express written consent of the affected DIP Agent, Prepetition Agent and/or affected DIP Lender or Prepetition Lender, in their sole discretion.  For the avoidance of doubt, consent to the Carve-Out or the approval of any budget hereunder shall not be deemed a consent under this paragraph.

35.   Section 552(b).  Subject to the entry of the Final Order, the Prepetition Agents and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Agents, the Prepetition Lenders or the Prepetition Obligations.  Accordingly, any valid, perfected and non-avoidable liens created by the Prepetition Loan Documents in any Prepetition Collateral shall attach with the same validity, priority, and perfection in and to any and all proceeds of such Prepetition Collateral, subject to Permitted Prior Liens (if any).

36.   No Marshaling/Application of Proceeds.  In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order.  In the event that the DIP Obligations are paid full in cash by the Debtors pursuant to the terms of a confirmed chapter 11 plan or from the proceeds of a sale that includes assets of the Debtors, if any, that were not the subject of a valid perfected lien or security interest on the

48

Petition Date ("<u>Unencumbered Assets</u>"), the proceeds of such Unencumbered Assets shall be deemed applied first to the DIP Obligations until the DIP Obligations are paid in full.

37.    <u>Right to Credit Bid</u>.  Each of the DIP Secured Parties (subject to the terms of the DIP Loan Documents) and subject to the entry of the Final Order, the Second Lien Trustee (at the direction of the Requisite Noteholders) shall have the unqualified right to "credit bid" up to the full amount of the DIP Obligations or the Second Lien Obligations, respectively, in connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Second Lien Note Collateral, respectively, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  The DIP Secured Parties have the absolute right to assign, transfer, sell or otherwise dispose of their rights to credit bid, except as may be prohibited by the DIP Loan Documents.

38.    <u>Discharge Waiver/Release</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Agent and the DIP Lenders has otherwise agreed, including as provided in an Acceptable Plan (as defined in the DIP Credit Agreement).

49

None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash within a commercially reasonable period of time, in no event later effective date of such plan of reorganization or sale, without the consent of the Required Lenders.

      39.  <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders under the DIP Loan Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order.

50

40.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

41.    <u>No Waiver by Failure to Seek Relief</u>.  The failure, at any time or times hereafter, of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders, to require strict performance by the Debtors of any provision of this Interim Order shall not waive, affect or diminish any right of such parties thereafter to demand strict compliance and performance therewith.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended or waived unless such amendment, modification, suspension or waiver is in writing and signed by the party against whom such amendment, modification, suspension or waiver is sought.  No consents required hereunder by any of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders shall be implied by any inaction or acquiesce by any of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders.

42.    <u>Binding Effect of this Interim Order</u>.  Immediately upon, and effective as of, entry by the Court, this Interim Order shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, and it shall become valid and binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, any and all other creditors of the Debtors, any Official Committee or other committee appointed in the Chapter 11 Cases, any and all other parties in interest and their

51

respective successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases, or upon dismissal of any of the Chapter 11 Cases.  Further, upon entry of this Interim Order, the Debtors' stipulations contained herein shall be binding on the Debtors, and the DIP Obligations shall constitute allowed claims for all purposes in each of the Chapter 11 Cases.

43.    <u>No Modification to Interim Order</u>.  Until and unless the DIP Obligations and the Prepetition Obligations evidenced by the Prepetition Credit Facility Documents have been indefeasibly paid in full in cash (or the Required Lenders otherwise agree in writing), the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:   (a) without the prior written consent of the DIP Agent (at the direction of the Required Lenders), (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP Superpriority Claim, other than the Carve Out; (b) without the prior written consent of the Required Lenders, any order authorizing the use of Cash Collateral resulting from the DIP Collateral or the Prepetition Collateral that is inconsistent with this Interim Order; (c) without the prior written consent of the Required Lenders, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Loan Documents or this Interim Order; or (d) without the prior written consent of the Requisite Noteholders or the DIP Agent (at the direction of the Required Lenders), any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Second Lien Note Liens or the Second Lien Noteholder Adequate

52

Protection Liens other than the DIP Obligations or as specifically provided in this Interim Order. The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the Required Lenders and the Requisite Noteholders.

44.    <u>Order Controls</u>.    In the event of any inconsistency between the terms and conditions of the DIP Loan Documents, any other document or any other order of the Court and of this Interim Order, the provisions of this Interim Order shall govern and control.

45.    <u>Limits on Lender Liability</u>.    Nothing in this Interim Order or in any of the DIP Loan Documents, the Prepetition Loan Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders of any liability for any claims arising from any and all activities by the Debtors in the operation of their businesses in connection with the Debtors' postpetition restructuring efforts.

46.    <u>Survival</u>.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases, (b) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of the Chapter 11 Cases, or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases.    The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of the Chapter 11 Cases, following dismissal of any of the Chapter 11 Cases, or any Successor Cases,

53

and shall maintain their priority as provided by this Interim Order.  The DIP Protections (defined below), as well as the terms and provisions concerning the indemnification of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, shall continue in any of the Chapter 11 Cases following dismissal of any of the Chapter 11 Cases, termination of the provisions of this Interim Order, and/or the indefeasible payment in full of the DIP Obligations.

47.    <u>Dismissal</u>.  If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) the rights, privileges, benefits and protections afforded herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claim (collectively, the "<u>DIP Protections</u>"), shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations have been paid in full, the Second Lien Obligations have been paid in full (and that all DIP Protections and the Prepetition Secured Parties' Adequate Protection shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' Adequate Protection.

48.    <u>Entry of this Interim Order/Waiver of Applicable Stay</u>.  The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of the Court maintained in regard to the Chapter 11 Cases.  This Interim Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3).

49.    <u>Notice of Entry of this Interim Order</u>.  The Debtors' counsel shall serve a copy of this Interim Order or a suitable notice respecting same on all of the following parties:  (a) the

54

U.S. Trustee; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the parties included on the Debtors' consolidated list of their twenty (20) largest unsecured creditors; (e) Stroock, as counsel to the Ad Hoc Committee and the DIP Lenders; (f) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (g) all financial institutions at which the Debtors maintain deposit accounts; (h) all counterparties to leases or licenses with the Debtors, and (i) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.

50.    <u>Final Hearing</u>.    The Final Hearing shall take place on [__], 2016 at [_____] [a.m./p.m.], and parties shall have until [__], 2016 at [_____] [a.m./p.m.] to file an objection if necessary and serve such objection on proposed counsel for the Debtors, (a) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Matthew S. Barr, Esq. and Sunny Singh, Esq.) and (b) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn:  Mark D. Collins, Esq. and John H. Knight, Esq.) and (ii) attorneys for the Consenting Second Lien Noteholders:   (a) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038 (Attn:  Kristopher M. Hansen and Erez E. Gilad) and (b) Young Conaway Stargatt & Taylor LLP, 1000 N. King Street, Rodney Square, Wilmington, Delaware 19801 (Attn:  Matthew B. Lunn).  Any objections by creditors or any other party-in-interest to the DIP Motion or any of the provisions of this Interim Order shall be deemed waived unless filed and received in accordance with the foregoing on or before the close of business on such date.  In the event the Court modifies any of the provisions of this Interim Order or other documents following the Final Hearing, such modifications shall not affect the rights and priorities of the DIP Agent and the DIP Lenders pursuant to this Interim Order with respect to the DIP Collateral and any portion of the DIP Facility that arises, or is

55

incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically modified pursuant to the Final Hearing.

51.    <u>Effect of this Interim Order</u>.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

52.    <u>Retention of Jurisdiction</u>.    The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

Dated: _____, 2016
       Wilmington, Delaware

 

_____
UNITED STATES BANKRUPTCY JUDGE

56

**<u>Exhibit A</u>**

Budget

**American Gilsonite Company**

**Initial 13 Week DIP Budget**

| | | | | | | 13 Week Cash Forecast | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Beginning: | 10/24 | 10/31 | 11/7 | 11/14 | 11/21 | 11/28 | 12/5 | 12/12 | 12/19 | 12/26 | 1/2 | 1/9 | 1/16 | Total |
| Collections, net of CR&A | $458 | $491 | $491 | $491 | $491 | $891 | $614 | $614 | $614 | $614 | $646 | $646 | $646 | $7,707 |
| OpEx / Payroll / CapEx / Other | (659) | (102) | (361) | (748) | (2,540) | (212) | (415) | (428) | (390) | (426) | (297) | (450) | (557) | (7,587) |
| **Cash Flow pre Interest Payments & Restructuring Costs** | **($201)** | **$390** | **$130** | **($257)** | **($2,049)** | **$679** | **$199** | **$186** | **$223** | **$188** | **$349** | **$196** | **$89** | **$121** |
| Restructuring Costs | (37) | (44) | - | - | (125) | (361) | (45) | - | (1,125) | (3,486) | - | - | - | (5,223) |
| **Cash Flow Before Interest Payments** | **($238)** | **$346** | **$130** | **($257)** | **($2,174)** | **$318** | **$154** | **$186** | **($902)** | **($3,298)** | **$349** | **$196** | **$89** | **($5,102)** |
| Total Interest Payments | 26 | (31) | - | - | - | 7,306 | - | - | - | (550) | - | - | - | 6,751 |
| **Net Cash Flow for Period** | **($213)** | **$314** | **$130** | **($257)** | **($2,174)** | **$7,624** | **$154** | **$186** | **($902)** | **($3,848)** | **$349** | **$196** | **$89** | **$1,649** |
| | | | | | | | | | | | | | | |
| Beginning Cash | 8,762 | 8,549 | 8,864 | 8,994 | 8,737 | 6,563 | 14,187 | 14,341 | 14,527 | 13,625 | 9,777 | 10,126 | 10,322 | 8,762 |
| **Ending Cash** | **$8,549** | **$8,864** | **$8,994** | **$8,737** | **$6,563** | **$14,187** | **$14,341** | **$14,527** | **$13,625** | **$9,777** | **$10,126** | **$10,322** | **$10,411** | **$10,411** |
| | | | | | | | | | | | | | | |
| *Check* | - | - | - | - | - | - | - | - | - | - | - | - | - | |